the publication of material by one without a privilege to do so which ridicules or treats the plaintiff with contempt." Draghetti v. Chmielewski, 416 Mass. 808, 812 (1994). Whether the statement is reasonably susceptible of a defamatory meaning is a question of law for the Court. Foley v. Lowell Sun Pub. Co., 404 Mass. 9, 11 (1989). The test is whether, under the circumstances, the statement discredits Plaintiff in the minds of any considerable and respectable segment of the community. Draghetti, 416 Mass. at 811; Smith v. Suburban Restaurants, Inc., 374 Mass. 528, 529-30 (1978). This interpretation "requires that the court examine the statement in its totality in the context in which it was published." Id. quoting Myers v. Boston Magazine Co., 380 Mass. 336, 341-42 (1980). "The court must consider all the words used, not merely a particular phrase or sentence" and further "must consider the medium by the which the statement [was] disseminated and the audience to which it [was] published." Myers, 380 Mass. at 341-42. It should be noted that matters of opinion are not actionable unless they are both derogatory and based on undisclosed facts. See Dulgarian v. Stone, 420 Mass. 843, 850 (1995); Myers, 380 Mass. at 339. An expression of opinion based on disclosed or assumed non-defamatory facts is not a viable basis for an action of defamation, no matter how unreasonable or derogatory it may be. See id.

With the exception of the written communications detailed in the Complaint, Plaintiff has not identified the statements that were supposedly uttered by Abbott and/or Sawicki, or the person(s) to whom they allegedly made them.[10] As for the documents generated by Abbott

---

[10] While it is true that Plaintiff alleges generally that Abbott engaged in a pattern and practice of retaliation which consisted of various acts including, "falsely alleging, for example, that Plaintiff has a mental disorder, feigned a serious work-related injury, and is professionally incompetent," he contends that Abbott did so "either directly or indirectly" through others. Complaint at ¶13. Plaintiff does not specify whether he is contending that the statements in question were actually uttered by Abbott or not. To the extent Plaintiff is alleging Abbott published these statements through others, no facts have been alleged as to the identity of such person(s) or to establish an agency relationship between Abbott and same. However, even if he had, the statements would no longer be actionable under the statute of limitations for the reasons previously articulated in this memorandum.

18

and Sawicki that are detailed in the Complaint,[11] none of the statements contained in those writings are reasonably susceptible of a defamatory meaning. See Foley, 404 Mass. at 11. Given the internal police department context in which they were uttered, the statements are not of the type that would hold Plaintiff up to ridicule or treat him with contempt and thus, any defamation claim that relies on them should be dismissed. See Draghetti, 416 Mass. at 812.

Notwithstanding this, even if the statements in Abbott's July 21, 2003 letter could be considered defamatory, Plaintiff has only alleged that the letter was sent to Plaintiff himself. Plaintiff does not contend that Abbott ever published the letter to a third party. In the absence of publication of the letter by Abbott to someone other than Plaintiff, a defamation claim that relies upon such letter cannot survive a motion to dismiss. See id.

As for Sawicki's December 29, 2003 written complaint to Abbott, even were the Court to find that document to be defamatory, Sawicki enjoyed a conditional privilege to submit that report given the supervisory position he held over Plaintiff as a lieutenant and Abbott's position as Chief. See Bratt v. International Business Machs. Corp., 392 Mass. 508, 509 (1984)(holding that an employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job). Plaintiff has not alleged that Sawicki published the document to anyone other than Abbott. As a result, any claim for defamation that is based on Sawicki's December 29th complaint also must fail. See id.

---

[11] The November 5, 2003 letter to Plaintiff was drafted by Sawicki's attorney and not Sawicki himself. See Defendants' Attachment D hereto. His attorney is not a party to this action.

19

## V. Conclusion

For the foregoing reasons, Defendants respectfully request that all claims against them in this matter be dismissed in their entirety.

DEFENDANTS

By their attorneys,

*/s/ David C. Jenkins*

David C. Jenkins (BBO# 251000)
Joseph S. Fair (BBO# 637818)
Kopelman and Paige, P.C.
 Town Counsel
31 St. James Avenue
Boston, MA 02116
(617) 556-0007

Date: 5/3/04

218319/60700/0503

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail/hand on 5/3/04

*/s/ Joseph Fair*



# Town of Freetown
# POLICE DEPARTMENT
225 CHACE ROAD
P.O. BOX 518
EAST FREETOWN, MA 02717-0518

CARLTON E. ABBOTT, JR., ESQ.
Chief of Police

LEAPS: FRE
NCIC: MA0030900
TEL. (508)763-4017
FAX: (508) 763-4010

ATTACHMENT A

July 21, 2003

Jon M. Taylor, Ptlm
4 Hollywood Avenue
Assonet, MA 02702

Re: Racial Profiling
    Boston Globe
    Sunday, 07/20/03

Dear Ptlm. Taylor:

**The purpose of this letter is to encourage you to voluntarily modify your conduct so as to allow you to avoid real or perceived allegations of racial or gender profiling.**

As you may be aware, the Boston Globe has published a series of articles relative to race, sex and age ticketing. I have attached a copy of the Sunday, July 20, 2003 issue.

As you will note, Mr. Wayne J. Oliver's photo appears on the front page. Oliver contends that on February 25, 2002 at 2:00 PM, he was stopped in Freetown by a white officer and issued a citation for operating at 40 mph in a 35 mph zone.

Mr. Oliver attributed the following remark to the officer, "I was going to give you a warning but you got cocky with me."

According to department records, you were the officer who issued the citation to Mr. Oliver for operating at 40 mph in a 35 mph zone.

**Allegations of racial or gender profiling or discriminatory practices, real or perceived, are detrimental to the relationship between police and communities they protect and serve, because they strike at the basic foundation of public trust.**

Enclosed please find a copy of the following:

- Department's Racial & Gender Profiling Policy No. 10
- Department's Traffic Safety Policy No. 605

With respect to Policy No. 605, "traffic enforcement action will be taken without regard to such factors as attitude, intent, or frivolous excuse."

July 21, 2003
Racial Profiling
Page 2

You are hereby directed to familiarize yourself with these policies no later than August 15, 2003.

Should you have any questions, please feel free to ask.

Very truly yours,

Carlton E. Abbott, Jr., Esq.
Chief of Police

encls.

Return Receipt Requested
7001 0360 0003 0486 5296

BOSTON.COM | A&E | BOSTON GLOBE | CARS | JOBS | REAL ESTATE | SPORTS | TECH | TRAVEL

The Boston Globe
HOME DELIVERY
SPECIAL OFFER

Archives
Buy photos
Contact the Globe
Globe services
Search the Globe
Send us feedback

Electronic edition
Headlines e-mail
Low-graphics version
Most e-mailed articles
Front page [JPG] [PDF]
Today's paper A to Z

Sections
PAGE ONE
NATION | WORLD
CITY | REGION
 Death notices
 Lottery
 Politics

 Brian McGrory
 Eileen McNamara
 Spiritual Life
 Adrian Walker

 Peaks & Valleys
  BJ Roche
 Starts & Stops
  Mac Daniel
 The Observer
  Sam Allis

BUSINESS
SPORTS
LIVING | ARTS
EDITORIALS | OP-ED

SPECIALS
Good Friday: 5 years later
Rhode Island club fire
Big Dig coverage
John Kerry series
Global health crisis
More special reports

Spotlight investigations
 Scandal in the church

WEEKLY
Health | Science (Tue)
 Judy Foreman
 Chet Raymo
Food (Wed)
 Recipes
Calendar (Thur)
Life at Home (Thur)

The Boston Globe — boston.com

## SPEED TRAP: WHO GETS A TICKET, WHO GETS A BREAK?



Wayne J. Oliver of Fall River was ticketed on Feb. 25, 2002 in Freetown for driving 40 miles an hour in a 35-m.p.h. zone. (Globe Staff Photo / David Kamerman)

# Race, sex, and age drive ticketing

Minorities and men least likely to receive warnings

By Bill Dedman, Globe Correspondent, and Francie Latour, Globe Staff, 7/20/2003

Nicole A. Azzolino saw blue lights in the rear-view mirror of her green Mazda, and knew she was busted this time. It was 1:35 a.m. on a Tuesday in April 2001, and after another night of cocktail waitressing, the 23-year-old student was headed back to UMass-Amherst, speeding down Route 9 through Belchertown.

"I assumed I would probably get a ticket," Azzolino recalls.

She seemed due for one. She had already gotten a warning that month in the same town, plus a second warning in Plymouth, and a third one in Palmer, for pushing 55 mph miles per hour in a 35 zone. So when the officer

*On city boulevards and rural lanes, whites and women are far more likely to receive written warnings instead of tickets when stopped for identical traffic offenses, according to a Boston Globe study of newly released state records.*

**THE SERIES**

**Day 1:**
▶ Race, sex, and age drive ticketing
▶ Minority officers are stricter on minorities
▶ Boston to track all stops by police

**Graphics:**







treatment of the most favored group for each offense - always white women.

If the pattern of tickets and warnings from the two-month study held true for the entire year, about 14,000 minority drivers in the state paid $6.4 million extra in fines and insurance premiums, for speeding tickets alone, because they were punished more consistently at the same speeds.

Because white men make up more of the drivers in the state, they faced an even larger estimated cost, $15.3 million. White women also paid a price, an estimated $3.8 million a year, when they fell outside the age group most favored.

By getting four warnings, instead of four tickets, Azzolino, the waitress, saved $580 in traffic fines, and about $2,500 on her insurance. Then, in the summer of 2001, her luck ran out.

She was ticketed in Belchertown, twice by the same officer, though a judge threw out one ticket and reduced the fine on the other. She said she had no doubt why most officers before then had given her a pass.

"I remember one guy saying to slow down," Azzolino said. "He said I was too pretty, and he didn't want me to wrap my face around a tree."

For many minority drivers, especially men, the police encounter was far less forgiving.

Wayne J. Oliver was driving his 1999 Oldsmobile Alero home to Fall River from a job in Carver, taking the back road, when he saw a Freetown police car coming toward him. It was Monday, Feb. 25, 2002, at 2 p.m. The speed limit was 35 m.p.h. and he was ticketed for going 40 m.p.h. Oliver is black; the officer was white.

"It's a back road, off of [Route] 24. I was doing maybe 40. I saw him, he passed me. Boom, his lights went on, and he did a U turn. He told me I was doing 55. I said, 'Are you serious?' He said, 'I was going to give you a warning, but you got cocky with me.' That's all I said to him. I knew right there I was appealing it."

Oliver, now 46, drives small commercial trucks. He had only one blemish on his driving record, speeding in Fall River back in 1985, according to the Registry of Motor Vehicles. To fight this new ticket, he missed a day of work for court in Fall River; the hearing officer dismissed the ticket.

Oliver said he has no way to know whether some combination of age, sex, and race caused this officer to write him a ticket.

http://www.boston.com/globe/metro/packages/tickets/072003.shtml                    7/20/2003

``Or maybe,'' he said, ``the cop was just having a bad day.''

There was no difficult conversation when Zhuo F. Chen was ticketed for speeding just 3 m.p.h. over the limit in Wellesley. The 23-year-old Chinese-American college student was driving home to Brookline on Jan. 31 from Worcester Polytechnic Institute. He went to court, where he said the judge immediately dismissed the ticket, which would have been Chen's second. He said he had no idea why he got the ticket.

``I figured it was just my age,'' Chen said.

While the balance of justice tilts against men, minorities, and the young, there are stunning exceptions: In Milton, a young black man from Dorchester, driving 75 m.p.h. in a 30 m.p.h. zone, was warned for speeding. In Medford, a 22-year-old white woman was ticketed, near her home, driving all of 31 m.p.h. in a 30 m.p.h. zone.

Still, for many minority drivers, the sense that they are being singled out lies at the heart of concerns about bias in policing.

``Our pitch has never been that people who speed shouldn't get a citation,'' said state Senator Dianne Wilkerson, a Boston Democrat and author of the profiling law. ``But no one can dispute the fact that on any given day, you've got some 85 percent of people who are likely to be breaking some law at some time on the road.''

With so many drivers flouting the law, Wilkerson said, officer discretion is inevitable.

``The problem,'' Wilkerson said, ``is that no rational, thinking person would believe that in the exercise of that discretion in a fair, random, non-discriminatory manner ... you could have these kinds of disparities, category by category by category.''

**In all neighborhoods**

If minority drivers often stand out in small towns, in Boston they are the norm. But living in a culturally diverse community doesn't protect Boston minorities and men from unequal treatment.

Some police officials have argued that a higher police presence in high-crime areas, where minorities are more likely to live, could explain racial disparities in a large city. But even in Boston's predominantly white neighborhoods, officers were less likely to warn minority drivers.

Police Superintendent Ann Marie Doherty said that each district captain sets the tone for traffic enforcement. Some districts, such as Dorchester, wrote tickets to eight out of 10 offending drivers, while officers downtown wrote tickets to just over three out of 10.

# HOWARD MARK FINE
*Attorney at Law*

86 Sherman Street • Cambridge, Massachusetts 02140-3233
Telephone 617-868-9200 • Fax 617-868-8400 • Email hmfine@aol.com

### LETTER OF PRESENTMENT AND DEMAND FOR SETTLEMENT
(pursuant to M.G.L. c. 149, s. 185(c)(1) and M.G.L. c. 258, s. 4)

COPY

October 2, 2003

Lawrence N. Ashley, Chairman
Board of Selectmen
Freetown Town Hall
3 North Main Street
P.O. Box 438
Assonet, Massachusetts 02702

**Re: Patrolman Jon M. Taylor/Freetown Police Department, et al.**

<u>BY CERTIFIED MAIL (no. 7001 2510 0008 1299 2849)</u>

Dear Chairman Ashley:

Kindly be advised that this office represents the legal interests of Patrolman Jon M. Taylor in connection with an ongoing employment dispute with the Town of Freetown and its Chief of Police, Carlton E. Abbott, Jr., Esquire.

It is my client's hope that the parties will be able to amicably resolve this issue without the necessity of prolonged and costly litigation.

As a matter of public record, my client has provided written notice to the Board of Selectmen of the Town of Freetown (the "Board") on at least four occasions (the most recent of which was provided on June 27, 2003) of serious and ongoing unlawful activity committed by Police Chief Abbott and others in his department. Such activity, for example, ranges from my client being: a) unjustly accused of falsifying departmental records, b) denied advantageous training and teaching opportunities, c) differentially treated with respect to terms and conditions of his employment, d) repeatedly being precluded from competing for promotional opportunities within the department, e) and threatened, intimidated and coerced by his superiors for having brought to light matters of public concern pertaining to the Freetown Police Department.

Subsequent to my client's June 27, 2003 letter to you and the Board, Patrolman Taylor has been subjected to further retaliation and harassment. For example, Police Chief Abbott, without just cause, suddenly warned Patrolman Taylor that the latter's conduct involving a routine traffic stop from more than a year ago was now tantamount to "racial profiling" and deserving of corrective action by the employer. The subject of this traffic stop was a motorist who himself admitted to the speeding violation.

In addition, on separate occasions, Police Chief Abbott and his second in-command officer, Lieutenant Walter Sawicki, without any basis in fact, have recklessly and maliciously maligned my client's professional reputation by communicating to others (for example, the Board and the Bristol County District Attorney's Office) that Patrolman Taylor's work-related injury, on June 21, 2003, is nothing more than a fabrication – despite the existence of credible corroborative documentation to the contrary – including an evaluation conducted by Freetown's municipally designated physician, Dr. Parakrama Ananta – documentation which the employer at all times material hereto has had in its possession, custody, and control.[1] To date, neither Police Chief Abbott nor Lieutenant Sawicki has retracted their statements, to the detriment of my client. Similarly, my client has been further slandered by Police Chief Abbott, who intentionally has spread damaging and humiliating rumors within the community that Patrolman Taylor is mentally unstable, has psychological problems and thus is unfit for duty.

Although the Board, on July 11, 2003, indicated that it "would check further into the matter,"[2] it ultimately failed, as with Patrolman Taylor's prior charges, to investigate the matter and remedy the situation.[3] Had it done so upon completion of its investigation, the Board, as required by state law, would have filed with the Town Clerk a report, which would have been printed in the annual town report.[4] As of August 14, 2003, no public records whatsoever exist of any investigations conducted from 1998 to August 2003 concerning complaints filed by my client against the police department and its chief.[5] Although the Board has acknowledged receipt of Patrolman Taylor's request for such

---

[1] See e.g., Statement of Sergeant Francis G. Poitrast, dated June 21, 2003; Occupational Medicine Evaluation, dated June 24, 2003 and dictated by Parakrama Ananta, M.D., M.S. (Orth.).

[2] See letter to Jon M. Taylor, dated July 11, 2003, from Linda H. Lynn Remedis, Administrative Assistant, Freetown Board of Selectmen.

[3] See letter to Jon M. Taylor, dated July 24, 2003, from the Freetown Board of Selectmen under the signatures of John S. Ashley, Chairmen, Lawrence N. Ashley, and John Laronda, Jr.; see also letter to Board, dated June 27, 2003, and, more specifically, references contained therein to written complaints dated October 26, 2002, November 22, 2000, and July 17, 2002.

[4] See M.G.L. c. 41, s. 23B ("The selectmen of any town may make an investigation into the conduct and operation of any town department. Upon completion of such investigation a report shall be submitted to the town clerk and such report shall (emphasis added) be printed in the annual town report.").

[5] See letter dated August 14, 2003, from Jacqueline A. Brown, Town Clerk, Howard Mark Fine, Esquire.

2

information, the Town Clerk of the Town of Freetown has affirmed that no records of any such complaints or investigations exist.[6]

Ironically, had the Board simply bothered to question its police chief about his testimony before the Massachusetts Commission Against Discrimination on July 11, 2003, it would have learned that Police Chief Abbott, under oath, testified unequivocally that he knew that one of his subordinates, former Patrolman Elton Ashley, had committed a theft – to wit, larceny - by falsifying payroll records in the White Mountain Cable Company case – criminal misconduct for which the chief never brought Patrolman Ashley up on charges or prosecuted him for his unlawful misconduct. Incredibly, the chief, despite having such knowledge about Patrolman Ashley's criminal misconduct, ultimately recommended Patrolman Ashley to the Board for promotion to a police sergeant position.[7] That promotion was approved by the Board on or about January 15, 2003. Whether Chief Abbott, acting alone or in concert with any other of his subordinates, aided and abetted Elton Ashley in the concealment from the Board and the authorities of this or similar crimes is another matter altogether and cannot, nor should it any longer, escape the Board's attention. Whether any of the Board's members had prior knowledge of the above facts at any time subsequent to Patrolman Taylor's initial complaint to the Board on October 26, 2000 remains unclear.

Suffice it to say, Patrolman Taylor has suffered, and continues to suffer, substantial damages as a result of the civil rights and other related infractions committed by the Town of Freetown and his superiors. Such damages include, but are not limited to, loss of compensation, benefits, and promotional opportunities, as well as defamation, and emotional distress.

Should my client proceed with a lawsuit, and prevail at trial, for example, under a civil rights claim brought pursuant to M.G.L. c. 149, s. 185, the Town of Freetown would face significant exposure to a variety of costly remedies, such as triple damages for lost wages, benefits and other remuneration, with interest thereon; attorney fees and costs; common law tort remedies; as well as equitable relief.

My client is willing to forego his day in court and resolve claims related to his civil rights action. Under separate cover, the specifics of his demand will be sent the Board's attorney, Kopelman and Paige, P.C.

---

[6] Id.; see also n. 2.

[7]. See Public Hearing transcript, Volume V, in the matter of Massachusetts Commission Against Discrimination, Charles Sullivan, and Terrance Christiansen v. Town of Freetown, docket numbers 97-BEM-4570 and 97-BEM-4569, at 4-101-102; see also Public Hearing transcript, Volume V, at 54-59, 88-89 (according to Police Lieutenant Sawicki, in testifying on Elton Ashley candidacy for police sergeant, the former stated that "Elton is an outstanding officer . . . (t)he only reason he was third choice was because of his lack of seniority so to speak." Lieutenant Sawicki further testified that he knew Elton Ashley had appeared before the Board regarding the White Mountain Cable case and "informed them that he had made a mistake . . ."

3

I await the courtesy of a prompt reply to my client's proposal.

Sincerely,

Howard Mark Fine, Esquire

HMF/mg

cc: Mr. John S. Ashley, Selectman, Town of Freetown (certified mail number 7001 2510 0008 1299 2887)
Mr. John Laronda, Jr., Selectman, Town of Freetown (certified mail number 7001 2510 0008 1299 2832)
Ms. Jacqueline A. Brown, Town Clerk, Town of Freetown (certified mail number 7001 2510 0008 1299 2856)
Chief Carlton E. Abbott, Jr., Esq. (certified mail number 7001 2510 0008 1299 2870)
Attorney Leonard Kopelman, Kopelman and Paige, P.C. (certified mail number 7001 2510 0008 1297 0250)
Patrolman Jon M. Taylor

# PEPPARD & LITTMAN, P.C.
ATTORNEYS-AT-LAW

KENNETH G. LITTMAN *

ANDREW B. PEPPARD

\* *Admitted in Massachusetts & Rhode Island*

ATTACHMENT C

251 CHERRY STREET
FALL RIVER, MASSACHUSETTS 02720
508-675-8900   FAX 508-678-1329

26 OCEAN AVENUE
JAMESTOWN, RHODE ISLAND 02835
401-847-3932

*Please Respond to Fall River Office*

November 5, 2003

Howard Mark Fine, Esq.
86 Sherman Street
Cambridge, MA   02140-3233

RE:   Patrolman Jon M. Taylor
      Freetown Police Department, et al

Dear Attorney Fine:

    I have been retained by Walter Sawicki, a Lieutenant in the Freetown Police Department with regard to allegations made against my client in a letter dated October 2, 2003 to the Board of Selectmen, the Freetown Chief of Police and Attorney Leonard Kopelman.

    Reference is made specifically to the allegation that Lt. Sawicki, without any factual basis, recklessly and maliciously "maligned [your] client's professional reputation by communicating to others... that Patrolman Taylor's work-related injury, on June 21, 2003, is nothing more than a fabrication...."

    Lt. Sawicki denies that he ever, at any time, communicated to anyone that your client's injury was "nothing more than a fabrication". Should this allegation of your client form the basis for legal action against Lt. Sawicki, be assured that he will press his remedies vigorously, as an appropriate investigation into the truth of the allegation would reveal that the claim is groundless and legal action frivolous.

Howard Mark Fine, Esq.
November 5, 2003
Page Two.

    I trust that an appropriate review of the allegation will end any repetition of this baseless claim.

                            Sincerely,

                            Andrew B. Peppard

ABP/bh
CC:   W. Sawicki
       L. Ashley
       J. Ashley
       J. Laronda, Jr.
       C. Abbott, Jr.

ATTACHMENT D

**Freetown Police Department**

# Memo

**To:** Chief of Police

**From:** Lieut. Walter Sawicki

**CC:**

**Date:** 12/29/03

**Re:** Ptlm. Jon Taylor

---

Sir; On today's date Patrolman Jon Taylor attended a motor vehicle citation appeal in front of a Judge in the Fall River District Court. Patrolman Taylor appeared as a witness in the proceeding.

Subsequent to the hearing Patrolman Taylor was standing outside the courthouse along with Sergeant Charles Sullivan. Sergeant Sullivan was speaking to a male individual. I approached the group and interrupted Sergeant Sullivan's conversation to advise the Sergeant that his presence was no longer needed at the Superior Court in New Bedford on this date. While speaking to Sergeant Sullivan I overheard Patrolman Taylor speak but did not discern his conversation except for the word "lawsuit".

As soon as Sergeant Sullivan acknowledged that he understood my message I turned and entered the courthouse. After entering the courthouse lobby I became aware that Patrolman Taylor had followed me into the building. Patrolman Taylor began saying, "there is no lawsuit". He repeated that statement a couple more times. I asked Patrolman Taylor what he was talking about. He replied in a gruff and rising voice, "you told his lawyer that there was a lawsuit, there is no lawsuit". I responded by asking, "what are you talking about?" Patrolman Taylor then responded in an aggressive manner, "I'm sick of this shit!" Patrolman Taylor then began to exit the building. I entered the Criminal Clerk's Office to conduct the business that had brought me to the courthouse. While in the Clerk's Office I came to the realization that Patrolman Taylor was talking about the case for which he had appeared as a witness today. This case involved a Matthew Garcia who had struck and injured Patrolman Taylor as he was directing traffic. Criminal and civil charges were brought by Sergeant Sullivan after investigating the accident. The case involved four Clerk Magistrate hearings that I had participated in pursuant to my duties.

Upon exiting the Clerk's Office a couple of minutes later I approached the front door of the building to exit and observed Patrolman Taylor standing just inside the front door. As I got closer I observed Patrolman Taylor look at me, his face appeared flushed and he displayed a hostile look. He then said to me, "you told their lawyer that there was a lawsuit". I responded, "Jon you weren't there, you don't know what I said". I then walked past Patrolman Taylor and exited the building. Patrolman Taylor responded, "let's go for a walk right now and straighten this out once and for all". As Patrolman Taylor's demeanor was aggressive I responded, " Jon I'm leaving, I am not walking anywhere with you." I then continued to walk toward my cruiser that was parked across the street (Rock Street) one building north of the District Attorney's office. Patrolman Taylor continued to walk along with me and stated, "there is no lawsuit for the accident, I hired a lawyer to make sure I got paid for it." Taylor then continued, "This has nothing to do with the other lawsuit." I then responded, "I don't know anything

1

about any other lawsuits." Taylor then replied, "If you don't know anything about it I guess my lawyer hasn't notified you yet." At this point I crossed the street toward my cruiser, Patrolman Taylor did not follow.

I believe that Patrolman Taylor's conduct and demeanor inside the courthouse lobby, in the presence of civilians and court employees, was insubordinate. I also believe that Patrolman Taylor's statements about "going for a walk and straightening this out once and for all" and "if you don't know about the lawsuit then I guess my lawyer hasn't notified you yet" were done to intimidate me with threats of physical or legal actions against me on his part. This would also be not only insubordinate, but conduct unbecoming an officer as well.

I bring this incident to your attention for whatever action you deem appropriate.