Town of Freetown
# POLICE DEPARTMENT
225 CHACE ROAD
P.O. BOX 518
EAST FREETOWN, MA 02717-0518

**CARLTON E. ABBOTT, JR., ESQ.**
Chief of Police

LEAPS: FRE
NCIC: MA0030900
TEL. (508)763-4017
FAX: (508) 763-4010

ATTACHMENT A

July 21, 2003

Jon M. Taylor, Ptlm
4 Hollywood Avenue
Assonet, MA 02702

Re: Racial Profiling
Boston Globe
Sunday, 07/20/03

Dear Ptlm. Taylor:

**The purpose of this letter is to encourage you to voluntarily modify your conduct so as to allow you to avoid real or perceived allegations of racial or gender profiling.**

As you may be aware, the Boston Globe has published a series of articles relative to race, sex and age ticketing. I have attached a copy of the Sunday, July 20, 2003 issue.

As you will note, Mr. Wayne J. Oliver's photo appears on the front page. Oliver contends that on February 25, 2002 at 2:00 PM, he was stopped in Freetown by a white officer and issued a citation for operating at 40 mph in a 35 mph zone.

Mr. Oliver attributed the following remark to the officer, "I was going to give you a warning but you got cocky with me."

According to department records, you were the officer who issued the citation to Mr. Oliver for operating at 40 mph in a 35 mph zone.

**Allegations of racial or gender profiling or discriminatory practices, real or perceived, are detrimental to the relationship between police and communities they protect and serve, because they strike at the basic foundation of public trust.**

Enclosed please find a copy of the following:

- Department's Racial & Gender Profiling Policy No. 10
- Department's Traffic Safety Policy No. 605

With respect to Policy No. 605, "traffic enforcement action will be taken without regard to such factors as attitude, intent, or frivolous excuse."

July 21, 2003
Racial Profiling
Page 2

You are hereby directed to familiarize yourself with these policies no later than August 15, 2003.

Should you have any questions, please feel free to ask.

Very truly yours,

Carlton E. Abbott, Jr., Esq.
Chief of Police

encls.

Return Receipt Requested
7001 0360 0003 0486 5296

| BOSTON.COM | A&E | BOSTON GLOBE | CARS | JOBS | REAL ESTATE | SPORTS | TECH | TRAVEL |

The Boston Globe
HOME DELIVERY
SPECIAL OFFER

Archives
Buy photos
Contact the Globe
Globe services
Search the Globe
Send us feedback

Electronic edition
Headlines e-mail
Low-graphics version
Most e-mailed articles
Front page [JPG] [PDF]
Today's paper A to Z

Sections
PAGE ONE
NATION | WORLD
CITY | REGION
  Death notices
  Lottery
  Politics

  Brian McGrory
  Eileen McNamara
  Spiritual Life
  Adrian Walker

  Peaks & Valleys
    BJ Roche
  Starts & Stops
    Mac Daniel
  The Observer
    Sam Allis

BUSINESS
SPORTS
LIVING | ARTS
EDITORIALS | OP-ED

SPECIALS
Good Friday: 5 years later
Rhode Island club fire
Big Dig coverage
John Kerry series
Global health crisis
More special reports

Spotlight investigations
  Scandal in the church

WEEKLY
Health | Science (Tue)
  Judy Foreman
  Chet Raymo
Food (Wed)
  Recipes
Calendar (Thur)
Life at Home (Thur)

The Boston Globe  boston.com

## SPEED TRAP: WHO GETS A TICKET, WHO GETS A BREAK?



Wayne J. Oliver of Fall River was ticketed on Feb. 25, 2002 in Freetown for driving 40 miles an hour in a 35-m.p.h. zone. (Globe Staff Photo / David Kamerman)

# Race, sex, and age drive ticketing

Minorities and men least likely to receive warnings

By Bill Dedman, Globe Correspondent, and Francie Latour, Globe Staff, 7/20/2003

**N**icole A. Azzolino saw blue lights in the rear-view mirror of her green Mazda, and knew she was busted this time. It was 1:35 a.m. on a Tuesday in April 2001, and after another night of cocktail waitressing, the 23-year-old student was headed back to UMass-Amherst, speeding down Route 9 through Belchertown.

"I assumed I would probably get a ticket," Azzolino recalls.

She seemed due for one. She had already gotten a warning that month in the same town, plus a second warning in Plymouth, and a third one in Palmer, for pushing 55 mph miles per hour in a 35 zone. So when the officer

*On city boulevards and rural lanes, whites and women are far more likely to receive written warnings instead of tickets when stopped for identical traffic offenses, according to a Boston Globe study of newly released state records.*

**THE SERIES**

**Day 1:**
▶ Race, sex, and age drive ticketing
▶ Minority officers are stricter on minorities
▶ Boston to track all stops by police

**Graphics:**






treatment of the most favored group for each offense - always white women.

If the pattern of tickets and warnings from the two-month study held true for the entire year, about 14,000 minority drivers in the state paid $6.4 million extra in fines and insurance premiums, for speeding tickets alone, because they were punished more consistently at the same speeds.

Because white men make up more of the drivers in the state, they faced an even larger estimated cost, $15.3 million. White women also paid a price, an estimated $3.8 million a year, when they fell outside the age group most favored.

By getting four warnings, instead of four tickets, Azzolino, the waitress, saved $580 in traffic fines, and about $2,500 on her insurance. Then, in the summer of 2001, her luck ran out.

She was ticketed in Belchertown, twice by the same officer, though a judge threw out one ticket and reduced the fine on the other. She said she had no doubt why most officers before then had given her a pass.

"I remember one guy saying to slow down," Azzolino said. "He said I was too pretty, and he didn't want me to wrap my face around a tree."

For many minority drivers, especially men, the police encounter was far less forgiving.

Wayne J. Oliver was driving his 1999 Oldsmobile Alero home to Fall River from a job in Carver, taking the back road, when he saw a Freetown police car coming toward him. It was Monday, Feb. 25, 2002, at 2 p.m. The speed limit was 35 m.p.h. and he was ticketed for going 40 m.p.h. Oliver is black; the officer was white.

"It's a back road, off of [Route] 24. I was doing maybe 40. I saw him, he passed me. Boom, his lights went on, and he did a U turn. He told me I was doing 55. I said, 'Are you serious?' He said, 'I was going to give you a warning, but you got cocky with me.' That's all I said to him. I knew right there I was appealing it."

Oliver, now 46, drives small commercial trucks. He had only one blemish on his driving record, speeding in Fall River back in 1985, according to the Registry of Motor Vehicles. To fight this new ticket, he missed a day of work for court in Fall River; the hearing officer dismissed the ticket.

Oliver said he has no way to know whether some combination of age, sex, and race caused this officer to write him a ticket.

"Or maybe," he said, "the cop was just having a bad day."

There was no difficult conversation when Zhuo F. Chen was ticketed for speeding just 3 m.p.h. over the limit in Wellesley. The 23-year-old Chinese-American college student was driving home to Brookline on Jan. 31 from Worcester Polytechnic Institute. He went to court, where he said the judge immediately dismissed the ticket, which would have been Chen's second. He said he had no idea why he got the ticket.

"I figured it was just my age," Chen said.

While the balance of justice tilts against men, minorities, and the young, there are stunning exceptions: In Milton, a young black man from Dorchester, driving 75 m.p.h. in a 30 m.p.h. zone, was warned for speeding. In Medford, a 22-year-old white woman was ticketed, near her home, driving all of 31 m.p.h. in a 30 m.p.h. zone.

Still, for many minority drivers, the sense that they are being singled out lies at the heart of concerns about bias in policing.

"Our pitch has never been that people who speed shouldn't get a citation," said state Senator Dianne Wilkerson, a Boston Democrat and author of the profiling law. "But no one can dispute the fact that on any given day, you've got some 85 percent of people who are likely to be breaking some law at some time on the road."

With so many drivers flouting the law, Wilkerson said, officer discretion is inevitable.

"The problem," Wilkerson said, "is that no rational, thinking person would believe that in the exercise of that discretion in a fair, random, non-discriminatory manner ... you could have these kinds of disparities, category by category by category."

### In all neighborhoods

If minority drivers often stand out in small towns, in Boston they are the norm. But living in a culturally diverse community doesn't protect Boston minorities and men from unequal treatment.

Some police officials have argued that a higher police presence in high-crime areas, where minorities are more likely to live, could explain racial disparities in a large city. But even in Boston's predominantly white neighborhoods, officers were less likely to warn minority drivers.

Police Superintendent Ann Marie Doherty said that each district captain sets the tone for traffic enforcement. Some districts, such as Dorchester, wrote tickets to eight out of 10 offending drivers, while officers downtown wrote tickets to just over three out of 10.

**Freetown Police Department**

# Memo

**To:** Chief of Police
**From:** Lieut. Walter Sawicki
**CC:**
**Date:** 12/29/03
**Re:** Ptlm. Jon Taylor

---

Sir; On today's date Patrolman Jon Taylor attended a motor vehicle citation appeal in front of a Judge in the Fall River District Court. Patrolman Taylor appeared as a witness in the proceeding.

Subsequent to the hearing Patrolman Taylor was standing outside the courthouse along with Sergeant Charles Sullivan. Sergeant Sullivan was speaking to a male individual. I approached the group and interrupted Sergeant Sullivan's conversation to advise the Sergeant that his presence was no longer needed at the Superior Court in New Bedford on this date. While speaking to Sergeant Sullivan I overheard Patrolman Taylor speak but did not discern his conversation except for the word "lawsuit".

As soon as Sergeant Sullivan acknowledged that he understood my message I turned and entered the courthouse. After entering the courthouse lobby I became aware that Patrolman Taylor had followed me into the building. Patrolman Taylor began saying, "there is no lawsuit". He repeated that statement a couple more times. I asked Patrolman Taylor what he was talking about. He replied in a gruff and rising voice, "you told his lawyer that there was a lawsuit, there is no lawsuit". I responded by asking, "what are you talking about?" Patrolman Taylor then responded in an aggressive manner, "I'm sick of this shit!" Patrolman Taylor then began to exit the building. I entered the Criminal Clerk's Office to conduct the business that had brought me to the courthouse. While in the Clerk's Office I came to the realization that Patrolman Taylor was talking about the case for which he had appeared as a witness today. This case involved a Matthew Garcia who had struck and injured Patrolman Taylor as he was directing traffic. Criminal and civil charges were brought by Sergeant Sullivan after investigating the accident. The case involved four Clerk Magistrate hearings that I had participated in pursuant to my duties.

Upon exiting the Clerk's Office a couple of minutes later I approached the front door of the building to exit and observed Patrolman Taylor standing just inside the front door. As I got closer I observed Patrolman Taylor look at me, his face appeared flushed and he displayed a hostile look. He then said to me, "you told their lawyer that there was a lawsuit". I responded, "Jon you weren't there, you don't know what I said". I then walked past Patrolman Taylor and exited the building. Patrolman Taylor responded, "let's go for a walk right now and straighten this out once and for all". As Patrolman Taylor's demeanor was aggressive I responded, " Jon I'm leaving, I am not walking anywhere with you." I then continued to walk toward my cruiser that was parked across the street (Rock Street) one building north of the District Attorney's office. Patrolman Taylor continued to walk along with me and stated, "there is no lawsuit for the accident, I hired a lawyer to make sure I got paid for it." Taylor then continued, "This has nothing to do with the other lawsuit." I then responded, "I don't know anything

1

about any other lawsuits." Taylor then replied, "If you don't know anything about it I guess my lawyer hasn't notified you yet." At this point I crossed the street toward my cruiser, Patrolman Taylor did not follow.

I believe that Patrolman Taylor's conduct and demeanor inside the courthouse lobby, in the presence of civilians and court employees, was insubordinate. I also believe that Patrolman Taylor's statements about "going for a walk and straightening this out once and for all" and "if you don't know about the lawsuit then I guess my lawyer hasn't notified you yet" were done to intimidate me with threats of physical or legal actions against me on his part. This would also be not only insubordinate, but conduct unbecoming an officer as well.

I bring this incident to your attention for whatever action you deem appropriate.