**PLAINTIFF'S
EXHIBIT**

~

D

UNITED STATES DISTRICT COURT

FOR THE
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * * *
JON M. TAYLOR,                         *
          Plaintiff

VS.                                    *     CIVIL ACTION NO.
                                             03-12417-PBS
TOWN OF FREETOWN,                      *
CARLTON E. ABBOTT, JR., ESQ.,
Individually, and as Chief of the      *
Freetown Police Department, and
WALTER J. SAWICKI, Individually, and   *
as Lieutenant of the Freetown
Police Department,                     *
          Defendants

                                       *
                                       *
                                       *
                                       *
                                       *
                                       *
                                       *

                                       *
                                       *
* * * * * * * * * * * * * * * *         *
```

**VOLUME 1 OF THE DEPOSITION OF JON M. TAYLOR,** taken on behalf of the Defendants, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Ruth E. Hulke, CSR No. 114893 and Notary Public for the Commonwealth of Massachusetts, at Kopelman and Paige, P.C., 101 Arch Street, Boston, Massachusetts, on Wednesday, June 7, 2006, commencing at 10:25 **a.m.**

# _Leavitt Reporting, Inc._

*1207 Commercial Street, Rear*
*Weymouth, **MA** 02189*

*Tel.    781-335-6791*
*Fax: 781-335-7911*
*lea vittreporting(@att.net*

*Hearings **+** Conferences **+** Legal Proceedings*

1 | that you believe you were denied?

2 |          A.          Yes, there was.

3 |          Q.          Okay. What was that opportunity?

4 |          A.          The department had implemented the use of a

5 | motorcycle outfitted for the department, the lights and

6 | everything.          I received a phone call when I was in

7 | Florida from one of the dispatchers, Deborah Sousa,

8     advising me they were going to assign people.          And

9 | Officer Donald Bullock had tried to get ahold of me to no 10 | avail. At that time I stated, yes, I was interested in 11 | the motorcycle unit, at which time they had picked three 12 | senior officers.          There was Sergeant Michael Byrnes,

13 | Terrence Christiansen, and the third person was -- Maybe

14     it was two.          Either -- Donald Bullock.          The Chief had

15 | called us in and myself and Officer Rose and says, "When 16 | there's an opening, you guys will be next in line," and 17 | it just never happened.

18 | On returning to work, a junior officer from myself, 19 | Officer Pereira, had been assigned, had been sent to the

20     training, had been assigned.          I spoke with Officer

21 | Bullock, and he said, basically, "You're not going to be 22 | assigned." So I went down to the Registry of Deeds, I

23 | pulled the deed for Officer Pereira 's mortgage, and found

LEAVITT REPORTING, INC.

2

3

the Chief had done some legal work as his attorney to close the

4    mortgage. I just left it at that.

5        Q.    Let me just back up for a moment to Officer

Rose. Do you know what class he taught in that August of 2000

6    auxiliary training?

7        A.    No.

8        Q.    Why do you believe you were unjustly not given

that class over Officer Rose?

9        A.    Again, it was brought to my attention that

1    anyone who went against the Chief in this department wasn't going

0    to see anything. That was a quote from Sergeant Swede Magnett

1    after he had been in the Chief's office.

1

1        Q.    Let me ask this way.    Why should you have

2    gotten the class over Officer Rose?

1        A.    I'm not saying I should have been assigned to

3    that particular class. There were other classes which I could have

1    been assigned to.

4        Q.    But you don't know what those are?    You don't

1    recall what those are as you sit here today?

5        A.    That's correct.

1        Q.    On the motorcycle, is it a motorcycle unit?

6        A.    It's a few guys who ride the motorcycle.

1                        LEAVITT REPORTING, INC.

7

1

8

**PLAINTIFF'S**
~ **EXHIBIT**
~   E
3

UNITED STATES DISTRICT COURT

FOR THE
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * * *
JON M. TAYLOR,                        *
        Plaintiff

VS.                                   *
                                         CIVIL ACTION NO.
                                         03-12417-PBS
TOWN OF FREETOWN,                     *
CARLTON E. ABBOTT, JR., ESQ.,
Individually, and as Chief of the
Freetown Police Department, and      *
WALTER J. SAWICKI, Individually,
and as Lieutenant of the Freetown
Police Department,                   *
        Defendants
                                      *

                                      *
                                      *
                                      *
                                      *

                                      *

                                      *

                                      *

                                      *

                                      *

    * * * * * * * * * * * * * *       *
```

**VOLUME II OF THE DEPOSITION OF JON M. TAYLOR,** taken

on behalf of the Defendants, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Ruth E. Hulke, CSR No. 114893 and Notary Public for the Commonwealth of Massachusetts, at Kopelman and Paige, P.C., 101 Arch Street, Boston, Massachusetts, on Thursday, June 15, 2006, commencing at 10:20 a.m.

# *Leavitt Reporting, Inc.*

*1207 Commerczd Street, Rear*
*Weymouth, MA 02189*

*Tel.   781-335-6791*
*Fax: 781-335-7911*
*lea vittreporting@,alt.net*

*Hearings **+** Conferences **+** Legal Proceedings*

1 | APPEARANCES:

2 |      JOSEPH S. FAIR, ESQ., of Kopelman and Paige, P.C.,
    101 Arch Street, Boston, Massachusetts, 02110, on behalf 3 |of the
Defendant, Town of Freetown.

4      AUSTIN  M. JOYCE, ESQ., of Reardon, Joyce & Akerson, Grove
P.C., 397 on Street, Worcester, Massachusetts, 01605, of the
5 behalf      Defendants, Carlton E. Abbott, Jr. and Sawicki.
    Walter J.

6      HOWARD   MARK   FINE,  ESQ., 86 Sherman Street, Cambridge, on
7 Massachusetts, 02140-3233,     behalf of the Plaintiff.

8

    ALSO PRESENT:      Carlton E. Abbott, Jr.
9                      Walter J. Sawicki

10

1
1

12

13

14

15

16

17

18

19

20

21

22

23
                      LEAVITT REPORTING, INC.

1

    **Q.**    So subsequent to that Board of Selectmen's

2    meeting then, the training book was then made readily available

3    to all officers. Is that correct?

    **A.**    Subsequent to the meeting, yes.

4        **Q.**    At that point in time then you yourself had

5    access to that book and the training opportunities that
were listed in there.    Correct?

    **A.**    That is correct.

6
    **Q.**    What other trainings did you apply for?

7
    **A.**    Again, I was interested in the motorcycle which

8    I was denied.

    **Q.**    Do you recall when you requested that training?

9
    **A.**    I was called when I was in Florida by again

10    Dispatcher Deborah Sousa, Donald Bullock was trying to get ahold

1
1    of me asking if I was still interested. They had secured the

    motorcycle. So it was probably 1998,

12    , 99.

13

14    **Q.**    You have already testified about the Train the

    Trainer training. Was there any other training that you had

15    requested?

16    **A.**    No, there wasn't.

17    **Q.**    Now, you did request to attend a fingerprint

18    recovery training.    Correct?

19

20          LEAVITT REPORTING, INC.

21

2

2

1

2

also.   So it was the same class.        It was a class that was

merged.    It was truck vehicle laws, weights, capacities.

3 |But, no, nothing else.

4 |      Q.   That was the only one?

5        A.   That's correct.

6 |      Q.   You have also claimed in this lawsuit you were

7 |denied more favorable shifts and assignments. What 8 |shifts

are you referring to?

9        A.   There was a time when the response we all

10 |received was it was management's rights, we didn't have a 11 right to

shifts by the Chief. I was approached by

12 Sergeant Byrnes who was doing the shifts at the time, and 13 |he said

there was open

slots, you            for a while, you have been there for quite some said,

            okay, I'll do the two eights, two mids.

      The Chief went in on a Saturday, took retired Sergeant

   Christiansen off the schedule, took myself off the schedule, put

   Officer Rose who's a junior officer to myself in a more favorable

   position, never notified us.

   I received a phone call from Dispatcher Mouquin stating, "John, you

   should be aware the Chief came in on Saturday, changed the schedule

   around. I'm not sure if you knew

should get off

14   17 18 19 20   midnights time. I        I was unaware of it.

15   21 22 23     about it."

16

She said, You're

LEAVITT REPORTING, INC.

2

3

Q.     Has anybody told you who was present for that
meeting?

4

5

A.     Have not.

Q.     When did that meeting take place?

6

A.     It was after that incident. That incident was

7

in February of, I think of '98. that.          So it was sometime after

8

Q.     Other than what Mr. Bullock told you, is there

9

any other information that you're relying upon to support your

1

contention that the Chief had subjected you to closer supervision by

0

some of your colleagues?

1

1

A     Officer Bullock wouldn't lie.        I take his word
.

1

truthfully.

1

Q.     Okay.

2

A.     A dispatcher also advised me of comments that

1

were made, she overheard them.

3

Q.     Who was that dispatcher?

1

A.     Suzanne Mouquin.

4

Q.     The comments she told you she overheard, this

1

was from that same meeting?

5

A.     Correct.

1

Q.     What did she tell you she overheard?

6

A.     Her not specific words were, basically, I'm

1

LEAVITT REPORTING, INC.

7

1

8

incompetent, I wasn't to be entrusted to be LLC.

      **Q.**    She's attributing those comments to whom?


walking through the hall and overheard comments made. She

didn't specifically state. It was inside the meeting.

      **Q.**    Did she ever identify for you who she heard

made those statements?

      **A.**    No.

      **Q.**    And what about Officer Bullock, did he ever

identify for you who had made the statements to him that he relayed

to you?

      **A.**    Best of my knowledge, he said the Chief.

      **Q.**    Well, you're saying the best of your knowledge.

Did Officer Bullock specifically tell you the Chief made these

comments?

      **A.**    To him, yes.

      **Q.**    Other than what the dispatcher and Officer

Bullock stated to you they heard or overheard at the meeting that

you have been testifying about, is there any other information that

you're relying upon to support your allegation that you were

subjected to closer supervision than some of your colleagues?

13          **A.**    Again, she stated what she heard.          She was

14

15

16

17

18

19

20

21

22

23

LEAVITT REPORTING, INC.

there appears to be a problem with the antilock brakes and to drive the car with, basically, extra caution. That car should have been removed immediately and fixed. It had not been fixed. As a result, an officer was injured.

Q.   Okay.   And are there any other cruisers that you are contending were unsafe that you were assigned?

A.   I was in the oldest, most dilapidated cars. I think I shared a car with Officer Pereira for a while.

Q.   When was that?

A.   For quite some time.     It was Officer Bullock for a while, then Officer Pereira for a while.          We were scrutinized routinely about the cars, we were told we were beating on them.     There was e-mails stating we were beating on the cars excessively.

Q.   From who?

A.   From the Chief.     Unfortunately, the cars that we received were the oldest, most dilapidated cars that had gone through everybody else. The cars had high mileage, they had been beat on by other officers. Unfortunately, with the mileage that was incurred on the vehicles, it was just a matter of time before they wore the brakes.

LEAVITT REPORTING, INC.

1      Q.     During the time you were assigned to -- Just so
I understand how the cruiser assignments worked.          Each

2     officer in the department doesn't get their own cruiser. Correct?

3
              That's correct.
       A
              We have three shifts in the department.
4      .
Correct?
5      Q
       A.     The Chief and Sergeant Byrnes had their own
       .
assigned cars.
6
       Q.     At any given time when assigned a cruiser,
7
there was another officer in the department who was also assigned
8
that same cruiser?
9
       A.     Should have been.
10
       Q.     That would have been the same for each shift?
1
       A.     For a while I had a car to myself. I think
1
that was 551. I shared it with Mark Bullock for quite some time.
12
Near the end it was basically myself or the Lieutenant that drove
13
it to court.
14
       Q.     Lieutenant Sawicki?
15
       A.     That's correct.
16
       Q.     How often would Lieutenant Sawicki use 551?
17
              MR. FINE: Objection.
18
       Q.     That you know of.
19
20                     LEAVITT REPORTING, INC.
21
22
23

1      A.    I don't know how many times he used it.        He did
the court work.    He would take whatever car was left
over, if somebody else was using it.

2      Q.    But sometimes that would include his using 551.

3  Correct?

4      A.    That's correct.

5      Q.    Do you know if there are times when he used

6  553?

7           We're talking 1997.      I don't have knowledge.

8      A     Okay.   Do you know whether or not he ever used

9      .   554?

10     Q

       A.    Well, actually, that would be incorrect.        He

1      .  had used each car.    Because when they came in, he would

1      drive the newest cars.      So he has driven each car in the

12  fleet.

13     Q.    Let me rephrase that.    I'm specifically

14

15  referring to did he ever use those cars at the same time you were

16  also using those cars.

       A.    551.

17                                          What about 553?

18     Q     551, I know you testified to. It

19     .   was also Rourke and myself.

20     A     What about 554?

2      .   I believe it was also Pereira and myself.

1      Q            LEAVITT REPORTING, INC.

22     .

23     A

       .

1          A.    No, I don't recall.

           Q.    On October 28, 2003, it is also alleged you

2                              Do you know whether or not you
were late on that date.

3   were late on that date?

           A.    Again, alleged.    I don't recall.    We're talking

4   three years ago.

           Q.    What about November 4, 2003, were you late on

5   that date?

           A.    Again, I don't recall.    We have officers that

6

7   cover for each other routinely.

           Q.    After you received that counseling notice, did

8   you ever take any steps to determine whether or not you, in fact,

    were late on those dates?

9          A.    Officer Pereira was there until I arrived.    As

10

1   long as there was a body there and/or the person would answer the

1   calls.

12         Q.    I thought you just testified on the October and

13  November, '03, dates you don't recall whether you were late or

14  not?

15         A.    Correct.

16         Q.    SO I'm just simply asking, did you ever take

17  any steps to determine whether or not you were, in fact, late on

18  those dates?

19                         LEAVITT REPORTING, INC.

20

21

22

2

3

speaks for itself as far as what it contains.

MR. FAIR: I thought we were reserving those.

Q.    Anyway, so Freetown Police Department

Counseling Notice is what is written at the top, right?

A.    That's correct.

Q.    That was issued to you by Steven Abbott.

Correct?

A.    Correct.

Q.    It alleges that you were late to work on

September 21, 2004. Correct?

A.    Alleges, yes.

Q.    Were you, in fact, late on that date?

A.    Actually, Officer Pereira was covering for me.

Q.    But if he was covering for you, then you

weren't there.    Correct?

A.    We cover for each other all the time.    We

always overlap for each other.

Q.    Okay.    But you weren't there -- What time was

your shift supposed to start?

A.    Midnight.

Q.    Were you there at midnight when your shift

started?

A.    Officer Pereira was present until I arrived.

LEAVITT REPORTING, INC.

2

3

**Q**    Did you arrive before or after midnight? After

4    .    midnight.

5    **A**    So you were not present at the time your shift Correct? started.

.

6    **A.**    Correct.    Officer Pereira was covering until I

**Q**

arrived, yes.

.

7    **Q.**    You reported to Sergeant Abbott you had

8    overslept. Correct?

**A.**    That was -- Correct.

9    **Q.**    You had indicated you had overslept because of

1    medication you were taking.        Correct?

0    **A.**    That's correct.

1    **Q.**    Now, according **--** If I can for a moment.

1    According to this document, it's also alleging that you had been

1    tardy, you were late for work on October 3rd of , 03 . 0"0 you see t

2    hat?

1    **A.**    Yes, I do.

3    **Q.**    Were you late on that date?

1    **A.**    That's alleged. If I was late, why wasn't I

4    ever spoken to until a year later?

1    **Q.**    Unfortunately, sir, you don't get to ask the

5    questions here. I do. I'm just asking you whether or not you

1    recall if you were late on October 3, 2003.

6                    LEAVITT REPORTING, INC.

1

7

1

1 |Police when, in fact, we had never seen a potential 2 |document

indicating who was a witness and who wasn't

3   regarding this lawsuit.        Furthermore, an officer will

4 |testify that he had consumed beverages, liquor, at his 5 |house

earlier that evening which he has stated once

6   before.    So that's how I came across.        And I demonstrated

7 |and documented everything that took place.

8 |        Q.     Who was the officer that you contend would

9 |testify that he had alcoholic beverages?

10 |        A.     Michael Connel.

1        Q.     CON N E L? I

1        A.     think.

12        Q.     How do you know Michael Connel will testify in

13

    Abbott had consumed liquor, a few bears, prior to going to his house.

    He had consumed a few bears before he left

14 this fashion?

15        A.     Because I spoke to Officer Connel who was my

16 |union shop steward, and he stated that Sergeant Steve

17   his house.    Furthermore, earlier that day Sergeant Abbott

18

19

20 |was involved in a jet ski watercraft accident with

21 |another officer and his wife, Officer Ryan Pereira, his 22 |wife

required medical assistance at the hospital.

23 |        Q.    Going back to the incident, you cited the

LEAVITT REPORTING, INC.

1  to my house?    No, I cannot.    I would say, no, I can't say

2  |he faxed the materials itself.

3      Q.    So what written statements did Lieutenant

4  |Sawicki generate which you're contending defamed you?

5      A.    I don't remember at this time. Sorry.

       Q.    Well, are there any written statements that you

6

7  can recall Lieutenant Sawicki generated that you contend 8 defamed

you?

9  |        A.    There were -- I don't have specifics off the

10 |top of my head. There were replies to, responses to

                          11 |reports that could have been
       things of that nature.
                 Q.    But you        identified a single written
       haven't
       statement.                     handled differently. It was 12 |his
                                      way of chastising me in front of
others, dispatchers 13 |who wi tnessed this, such as Debra Sousa,
contending

14

       A.    I don't recall. Showing
15
       Q.    you Exhibit 3.
16                                     I'm directing your

17

18

19 |attention to Interrogatory Number 17 of your answers to 20 |
Lieutenant Sawicki's interrogatories requesting the

21 |factual basis for your contention that Lieutenant Sawicki 22 |

generated false and defamatory statements, both oral and 23 |written,

regarding yourself. Your response is the

LEAVITT REPORTING, **INC.**