UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. NO. 03-12417-PBS

JON M. TAYLOR,
     Plaintiff,

v.

TOWN OF FREETOWN, CARLTON E.
ABBOTT, JR., individually and as Chief of the
Freetown Police Department, and WALTER J.
SAWICKI, individually and as Lieutenant of
the Freetown Police Department,
     Defendants.

<u>AFFIDAVIT OF CARLTON E.
ABBOTT, JR.</u>

Now comes the undersigned and hereby deposes and states as follows:

1. My name is Carlton E. Abbott, Jr.  From August 1998 to the present, I have been employed by the Town of Freetown (hereinafter, "Town") as its Chief of Police.

2. The Town is governed by an elected three (3) member Board of Selectmen (hereinafter, "Board").

3. At all times relevant, the Freetown Police Department (hereinafter, "Department") was governed by M.G.L. c. 41, §97 and as such, the Board of Selectmen has served as the appointing authority for all Department personnel and is ultimately responsible for all hiring, firing and promotional decisions.

4. The plaintiff, Jon M. Taylor (hereinafter, "Plaintiff"), has served as a permanent, full-time police officer in the Department from September 6, 1997 to the present.

5. The defendant, Walter Sawicki (hereinafter, "Sawicki"), has served as a permanent, full-time police lieutenant in the Department from September 1987 to the present.  In

addition, he has served as the Department's Internal Affairs (hereinafter, "IA") officer since January 15, 2003 and as the Department's Court Officer since September 12, 2000.

6. Pursuant to the Department's IA policy, Sawicki, as the IA officer, is required to investigate all complaints made against the Department or its members regardless of the source of the complaint. A true and accurate copy of the IA Policy is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 1.

7. The police officer rank structure in the Department in increasing order of authority is as follows: auxiliary police officer, reserve police officer, patrol officer, sergeant, lieutenant and chief.

8. At all times relevant, the Department's reserve patrol officers and permanent, full-time police officers from the rank of patrol officer up to and including the rank of lieutenant were members of a collective bargaining unit that was represented initially by the Freetown Police Association and later by Local 1144 of the Laborers' International Union of North America (hereinafter, "Union").

9. At all times relevant, the terms and conditions of the reserve patrol officers and permanent, full-time police officers in the Department have been governed by the terms of a collective bargaining agreement between the Town and the Union. A true and accurate copy of the 2001-2004 collective bargaining agreement is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 2.

10. In general, permanent, full-time police officers have at all times relevant been assigned to one of the following regular shifts or some combination thereof: 8:00am to 4:00pm, 4:00pm to 12:00am or 12:00am to 8:00am.

11. Prior to June 2001, officer shift assignments were made at the discretion of the Police Chief.

12. In July 1999, Plaintiff's assigned shift was the 12:00am to 8:00am shift. A true and accurate copy of a June 1999 Department memorandum reflecting this is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 3.

13. Sometime thereafter, the Department shifts were reassigned and Plaintiff was assigned to a different shift.

14. In and around November 1999, I reassigned Plaintiff to the 12:00am to 8:00am shift in an effort to accommodate another officer who had expressed to me that the midnight shift was posing a family hardship. Prior to making that change, I asked Plaintiff if he had any objections to going back to the midnight shift and Plaintiff responded that he did not.

15. In June 2001, the Town and the Union negotiated a shift bidding procedure which is still in effect today under which officers are permitted to bid on their desired shifts every twelve (12) weeks in order of their length of service in grade/rank.

16. The Department's records reflect that of the twelve (12) shift bids that Plaintiff submitted for the various twelve (12) week scheduling periods that ran from July 2001 through December 2006, he listed the four (4) day a week 12:00am to 8:00am shift as his first choice eleven (11) times, all of which were granted.

17. In addition to being assigned to a particular shift, officers are assigned to a particular police cruiser for use on their shift.

18. The total number of officers assigned to the three (3) shifts exceeds the number of police cruisers the Department possesses so each cruiser is assigned to multiple officers for use over the three (3) shifts. The cruiser assignments are not permanent, but instead, are

periodically reassigned among the officers.  True and accurate copies of representative cruiser assignment postings are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 4.

19. Pursuant to Department Orders, a Cruiser Maintenance Supervisor has been assigned to oversee the maintenance of the Department's cruisers.  Throughout my tenure, the Maintenance Supervisor has also been responsible for making the cruiser assignments. Since December 2002, the Maintenance Supervisor has also designated one officer for each cruiser to serve as that particular cruiser's Maintenance Officer.  At all times relevant, the officers assigned to the cruisers have been responsible for reporting any repair and maintenance issues to the Maintenance Supervisor.  True and accurate copies of the Department Orders are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 5.

20. Neither I nor Lt. Sawicki have ever served as the Department's Maintenance Supervisor.

21. Throughout my tenure, officers who are desirous of receiving additional training beyond the mandatory must first receive my approval in order to attend.

22. As early as November 2000, the Department instituted a training book which contained the outside training courses that were being offered which officers could request to attend.

23. Blank Request For Training forms were disseminated to all officers and additional forms were made available to officers in the training book itself.  The training book was made readily available to all officers in the Department, including Plaintiff.  True and accurate copies of Department emails and notices which reflect this are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 6.

24. From time to time, I would also advise officers by email of upcoming training opportunities that were available.   True and accurate representative copies of such emails are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 7.

25. A review of the Department's records reveals that a total of 94 out of 133 training opportunities were approved by me between February 2001 and June 2006.  A summary of the trainings that were approved for this time period is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 8.

26. Auxiliary police officers are essentially citizen volunteers who are assigned to assist the Department as needed.

27. The auxiliary police officers are trained in part by full-time officers within the Department.

28. In order to train the auxiliary officers, a full-time officer must be certified or possess experience in teaching the particular subject area that the auxiliaries are being trained in by him.

29. Plaintiff is not a certified instructor in any of the specific subject areas auxiliaries are trained by the Department in nor does he possess experience teaching in any of those specific subjects.

30. In addition to their regular shifts, full-time officers regularly work paid details, such as construction and utility details for private entities.

31. After working a paid detail, officers are required to submit a detail slip containing the information for the detail that was worked including the date, the start and stop time, the total number of hours and the entity for which the detail was performed.

32. Payment for the details that officers work is made by the Department based on the information that officers provide on the detail slips and on the weekly payroll reports that they are required to submit which identifies the number of regular, overtime and detail hours they worked on each day.

33. Since 1998, Rule 9.21 of the Department's Rules and Regulations, a copy of which Plaintiff received, has required that officers, upon observing or otherwise becoming aware of a violation by another officer of the force or by an employee of the Department's Rules and Regulations or Policies and Procedures, to report said violations to their Superior Officer.  True and accurate copies of Rule 9.21 and the acknowledgment Plaintiff signed reflecting his receipt of a copy of the Department's Rules and Regulations is attached to Defendants' Local Rule 56.1 Statement of Facts as  Exhibit 9.

34. In and around 1998, a large number of the paid details that were performed by officers were for White Mountain Cable Company in connection with White Mountain Cable's installation of cable television lines in Town.

35. On September 21, 1998, I was informed by a sergeant that a patrol officer who was assigned to the 12:00am – 8:00am shift had also worked a White Mountain Cable detail that started at 6:30am that same day.

36. Upon investigating the matter further, it appeared to me that the officer had in fact been paid on certain days for working White Mountain Cable details that covered periods of time which overlapped with the end of the officer's 12:00am – 8:00am shift, without any evidence that another officer had covered the officer's shift for the period of overlap, thereby resulting in his being paid for being in two places at the same time.

37. Based in part on this finding, I sent a request to the Board of Selectmen requesting that a disciplinary hearing be scheduled regarding the officer.

38. As a result of my findings, I expanded my investigation and examined the White Mountain Cable detail history for all officers who were assigned to the 12:00am – 8:00am shift.

39. On November 27, 1998, I interviewed a second officer in connection with my investigation of potential White Mountain Cable detail improprieties, but that officer was not ultimately charged, however, due to insufficient evidence.

40. On or about February 19, 1999, I distributed a memorandum to all of the Department's existing sergeants and lieutenants and asked them to provide the names of three (3) officers who they would recommend for promotion to sergeant using the criteria identified in the memorandum.

41. By letter dated April 30, 1999, I submitted the completed supervisor surveys to the Board of Selectmen for their consideration in filling two (2) sergeant vacancies.  In my letter to the Board, I disclosed that my brother Steven Abbott was a candidate for one of the vacancies and therefore, I could not make any recommendations as to any of the candidates.  True and accurate copies of my letter to the Board and the supervisor surveys are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 10.

42. At a May 4, 1999 meeting of the Board of Selectmen, the Board announced that Steven Abbott and Michael Lecuyer had been appointed to the rank of acting sergeant.

43. At the time of their acting sergeant appointments, Steven Abbott and Lecuyer had been permanent, full-time Freetown police officers since October 31, 1988 and April 3, 1978, respectively.

44. Thereafter, the Board appointed Steven Abbott and Lecuyer to the rank of permanent sergeant effective June 28, 1999.

45. On September 7, 1999, I advised Plaintiff via email that he would be the recipient of the 1999 Mothers Against Drunk Driving Officer of the Year Award. In order to receive the award, an officer must be nominated by me. Plaintiff was the only officer that I nominated for the award. A true and accurate copy of my email to Plaintiff is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 11.

46. On or about October 8, 1999, Plaintiff approached me and verbally requested to attend a "Train The Trainer" course that was being offered by the Department of Correction. Plaintiff stated that the reason why he wanted to attend the training was so that he could teach at Bristol Community College.

47. I denied Plaintiff's request because I did not see how Plaintiff teaching at a local college would inure to the benefit of the Department and I was uncertain as to whether such a course taught in the care and custody of prisoners context of corrections work would translate well to the public safety and law enforcement arena.

48. On December 3, 1999, I submitted a request to the Board of Selectmen that they appoint an acting sergeant to fill in for Lt. Roger Levesque who was expected to be out of work for an extended period of time. A true and accurate copy of my request is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 12.

49. In my request, I recommended that the position be made permanent upon Lt. Levesque retiring or otherwise leaving the Town's service.

50. Using the same criteria that I had previously asked the Department supervisors to consider in making their sergeant recommendations, as well as the results of those surveys, I recommended Donald Bullock for the position.

51. On December 6, 1999, the Board appointed Donald Bullock acting sergeant. At the time of his appointment, Bullock had been a permanent, full-time Freetown officer since August 8, 1988.

52. At the beginning of January 2000, I interviewed a third officer in connection with my White Mountain Cable investigation. During the interview, I presented the officer with a written offer of stipulated discipline under which the officer would admit to the violations at issue and agree to accept six (6) punishment days. In response, the officer admitted to having worked White Mountain Cable details on several occasions for time periods that overlapped with his regular patrol shift and agreed to sign the offer of stipulated discipline.

53. Shortly thereafter, the officer brought the matter before the Union for its approval of the disciplinary agreement, but the Union refused to give its assent.

54. Since the Union's assent was necessary in order for the agreement to be enforceable as to both the officer and the Union, and since that option was no longer available, I referred a formal set of disciplinary charges against the officer to the Board of Selectmen on January 4, 2000. The hearing was held on February 22, 2000 at which the officer forthrightly admitted to the violations. As a result, the Board voted to issue him two (2) punishment days.

55.  Based on my continued review of Department records, it appeared that Plaintiff had also been paid for working a White Mountain Cable detail that covered a period of time which

overlapped with the end of his 12:00am – 8:00am shift.  Specifically, the Department's police log for the day in question reflected that Plaintiff had made traffic stops at 7:03am and 7:16am while on patrol, despite the fact that the Department schedule and the payroll voucher Plaintiff completed for that day reflected that he began working a White Mountain Cable detail at 7:00am.  True and accurate copies of the police log, the Department schedule and the payroll voucher are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 13.

56. Sometime in February 2000, I interviewed Plaintiff in connection with his White Mountain Cable detail investigation.

57. As I had with the other officer, I presented Plaintiff with a written offer of stipulated discipline under which Plaintiff would admit to the violation at issue and agree to accept two (2) punishment days.

58. At that meeting, Plaintiff rejected my offer, denied the allegation and stated that he and Sgt. Lecuyer had discussed the potential problem of working both a detail and patrol, suggesting in essence that another officer had covered his patrol shift for him and that the police log was in error.  At that time I stated that I would look into the matter further.

59. Subsequently, I spoke with Sgt. Lecuyer who stated that he could not recall any officers covering for Plaintiff on the day in question.

60. In addition, I also sought to listen to the Department dispatch recordings for the day at issue, but was advised by the dispatch supervisor that the tapes had been destroyed as a result of a previous lightning strike.

61. In light of these facts and the fact that Plaintiff had not been disciplined for any reason in the past, I gave Plaintiff the benefit of the doubt and advised him the day after our initial meeting that I was dismissing the charges against him.

62. Following Lt. Levesque's retirement in April 2000, the Board of Selectmen appointed Donald Bullock to the position of permanent sergeant effective September 2000, consistent with ,u December 3, 1999 recommendation.

63. On or about October 26, 2000, Plaintiff wrote to the Board of Selectmen in connection with his earlier request for a copy of the disciplinary charges that I had presented to him at the beginning of February 2000. In his letter to the Board, Plaintiff objected to my accusations and reasserted his request for a copy of the "complaints issued against me by Chief Charlton (sic) Abbott, Jr." and further requested that a letter be placed in his personnel file reflecting that he had been falsely accused.

64. After receiving a copy of Plaintiff's October 26, 2000 letter to the Board, I sent Plaintiff a letter dated October 31, 2000 in which I confirmed that no disciplinary action was taken or is being taken against him regarding White Mountain Cable details, that there was no active investigation involving Plaintiff regarding same and that no disciplinary documentation concerning White Mountain existed in his personnel file. A true and accurate copy of my letter is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 14.

65. In January 2001, I learned via another officer that Plaintiff was interested in taking a "Train The Trainer" course that was being offered by the Massachusetts Criminal Justice Training Council and approved him to attend same without loss of pay.

66. In and around June 2001, I received requests from multiple officers to attend a multi-day Motorcycle Operation training, including one from Plaintiff.

67. Since the demand for the training exceeded the Department's need for motorcycle operators, not all of the requests could be approved so I approved the officers who I believed had the most motorcycle operating experience and who were actively riding motorcycles at that time.

68. At the time of the training, Plaintiff did not own a motorcycle of his own to my knowledge.

69. Plaintiff and Scott Rose were the two (2) officers whose requests for the Motorcycle Operation training were denied.

70. In and around June 2001, I approached Plaintiff and asked him if he would be interested in attending a Fingerprint Recovery training. Plaintiff responded that he was and I subsequently sent him to the training.

71. In and around August 2001, Donald Bullock voluntarily resigned his sergeant position and was returned to the rank of patrol officer.

72. To fill the vacancy created by Bullock's resignation of rank, I recommended to the Board of Selectmen that it appoint the most senior patrol officer, Charles Sullivan, to the position of Acting Sergeant which recommendation the Board voted to accept on or about September 4, 2001.

73. At the time of his appointment, Sullivan had been a permanent, full-time Freetown officer since July 1, 1980.

74. On November 14, 2002, I issued Plaintiff a letter of commendation for his meritorious service in connection with his investigation of a stolen car ring. A true and accurate copy of my letter is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 15.

75. In and around November 2002, Sgt. Lecuyer announced that he would be retiring thereby resulting in another sergeant vacancy. As a result, I recommended to the Board that it appoint the most senior officer who was willing and able to accept the position of acting sergeant until such time as a permanent sergeant could be selected.

76. At the time, Mark Rouke was the most senior officer but was out of work on injured on duty leave and, therefore, was not physically able to fill the position so I approached the next most senior officer, Mark Bullock. He, however, indicated that he did not want the position because of the work schedule that accompanied it. This made Donald Bullock the next most senior officer, but he was not interested in returning to the sergeant position that he had previously resigned from. This left Elton Ashley as the next most senior officer.

77. On November 18, 2002, the Board accepted my recommendation and appointed Ashley to the position of acting sergeant effective January 15, 2003. At the time of his appointment, Ashley had been a permanent, full-time Freetown officer since March 6, 1995.

78. Before, during and after this period of time, the Town was in the process of discussing a new promotional procedure with the Union which was to include, among other things, a written examination component.

79. On or about April 17, 2003, I received an anonymous written complaint from a citizen regarding Plaintiff. Consistent with the Department's Internal Affairs policy, I completed a Complaint Control Form and forwarded the complaint to Lt. Sawicki for investigation.

80. Pursuant to Lt. Sawicki's request, Plaintiff submitted a May 14, 2003 written response to the complaint. A true and accurate copy of Plaintiff's response is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 16.

81. Thereafter, Lt. Sawicki forwarded me his investigative report in which he recommended that no disciplinary action be taken against Plaintiff in response to the citizen's allegations, that Plaintiff be counseled regarding the "perception" by motorists that he is following too closely and that Plaintiff be counseled regarding the Department's IA policy and the state perjury statute. A true and accurate copy of Lt. Sawicki's report is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 17.

82. On June 9, 2003, the Department's newly negotiated promotional procedure, including the written examination requirement, was implemented.

83. By memorandum dated June 12, 2003, I advised Plaintiff that the anonymous complaint was not sustained and that no disciplinary action would be taken. I instructed Plaintiff to give consideration to motorists' perceptions that he is following too closely and to familiarize himself with the Department's IA policy and the state perjury statute. A true and accurate copy of my memorandum is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 18.

84. On June 21, 2003, Plaintiff was struck by a motor vehicle while on duty which resulted in his suffering physical injuries and being placed on injured on duty leave pursuant to M.G.L. c. 41, §111F.

85. On June 24, 2003, I sent an email to all officers, including Plaintiff, advising them that a copy of the announcement for the upcoming sergeant promotional exam had been placed in each of their Department mailboxes and that a copy had also been posted on the Union bulletin board. A true and accurate copy of my email and the exam announcement are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 19.

86. The announcement advised officers that the exam would be held on October 11, 2003 at 10:00am at the Freetown Senior Center, which is located next to the Police Station, and instructed interested officers to contact Lt. Sawicki if they intended to take the exam.

87. On or about June 27, 2003, Plaintiff sent a letter to the Board of Selectmen in which he alleged that he was being retaliated against by Chief Abbott as a result of his having complained internally about officers in the Department who had claimed to be working paid details for White Mountain Cable at a point at which they were still on duty. A true and accurate copy of that letter can be found at Complaint Exhibit D.

88. By letter dated July 2, 2003, I ordered Plaintiff to provide to me in writing no later than August 1, 2003 the names of the officers that he was contending he complained internally to, the date and time of the report, the manner in which the report was made and the essence of the report. A true and accurate copy of my letter is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 20.

89. On July 20, 2003, the Boston Globe published a newspaper article entitled "Race, sex and age drive ticketing" with the subheading of "Minorities and men least likely to receive warnings." A true and accurate copy of that article is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 21.

90. In the article, the reporter identified an African-American motorist who contended that he had been issued a traffic citation and fine by a Freetown Police Officer for driving 40 MPH in a 35 MPH zone.

91. Upon investigating the matter, I learned that the officer who had issued the citation was Plaintiff and discovered that on the day in question, Plaintiff issued a total of six (6) citations.  The five (5) motorists whose race Plaintiff identified on the citation as being White received only warnings, while the lone African-American motorist – the one that was identified in the Globe article – received the only fine.

92. Based on this information, I issued Plaintiff a counseling letter on July 21, 2003 in which I instructed him to familiarize himself with the Department's Racial and Gender Profiling policy and Traffic Safety policy and encouraged him to modify his conduct so as to avoid any real or perceived allegations of racial or gender profiling in the future.

93. Under the Department's disciplinary policy, counseling letters are not considered to be disciplinary action, are not placed in an officer's personnel file and are not punitive in nature.  Instead, they are intended to help the officer improve on areas of his performance so as to avoid possible disciplinary action in the future.

94. In response to the instructions contained in the announcement for the October 11, 2003 promotional exam, Plaintiff sent an email to Lt. Sawicki on August 1, 2003 indicating that he wished to take the exam.  A true and accurate copy of that email is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 23.

95. On August 1, 2003, Plaintiff responded to my July 2, 2003 order to him provide information regarding Plaintiff's White Mountain Cable detail allegations by stating that he had provided his attorney with proof of unlawful conduct regarding those details and

that his attorney had advised him that the information would be produced to Town

Counsel.  A true and accurate copy of Plaintiff's letter is attached to Defendants' Local

Rule 56.1 Statement of Facts as Exhibit 24.

96. On August 5, 2003, I reiterated my July 2, 2003 order to Plaintiff to provide the

information I had requested.  A true and accurate copy of my letter to Plaintiff on the

matter is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 25.

97. By letter dated August 7, 2003, Plaintiff advised me that the information I had requested

had been given to his attorney who would in turn produce it to Town Counsel.  He further

advised me to direct all further communications on the matter to his attorney, Howard

Fine.  A true and accurate copy of Plaintiff's letter is attached to Defendants' Local Rule

56.1 Statement of Facts as Exhibit 26.

98. Contrary to his representations in his August 1 and 7, 2003 letters, neither Plaintiff nor

his attorney ever produced the information Plaintiff referred to in his letters outside of the

context of this litigation.

99. On October 11, 2003, the promotional exam was administered as scheduled.  Three (3) of

the officers who had previously sent emails to Lt. Sawicki indicating that they wished to

take the exam appeared at the testing location and took the exam.  Plaintiff was not one of

them.

100.    At no time did I advise Plaintiff verbally or in writing that he could not take the

exam.

101.    None of the officers who took the October 2003 exam achieved a passing score,

so a second exam was scheduled for December 20, 2003.

102.     Plaintiff, who was out of work on injured on duty status at the time, but was in the process of returning to duty, was provided with a copy of the new exam announcement via memorandum from me dated October 16, 2003.  A true and accurate copy of that memorandum is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 27.

103.     Plaintiff never responded to the posting to signify a desire to take the exam.

104.     Despite the fact that Plaintiff did not sign up for the exam by the November 1, 2003 deadline, I advised him in writing on several occasions that he would nonetheless be permitted to take the exam.  True and accurate copies of my notifications to Plaintiff are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 28.

105.     Subsequently, Attorney Fine wrote to me and advised me that Plaintiff would be away on a non-refundable vacation when the exam was scheduled to take place and requested that the exam be rescheduled.  A true and accurate copy of Attorney Fine's letter is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 29.

106.     In an effort to accommodate Plaintiff, I rescheduled the exam to January 10, 2004.

107.     On December 4, 5 and 9, 2003, I notified Plaintiff and Attorney Fine in writing that the exam had been rescheduled to January 10, 2004.  True and accurate copies of my correspondence to them are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 30.

108.     On or about December 29, 2003, I received a written complaint from Lt. Sawicki in connection with an incident he had had with Plaintiff on that date.  A true and accurate copy of that complaint is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 31.

109.    After receiving Plaintiff's response to Lt. Sawicki's complaint, no further action was taken on the matter by me or the Board of Selectmen.

110.    On January 10, 2004, the aforementioned promotional exam was administered as scheduled, but Plaintiff never reported to the testing location to take the exam and did not advise anyone with the Department as to the reason why.

111.    The officer who received the highest score on the January 10, 2004 exam was Elton Ashley.

112.    Following the completion of the formal promotional process, Ashley was appointed by the Board of Selectmen to the rank of permanent sergeant effective March 22, 2004.

113.    On July 15, 2004, Plaintiff sent me an email requesting approval to attend a multi-day Motorcycle Operation training that was scheduled to take place from July 19, 2004 through July 23, 2004.  A true and accurate copy of that request is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 31.

114.    As of the date of Plaintiff's email, Officer Ryan Perreira had already requested and received my approval to attend the same training.  A true and accurate copy of Perreira's request is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 32.

115.    Due to the fact that Perreira had already been approved for the training and that Plaintiff's request was received only a few days before the training was to take place which would require me to find someone to cover Plaintiff's shifts, I denied Plaintiff's request.

116.    On September 21, 2004, Plaintiff reported for his shift eighteen (18) minutes late and was instructed by the officer in charge of the shift, Sgt. Steven Abbott, to advise him of the reason. A true and accurate copy of Sgt. Abbott's email to Plaintiff is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 33.

117.    On September 22, 2004, Plaintiff advised Sgt. Abbott via email that he had overslept due to prescription medication that he was taking. A true and accurate copy of Plaintiff's email is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 34.

118.    On September 27, 2004, Sgt. Abbott issued Plaintiff a counseling notice for being tardy on September 21, 2004, citing prior incidents of tardiness in support of same. A true and accurate copy of that notice can be found at Complaint Exhibit L.

119.    After I was advised of the reason Plaintiff had provided for being late, i.e. prescription medication, I emailed Plaintiff on September 22, 2004 and instructed him, pursuant to Department Rule 13.9, to provide me with information regarding the type of medication he was taking and the dosage by the end of his next shift. A true and accurate copy of my email to Plaintiff is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 35.

120.    Although he received the email, Plaintiff did not respond to me in any way.

121.    Receiving no response by the designated deadline, I emailed Plaintiff on September 27, 2004 and again directed him to provide the requested information. A true and accurate copy of my email is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 36.

122.    After Plaintiff did not respond by the deadline he was given, I confirmed via the Department's email system that Plaintiff had received the email and deleted it.

123.    In light of Plaintiff's failures to respond, I placed Plaintiff on paid administrative leave on October 8, 2004 and instructed him to report to my office on October 12, 2004.

124.    After meeting with Plaintiff and involving Town Counsel in discussions with Plaintiff's counsel, I eventually received the information.

125.    In light of the measures that I was forced to take in order to receive a response from Plaintiff, I drafted a set of insubordination charges that I wished to file against Plaintiff and faxed them to Town Counsel for review.  A true and accurate copy of my fax is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 37.

126.    On November 8, 2004, I forwarded a final version of the charges to the Board of Selectmen and requested that a hearing be held regarding same.  Plaintiff was also sent a copy of the charges.  A true and accurate copy of my letter to the Board with the accompanying charge is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 38.

127.    While the disciplinary charges were still pending, and after receiving confirmation from the Town physician that the medications Plaintiff was taking would not impair his abilities to perform his job safely, I advised Plaintiff that I was restoring him to active duty.

128.    In response, Plaintiff advised me by letter dated November 12, 2004 that he was suffering from the ongoing effects of his June 21, 2003 work related accident, to wit, sleep deprivation and black outs, and that he did not feel he could safely perform his job duties as a result of same.  Plaintiff requested that I place him on injured on duty leave

pursuant to M.G.L. c. 41, §111F. A true and accurate copy of Plaintiff's letter is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 39.

129. On December 10, 2004, I ordered Plaintiff to undergo a psychological evaluation before Mark S. Schaefer, Ph.D. in connection with his request for injury leave benefits.

130. Plaintiff was examined by Dr. Schaefer on December 21 and 28, 2004 who subsequently opined by report dated January 19, 2005 that Plaintiff was disabled from his duties as a police officer due to Post-Traumatic Stress Disorder type symptoms that Plaintiff was suffering from as a result of his June 21, 2003 work accident.

131. Plaintiff was permitted to utilize his available sick leave while his injury leave request was pending.

132. On January 26, 2005, I mailed Plaintiff and Attorney Fine a copy of a posting for a promotional exam that was to be given on May 7, 2005. A true and accurate copy of my letter and the posting are attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 40.

133. Plaintiff never signed up for the exam nor made any other efforts to take the exam.

134. After receiving Dr. Schaefer's report, Town Counsel forwarded a copy to Plaintiff's counsel by letter dated February 3, 2005 and requested that he contact him to discuss it. A true and accurate copy of Town Counsel's letter is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 41.

135. By letter dated February 17, 2005, Attorney Fair followed up with Attorney Fine further on the matter. A true and accurate copy of Attorney Fair's follow-up letter is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 42.

136.     By letter dated March 1, 2005, Attorney Fine sent Attorney Fair a proposed memorandum of agreement concerning Plaintiff's pending request for injury leave benefits.  A true and accurate copy of Attorney Fine's letter and memorandum of agreement is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 43.

137.     Thereafter, the parties exchanged a number of offers and counteroffers on the matter a resolution of the matter was finally reached in June 2005, pursuant to which, Plaintiff was granted injury leave benefits retroactive to the date of his initial request, i.e. November 12, 2004, and continuing.  A true and accurate copy of the parties' final agreement is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 44.  .

138.     After numerous requests for continuances by Plaintiff, a hearing was eventually held on the insubordination charges on September 19, 2005 at which Plaintiff did not dispute that he had ignored my email requests to him.

139.     After taking the matter under advisement, the Board of Selectmen voted on October 3, 2005 to issue Plaintiff a written reprimand for insubordination as a result of his failure to respond in any way to my emails.  A true and accurate copy of the Board's letter of reprimand is attached to Defendants' Local Rule 56.1 Statement of Facts as Exhibit 45.

140.     On October 7, 2005, Attorney Fine provided Town Counsel with a note from Plaintiff's psychiatrist who in turn provided it to me.   The note from Plaintiff's psychiatrist stated that Plaintiff was able to return to his position as a police officer without restrictions with medication.

141.    After verifying that the medications would not impair Plaintiff's ability to perform his job safely, I advised Plaintiff by letter dated November 7, 2005 that he was to report to duty effective November 21, 2005.

142.    On or about November 18, 2005, I received a second note from the same psychiatrist which indicated that Plaintiff was not ready to return to work.

143.    Given the conflicting information that I had received, I referred Plaintiff back to Dr. Schaefer for a re-evaluation.

144.    In his subsequent January 9, 2006 report and his January 25, 2006 addendum thereto, Dr. Schaefer opined that Plaintiff continued to be disabled from his duties as a result of his June 2003 work accident.  In his addendum, Dr. Schaefer stated that "it may be time to consider whether Officer Taylor should be evaluated for disability and retirement from the force."

145.     Based on Dr. Schaefer's suggestion, as well as the length of time Plaintiff had already been out of work, I filed an involuntary accidental disability retirement application concerning Plaintiff with the Bristol County Retirement Board by letter dated February 21, 2006.

146.    On or about April 6, 2006, I received a note from Plaintiff's psychiatrist which stated that Plaintiff was again fit for a return to duty.

147.    After receiving confirmation of this following a further evaluation by Dr. Schaefer, Plaintiff was returned to active duty and I withdrew the involuntary retirement application I had filed.

148.    In total, Plaintiff was out of work and received injury leave benefits from the Town as a result of his June 21, 2003 accident and the effects therefrom for a total of

approximately thirty-two (32) months over the following periods of time:  June 21, 2003 – October 26, 2003, December 8, 2003 – June 17, 2004 and November 12, 2004 – August 7, 2006.

149.     Only one (1) of the twelve (12) Internal Affairs investigations that have been conducted since 1999 regarding Plaintiff has resulted in his being disciplined.  As for the remaining investigations, eight (8) of them resulted in no action whatsoever being taken against Plaintiff and three (3) resulted only in his receiving a written letter of counseling.

150.     At no time did I ever instruct Officer Ashley or Officer Rose to ask Plaintiff what "side" or "team" he was on or to request on my behalf that he assist in covering up any White Mountain Cable detail improprieties.  Furthermore, I am unaware of any such conversations ever having taken place between Plaintiff and Ashley and/or Rose.

151.     At no time did I ever instruct any Department supervisors to "write up" Plaintiff for "whatever you can."

Signed under the pains and penalties of perjury this 15th day of November 2006.


/s/Carlton E. Abbott, Jr.
Carlton E. Abbott, Jr.


298654/60700/0503