1

```
 1              UNITED STATES DISTRICT COURT

 2                        FOR THE
                   DISTRICT OF MASSACHUSETTS
 3

 4

 5

 6     * * * * * * * * * * * * * * * *
                                      *
 7     JON M. TAYLOR,                 *
            Plaintiff                 *
 8                                    *
       VS.                            *  CIVIL ACTION NO.
 9                                    *  03-12417-PBS
       TOWN OF FREETOWN,              *
10     CARLTON E. ABBOTT, JR., ESQ.,  *
       Individually, and as Chief of  *
11     the Freetown Police Department,*
       and                           *
12     WALTER J. SAWICKI,             *
       Individually, and as Lieutenant*
13     of the Freetown Police         *
       Department,                    *
14          Defendants               *
       * * * * * * * * * * * * * * * *
15

16

17

18

19          VOLUME 1 OF THE DEPOSITION OF JON M. TAYLOR,
       taken on behalf of the Defendants, pursuant to the
20     applicable provisions of the Federal Rules of Civil
       Procedure, before Ruth E. Hulke, CSR No. 114893 and
21     Notary Public for the Commonwealth of Massachusetts, at
       Kopelman and Paige, P.C., 101 Arch Street, Boston,
22     Massachusetts, on Wednesday, June 7, 2006, commencing at
       10:25 a.m.
23
```

LEAVITT REPORTING, INC.

1    Q.   So what information did you come by?

2    A.   You would hear comments here and there.

3    Q.   Such as?

4    A.   I overheard people stating that the Chief had

5    mentioned because of the allegations or the alleged

6    allegations that it was just a fancy football league and

7    any and all proceeds were to be used to buy dinner for

8    all parties involved.

9    Q.   Do you know whether or not that's true?

10    A.   I have no idea, sir.

11    Q.   If that were true, would that then be illegal,

12    as you understand the term?

13    A.   Keeping ledgers regarding sports betting would

14    be construed as illegal activity.

15    Q.   But that is not what I asked.  I asked you if

16    all the proceeds that were collected were subsequently

17    used and disbursed as part of some sort of a meal or food

18    or dinner, would that constitute illegal sports betting,

19    as you understand it?

20    A.   The exact comment that was used was the Chief,

21    Mr. Carlton Abbott, stated this is how we can cover our

22    ass and state it was used for funds at the end of the

23    season to split a dinner that we all, that the winner

1    buys the dinner for everybody.

2          Q.    Who did he make that statement to?

3          A.    There was officers talking.  I was coming out

4    of the officers' room and I overheard the comment.

5          Q.    You overheard the comment --

6          A.    That's correct.

7          Q.    -- that Chief Abbott made?

8          A.    That the officers stated the Chief had made.

9          Q.    So you didn't hear the Chief say that?

10         A.    That's correct.

11         Q.    You heard officers say that the Chief said

12   that?

13         A.    That's correct.

14         Q.    Who did you hear say that the Chief said that?

15         A.    I did not see the actual person who said it.

16   There was, it was just conversation.  I walked in, and

17   everybody became quiet.

18         Q.    Did you at any point in time learn the identity

19   of the person who made this statement according to what

20   the Chief had said about the illegal betting?

21         A.    There were two officers in the room.  I left

22   for the day.  I wasn't interested.  I just wanted to walk

23   out of there.  It was after my shift, after the midnight

                    LEAVITT REPORTING, INC.

1    shift.

2        Q.    So is the answer to my question, no, you didn't

3    learn the identity of the officer who said the Chief said

4    this is how we can cover our ass?

5        A.    That's correct.  I walked out the door.

6        Q.    Now, you said that you brought the illegal

7    sports betting to the Chief's attention -- to the

8    Lieutenant's attention?

9        A.    That's correct.

10       Q.    And then what happened from there?

11       A.    Lieutenant Alves brought it forward.  And

12   according to the documents or newspaper articles, the

13   Chief was quoted as saying there's nothing to

14   substantiate the allegations.  Further documents provided

15   to the Town of Freetown by the Chief stated he had

16   investigated the incident.

17       Q.    Other than Lieutenant Alves, did you speak to

18   anybody else about the illegal sports betting

19   allegations?

20       A.    Former Officer Marc Rourke.

21       Q.    When did you speak to him?

22       A.    Soon after.

23       Q.    Was he a superior officer?

LEAVITT REPORTING, INC.

1   up the White Mountain Cable detail?

2       A.    Sure.  If we back up a little bit further,

3   after he became the Chief, I had two officers approach me

4   in the officers' room, now Sergeant Elton Ashley and

5   Officer Scott Rose.  They asked me to -- The Chief asked

6   them to speak to me and asked that I cover up and state

7   that I had worked some shifts and regarding some

8   paperwork, at which time I refused.

9       Shortly after that, Sergeant Ashley approached me a

10  second time and asked me, stated that he was speaking to

11  me on behalf of Chief Abbott and the Chief wasn't sure

12  what side of the fence I was on, am I on the side of

13  Christiansen, Sullivan and Rourke or was I on his side,

14  at which time Officer Ashley stated I could be on the

15  inside looking out or on the outside looking in.  I

16  specifically stated to Officer Ashley, "I work with

17  everybody.  I might prefer to work with some than others.

18  I get along with everybody.  I'm neutral.  Not involved."

19  He said, "So let it be you'll be on the outside looking

20  in.  I'll advise the Chief of same."  That was the

21  conversation.

22      Q.    The first conversation that took place between

23  you and Elton Ashley, do you recall when that took place?

54

1      A.    And Officer Rourke.  I'm sorry.  Strike that.
2  Officer Rose.

3      Q.    And Officer Rose?

4      A.    That's correct.

5      Q.    So the first time that anybody approached you
6  concerning what you perceived to be White Mountain Cable
7  was when Elton Ashley approached you with Officer Rose?

8      A.    That's correct.

9      Q.    Do you recall when that was?

10      A.    That was in the latter part of September.

11      Q.    Of what year?

12      A.    That would have been 1997, I believe.  '98.
13  I'm not sure exactly on the day.  I think it was '97.

14      Q.    It may be '97?

15      A.    I believe it was either '97 or '98.

16      Q.    Where did that conversation take place?

17      A.    In the officers' room.

18      Q.    Who was present again?  Yourself, Officer Rose,
19  Elton Ashley?

20      A.    Yes.

21      Q.    Anybody else?

22      A.    That was it.

23      Q.    Specifically, to the best you can recall, the

LEAVITT REPORTING, INC.

1  exact language that was used by Sergeant Ashley --
2       MR. FINE:  Objection.
3  Q.    -- in that conversation?
4       MR. FINE:  Asked and answered.
5  A.    Actually, it took place in September of 1998,
6  it was the last week.  The specific conversation, they
7  approached me and said, quote unquote, "Do you have a
8  minute?  Can we talk to you?  The Chief has asked us to
9  come speak to you concerning the White Mountain Cable
10  incident.  He's afraid you're going to start some shit.
11  He asked us to write to/from letters to him regarding the
12  incident.  He also asked us to speak to you and ask if
13  you would cover for us."
14       Q.    Okay.  Continue.
15       A.    At which time I refused.
16       Q.    Then, specifically, what further conversation
17  took place at that point?
18       A.    That was it.  They walked out.
19       Q.    Did Sergeant Ashley ever indicate what he was
20  referring to when he said if you would write something to
21  cover for us?
22       A.    Stating would you cover the shifts for us, the
23  overlapping shifts.

LEAVITT REPORTING, INC.

1      Q.    That you had covered the shifts, the

2  overlapping shifts for them?

3      A.    Yes.  I had either come in early and/or covered

4  for them.

5      Q.    Sergeant Ashley, according to you, had

6  indicated the Chief had asked him to come speak to you?

7      A.    They both indicated that.

8      Q.    Other than Officer Rose's and Sergeant Ashley's

9  statements to you to that effect, do you have any other

10  information you're relying on to support the allegation

11  that they had come to you at the Chief's behest?

12      A.    No.

13      Q.    You weren't present for any conversations that

14  took place between Chief Abbott and either Sergeant

15  Ashley or Officer Rose.  Is that correct?

16      A.    That would be correct.

17      Q.    Did you ever report Sergeant Ashley's and

18  Officer Rose's remarks to you to anyone associated with

19  the town?

20      A.    Actually, I spoke to Officer Rourke.

21      Q.    Anybody else?

22      A.    That would have been it.

23      Q.    What was your purpose in speaking to Officer

LEAVITT REPORTING, INC.

57

1    Rourke about it?

2        A.   Well, when they spoke to me, I confronted

3    Officer Rourke as to what took place.  He had reviewed

4    numerous documents, and he said specifically, "Jon, I

5    know you didn't do it."  He had gone through numerous

6    payroll logs.  Further, after a conversation that Officer

7    Rourke had with Officer Rose shortly after that, he

8    confronted Officer Rose about the to/from letter which

9    Officer Rose stated the Chief had them write.

10       Q.   So Officer Rourke told you that Officer Rose

11   told him that the Chief asked Officer Rose to write a

12   to/from letter?

13       A.   That's correct.  They were en route to Taunton

14   District Court.

15       Q.   When did that take place?  When did Officer

16   Rourke tell you about this conversation?

17       A.   That would have been a few months.  Within a

18   few months of what took place with me.

19       Q.   Did he indicate when he had that conversation

20   with Officer Rose?

21       A.   They were en route to court.  I don't remember

22   the specific month.

23       Q.   Did he indicate whether or not anybody else was

LEAVITT REPORTING, INC.

1   present when they had that conversation?

2       A.   The two of them.

3       Q.   Was anybody else present when you spoke to

4   Officer Rourke?

5       A.   The two of us.

6       Q.   Was it your intention in speaking to Officer

7   Rourke that you were reporting in a sort of official

8   capacity the actions of Sergeant Ashley and Officer Rose?

9            MR. FINE:  Objection.

10      A.   I brought light to the conversation that took

11  place.

12      Q.   But what was your intent in doing that?  Was it

13  to have a conversation with Officer Rourke or were you

14  doing so with the intent that formal actions be taken

15  against Sergeant Ashley and/or Officer Rose?

16      A.   I brought it to Officer Rourke's attention and

17  specifically mentioned I'm not getting involved, I'm not

18  a participant, I did nothing, leave me out of this.

19      Q.   I understand, but did you -- Two officers came

20  to you and asked you to participate in a conspiracy to

21  cover up the White Mountain Cable detail.  Is that

22  correct?

23      A.   That's correct.

LEAVITT REPORTING, INC.

59

1       Q.    You have told me that you spoke to Officer

2    Rourke about that?

3       A.    That's correct.  That's correct.

4       Q.    Were you doing so with the intention of

5    reporting this alleged conspiracy that was going on so

6    that formal action could be initiated against the officer

7    involved?

8            MR. FINE:  Same objection.

9       A.    I brought it to Officer Rourke's attention for

10   no other reason than to bring it to his attention as to

11   what was taking place.

12      Q.    You didn't bring the information that you

13   possessed about this alleged conspiracy to anybody else

14   in the department.  Correct?

15      A.    I did.

16      Q.    Who did you bring that to?

17      A.    Sergeant Lecuyer.

18      Q.    What did you say to Sergeant Lecuyer?

19      A.    Sergeant Lecuyer and I spoke on numerous

20   occasions at the Freetown State Forest at the midnight

21   shift as to what was taking place.  I gave my input.  He

22   gave his input.  Sergeant Lecuyer wouldn't let us take a

23   shift until after our shift was complete.  I didn't agree

LEAVITT REPORTING, INC.

60

1    with what was going on.  In the meantime, I had spoke

2    with Officer Rose prior to being confronted, told him

3    you're going to get in trouble.  I was told to mind my

4    business.

5        Q.    Told by who?

6        A.    Officer Rose.  To mind my own business.  Soon

7    after I was approached by those two gentlemen.  Soon

8    after that I was approached by Sergeant Ashley asking

9    what side of the fence I'm on, and a short time later

10   things began happening.

11       Q.    Who did you report the alleged conspiracy to

12   that was brought to you by Officer Rose and Sergeant

13   Ashley?

14       A.    I spoke to Sergeant Lecuyer.  He was my

15   immediate supervisor.

16       Q.    Did you ask Sergeant Lecuyer to look into the

17   matter?

18       A.    No, I did not.

19       Q.    Did you file any formal -- After a period of

20   time I assume that you noted that Sergeant Lecuyer wasn't

21   taking any formal action.  Is that correct?

22       A.    I didn't ask Sergeant Lecuyer to take any

23   action.  I was making him aware as to what had taken

LEAVITT REPORTING, INC.

1    place.

2         Q.    At some point in time you were aware that

3    Sergeant Lecuyer was not, whether you told him or not,

4    was not taking any formal action with respect to that

5    allegation.  Is that correct?

6              MR. FINE:  Objection.

7         A.    That's correct.

8         Q.    Sergeant Ashley came to you again to speak to

9    you about where you stood, what side of the fence you

10   were on.  Correct?

11        A.    That is correct.

12        Q.    When did that take place?

13        A.    That was within a few weeks after I was

14   approached the first time.

15        Q.    Okay.  Did it occur before or after you spoke

16   to Officer Rourke about what had happened in the first

17   conversation with Officer Rose and Sergeant Ashley?

18        A.    I spoke with Officer Rourke prior.

19        Q.    What about Sergeant Lecuyer, had you spoken to

20   him before Sergeant Ashley came back a second time?

21        A.    No, I did not.

22        Q.    The conversation with Sergeant Ashley, the

23   second conversation, who was present for that?

LEAVITT REPORTING, INC.

1      A.    It was just Sergeant Ashley and myself in the

2    officers room.

3      Q.    What time did that take place?

4      A.    Actually, it took place approximately 4:20 in

5    the afternoon.

6      Q.    As best you can recall, what were the specific

7    statements made by Sergeant Ashley and you to him?

8      A.    Sergeant Ashley stated, quote unquote, "Chief

9    Carlton had asked me to come speak to you.  He's not sure

10   what team you're on, what side of the fence you're on.

11   He's not sure if you're on Christiansen/Sullivan, the

12   wrong side, or you want to be on the inside looking out

13   or the outside looking in."  I specifically stated again,

14   "I get along with everybody I work with, everybody.  I

15   might prefer to work with some more than others, I'm not

16   involved, leave me out of it."  He said, "Fine.  So let

17   it be, you'll be on the outside looking in.  I'll advise

18   the Chief of that."

19     Q.    Other than the statements that you just relayed

20   to me about what Sergeant Ashley stated to you, is there

21   any other information you're relying on to support your

22   allegation that Sergeant Ashley was acting at the Chief's

23   behest?

LEAVITT REPORTING, INC.

1      A.   He stated specifically that he was asked to

2   speak to me on behalf of the Chief.

3      Q.   I understand.  Other than that statement.

4      A.   No.

5      Q.   Is there anything else?

6      A.   No.

7      Q.   To the extent you're contending that Sergeant

8   Ashley was in both conversations acting pursuant to the

9   Chief's request, that's based on statements Sergeant

10  Ashley made to you.  Is that correct?

11     A.   Yes.

12     Q.   It's not based on any other information.

13  Correct?

14     A.   Sergeant -- Officer Rose was present at the

15  first time.

16     Q.   The first time, okay.  Other than Officer Rose

17  being present, nothing else.  Is that correct?

18     A.   That is correct.

19     Q.   Did you ever report Sergeant Ashley's remarks

20  that he made to you in that second conversation to anyone

21  associated with the town?

22     A.   I had spoke with former Officer Rourke

23  regarding the same.

LEAVITT REPORTING, INC.

70

1   prior to October 26th of 2000?

2        A.   I have asked for my record to be, any documents

3   which I was told didn't exist, that I was never charged

4   with White Mountain Cable by the Chief.  I had gone to

5   the Selectmen's office and asked for copies, and

6   basically it's in the letters there.  I was told that I

7   had never been charged by the Chief of Police with any

8   crime.  I was told there's nothing in my file regarding

9   White Mountain Cable.

10        On another incident I was then, after we had

11   requested a copy of our files, I believe on the third

12   file I had a stipulation of settlement that was in there

13   which would clearly indicate that I had been charged with

14   an alleged crime.

15        Q.   Okay.  Did you make any verbal complaints to

16   the Chief about White Mountain Cable?

17        A.   No.  I went to his superiors, the Board of

18   Selectmen.

19        Q.   So prior to October 26, 2000, you hadn't

20   complained to the Chief about this alleged police

21   corruption that was taking place in the department.  Is

22   that fair to say?

23        A.   That's correct.

LEAVITT REPORTING, INC.

71

1    Q.   Had you made any complaints to Lieutenant

2  Sawicki verbally prior to October 26, 2000, your

3  October 26, 2000, letter to the Board of Selectmen?

4    A.   No.  I have not.

5    Q.   Did you make any verbal complaints to any other

6  department officials concerning this alleged police

7  corruption that was going on with regard to White

8  Mountain Cable?

9    A.   Sergeant Byrnes.

10    Q.   When did you speak to Sergeant Byrnes?

11    A.   Again, when we were en route to court that day,

12  Second District Court.

13    Q.   That's when you spoke to him about the

14  conversation that you had with the Chief?

15    A.   That's correct.  The Chief had with me, yes.

16    Q.   Anything else?

17    A.   Just Sergeant Lecuyer and Byrnes.

18    Q.   Prior to your conversation with the Chief in

19  which he presented you with the document that he was

20  asking you to sign, had you made any verbal complaints to

21  any department officials concerning the White Mountain

22  Cable double dipping?

23    A.   No, I had not.

LEAVITT REPORTING, INC.

74

1      admitted to this?  This is based on what Sergeant Lecuyer
2      told you?
3          A.   That's correct.
4          Q.   Anybody else make any statements to you about
5      Sergeant Ashley's involvement in this?
6          A.   He made --
7          Q.   Who is "he"?
8          A.   Sergeant Ashley had made a comment to retired
9      Officer Marc Rourke on a detail, Tiffany Construction
10     detail at the Assonet Four Corners stating, "I hope we
11     can all come out of this unscathed."  Officer Rourke had
12     come to me, he was just dumbfounded that such a
13     conversation had taken place.
14         Q.   Sergeant Rourke told you about that
15     conversation?
16         A.   Retired Officer Rourke, yes.
17         Q.   I'm sorry.  Officer Rourke.  You weren't
18     present for that conversation either?
19         A.   That's correct.
20              MR. FAIR:  Off the record.
21              (Discussion off the record.)
22              (Brief recess)
23         Q.   Officer Taylor, just taking one step back

LEAVITT REPORTING, INC.

75

1    concerning your conversations with Sergeant -- Well,

2    there was a first conversation with Sergeant Ashley which

3    Officer Rose was present for?

4        A.    That's correct.

5        Q.    Do you know whether or not Sergeant Ashley or

6    Officer Rose ever communicated your responses to them

7    back to the Chief?

8        A.    No, I don't.

9        Q.    What about the second conversation with

10    Sergeant Ashley, do you know whether or not Sergeant

11    Ashley ever communicated your responses back to the

12    Chief?

13        A.    Other than stating he would go back to him, no.

14    I do not.

15        Q.    When you say "he"?

16        A.    Ashley.

17        Q.    Sergeant Ashley said to you that he was going

18    to go back to the Chief with your statements?

19        A.    That's correct.

20        Q.    But other than that, you don't have any other

21    information he did that?

22        A.    That would be correct.

23        Q.    How is Officer Rose -- Is he still an officer,

LEAVITT REPORTING, INC.

1      Q.    The letters that you're referring -- Other than
2   that, did you file any other formal complaints with
3   anyone in the department or the town concerning Sergeant
4   Ashley's actions against you?
5      A.    No.  They would be contained in letters.
6      Q.    The letters you're referring to are Exhibits A
7   through D of the complaint.  Correct?
8      A.    Correct.
9      Q.    Any other letters that you're referring to that
10  you're contending that you are making these formal
11  allegations or formal complaints regarding Sergeant
12  Ashley's conduct?
13     A.    The allegations in the letters are not
14  specifically geared towards Sergeant Ashley; they're of
15  misconduct which has taken place in the police
16  department.
17     Q.    Okay.  Are there any other letters or are there
18  any letters in which you formally complained about the
19  conduct of Sergeant Ashley towards yourself?
20     A.    No.
21     Q.    To the extent that you did generate any formal
22  complaints concerning the police corruption, I believe as
23  you have termed it, in the department, those are

LEAVITT REPORTING, INC.

68

1    contained in Exhibits A through D of your complaint?

2        A.    That would be correct.

3        Q.    Were there any other formal complaints that you

4    filed with anyone in the department or the town

5    concerning the White Mountain Cable double dipping

6    situation other than those documents?

7        A.    Those documents there went to the Board of

8    Selectmen.  Have I gone to anybody else?  Is that what

9    you're asking?

10       Q.    I'm asking you if you have filed any formal

11   complaints other than Exhibits A through D with anyone

12   affiliated with the town or the department concerning the

13   White Mountain Cable double dipping.

14       A.    I went to the Board of Selectmen who are the

15   police commissioners to attempt to straighten this out.

16       Q.    Did you file the -- The formal complaints that

17   you filed with them are Exhibits A through D of the

18   complaint?

19       A.    Yes.

20       Q.    Anything else?  Any other formal documents

21   complaining about the White Mountain Cable situation that

22   you filed with anyone with the town or the department?

23       A.    You have the documents there.

LEAVITT REPORTING, INC.

69

1      Q.    So we're limiting it to Exhibits A through D.
2    There's nothing else out there?
3      A.    Just the payroll records.
4      Q.    But no formal complaints that were filed by you
5    other than Exhibits A through D.   Correct?
6      A.    That would be correct.
7      Q.    Okay.  At what point did you verbally at any
8    point prior to -- and I note that the date of the first
9    letter is October 26th of 2000.
10     A.    That's correct.
11     Q.    That would have been the first formal complaint
12   that you filed on this White Mountain Cable situation?
13     A.    That's correct.
14     Q.    Were there any verbal complaints that you made
15   concerning the White Mountain Cable situation prior to
16   October 26 of 2000?
17     A.    No.  They're contained in the letters to the
18   Board of Selectmen.
19     Q.    So you didn't make any verbal complaints to the
20   Board of Selectmen prior to the letters.   Correct?
21     A.    No.  I put it on paper.
22     Q.    Did you make any verbal complaints to the Chief
23   of Police concerning the White Mountain Cable situation

LEAVITT REPORTING, INC.

1    Q.    You drafted this e-mail in response to Sergeant

2    Abbott?

3    A.    Yes.

4    Q.    And I note that in the paragraph you indicate

5    in response to his request about why you were late, the

6    second sentence says, "Due to my prescription medication,

7    I apparently woke up late."  Do you see that there?

8    A.    Yes, I do.

9    Q.    And I would like you to turn to the next page,

10    please.  This is a September 22, 2004, e-mail from Chief

11    Abbott to yourself.  It states, "Pursuant to Rule 13.9

12    you are required to inform me of any controlled

13    substances you possess and/or use on or off duty.  Notify

14    me via e-mail, no later than the end of your next shift,

15    as to the specific name(s) and strengths of any

16    controlled substances as required by the above rule.

17    Thank you."  Did you receive that e-mail?

18    A.    Yes, I did.

19    Q.    When did you receive that e-mail?

20    A.    On or about the 22nd of 2004, I believe.

21    Q.    You didn't respond to that e-mail in any way,

22    did you?

23    A.    No, I did not.

LEAVITT REPORTING, INC.

128

1      Q.    Why not?

2      A.    I was consulting with my union rep first, Mr.

3   Tony Pini.

4      Q.    Did you advise the Chief you were consulting

5   with your union rep at that time?

6      A.    No.  I did not.

7      Q.    So you didn't respond to the Chief's e-mail in

8   any way at that point.  Correct?

9      A.    That's correct.

10      Q.    If you could turn the page to the next attached

11   document, e-mail dated 9-27-2004, Chief Abbott to

12   yourself.  Did you receive that e-mail?

13      A.    Yes, I did.

14      Q.    When did you receive that e-mail?

15      A.    Again, it was on or about the 27th.

16      Q.    You didn't respond to that e-mail in any way,

17   did you?

18      A.    Well, actually, he had spoke to Sergeant

19   Sullivan, and Sergeant Sullivan said to respond.  I had

20   gone back to see Dr. Carty, as the records indicate, and

21   had just received a new prescription.  I was in the

22   process to call the Chief, and he told me I was not to

23   report back to work and that I was, I believe, suspended

LEAVITT REPORTING, INC.

129

1   and to be in his office Monday at approximately 9:00 or
2   9:30, and to have union representation if I wished to.
3        Q.   Did you respond to this e-mail?
4        A.   I was to call him by four o'clock.  He called
5   me between 3:45 and 3:50.
6        Q.   When did he call you?
7        A.   Sergeant Sullivan told me to respond to him by
8   four o'clock.  He spoke to Sergeant Sullivan.
9        Q.   When was that?
10       A.   I think this was a Thursday at midnight into a
11  Friday morning shift, I believe.  I'm not sure when it
12  was.
13       Q.   Several days after you received the e-mail,
14  though?
15       A.   I had spoke to Sergeant Sullivan who was the
16  next union brother and asked him his advice how to
17  respond to such a thing.
18       Q.   All I'm asking you, sir, is when did you
19  receive word from Sergeant Sullivan that the Chief had
20  ordered you to come into his office and you called the
21  Chief.  Correct?
22       A.   I was actually -- I just got a prescription
23  refilled at CVS from the doctor's office.  Sergeant

LEAVITT REPORTING, INC.

130

1    Sullivan pulled me aside in the juniors parking lot
2    located on South Main Street and said, "Jon, do what you
3    want to do, talk to him about it.  Just respond to the
4    Chief before the end of the shift which is four o'clock,
5    not eight o'clock."  He said, "Before four o'clock."
6        Q.    When did you have that conversation with
7    Sergeant Sullivan?
8        A.    It was the night before.  I was told not to
9    return to work until Monday, to have union representation
10   with me.
11       Q.    Do you recall the date that occurred?
12       A.    It was around this time.  It was, it would have
13   been a Thursday into Friday morning.  So this might be
14   around the same time.  Might be a day one way or the
15   other.
16       Q.    Why don't you take a look, if you would, at the
17   second to the last page.  It's a document, Freetown
18   Police Department, it's a calendar for September, 2004,
19   Taylor - 838.  Do you recognize that as your work
20   schedule?
21       A.    Yes.
22       Q.    According to this document anyway, on
23   September 27th you worked the midnight to 8:00 a.m.

LEAVITT REPORTING, INC.

1    shift.  Correct?

2         A.    Correct.

3         Q.    Then the next day, the 28th, you were scheduled

4    to work the midnight to 8:00, the SL.  Do you know what

5    that stands for?

6         A.    Sick leave.

7         Q.    So you didn't work that day.  Correct?

8         A.    That's correct.

9         Q.    You didn't work, according to the schedule,

10   Wednesday or Thursday, the 29th and 30th.  Those were

11   your scheduled days off?

12        A.    My first shift back would have been the Friday

13   midnight to Friday eight o'clock in the morning.

14        Q.    Okay.

15        A.    Or which would be Thursday into Friday morning.

16        Q.    So the midnight, it would have been midnight

17   of?

18        A.    Friday.

19        Q.    It would have been zero hours on Friday.

20   Correct?

21        A.    Correct.

22        Q.    Of October 1st?

23        A.    That's correct.

                    LEAVITT REPORTING, INC.

132

1    Q.    In relation to that shift, did you speak to

2    Sergeant Sullivan?

3    A.    That was approximately 2:20 in the morning.

4    Q.    So you received the e-mail on or about the 27th

5    of September when you worked.  Correct?

6    A.    That's correct.

7    Q.    And the Chief had requested that you notify him

8    via e-mail no later than the end of your next shift.  You

9    did not do that.  Correct?

10    A.    I sought out the counsel of my union brothers

11    which, unfortunately, Sergeant Sullivan wasn't back on

12    until that Friday midnight.

13    Q.    So the answer to my question then is you did

14    not notify the Chief by the end of your next shift as he

15    had instructed in his e-mail?

16    A.    Correct.

17    Q.    Instead, you waited to speak to Sergeant

18    Sullivan on Friday, October 1st?

19    A.    That's correct.

20    Q.    It was at that point, as I understand your

21    testimony, that Sergeant Sullivan advised you that you

22    should speak to the Chief before the end of your shift?

23    A.    Before four o'clock that day.

LEAVITT REPORTING, INC.

133

1     Q.    4:00 p.m. that day?

2     A.    Yes.

3     Q.    Did you contact the Chief before 4:00 p.m. that

4     day?

5     A.    He contacted me, actually.

6     Q.    What did the Chief say to you?

7     A.    My specific comment to the Chief was "I was

8     just getting ready to call you back.  I had just got a

9     new prescription filled at CVS by my doctor."  He said,

10    "I don't want to hear it."  He said, "You're out until

11    Monday.  It would be in your best interest to speak to

12    your union rep.  I expect to see you in my office either

13    9:00 or 9:30," at which time I was represented by Mr.

14    Tony Pini from the Mass. Labor Union and Officer Conley.

15    Q.    So it's fair to say then that as of

16    October 1st, prior to the Chief calling you, you had not

17    responded to him either verbally or by e-mail to either

18    of his e-mails.  Correct?

19          MR. FINE:  Objection.

20    A.    I had not responded to him as of the Friday

21    morning, if that falls on the 1st.

22    Q.    October 1st?

23    A.    Correct.

LEAVITT REPORTING, INC.

134

```
 1         Q.    The first time you spoke to the Chief at all
 2    subsequent to receiving his two e-mails was when he
 3    telephoned you and placed you on administrative leave.
 4    Correct?
 5         A.    That's correct.  I spoke with Sergeant
 6    Sullivan.
 7         Q.    And the Chief at the time he spoke with you
 8    said he was putting you on paid administrative leave.
 9    Correct?
10         A.    That's correct.
11         Q.    And you didn't lose any pay or anything during
12    that period that you were told not to report to work?
13         A.    You are correct, sir.
14         Q.    Why didn't you respond to the Chief?
15         A.    Because I sought out the advice of my senior
16    officer, Mr. Sullivan.  I respect his opinion.  I wanted
17    to speak to him.  I have the right to speak to my brother
18    union member.
19         Q.    So is it your position then if a superior
20    officer gives you an order to report back to them by a
21    specific time that you're free to consult with others
22    before you do so?
23              MR. FINE:  Objection.
```

LEAVITT REPORTING, INC.

1   Correct?

2       A.    After we had turned it over to you, yes.

3       Q.    Okay.  So we have established that the Chief

4   asked you after it was turned over to me to provide the

5   information directly to him.  Correct?

6       A.    That's correct.

7       Q.    Did you do that?

8       A.    No.  Because you had the list.

9       Q.    Thank you.  Now, you indicate that at some

10  point the Chief -- strike that -- that you informed the

11  Chief you had gone to the FBI?

12      A.    That is correct.

13      Q.    When did you inform the Chief that you had gone

14  to the FBI?

15      A.    Just prior to being charged with these

16  department rules and regulations, so it would have been

17  November.

18      Q.    November of 2004?

19      A.    That would be correct, yes.

20      Q.    Do you recall -- How did you inform the Chief?

21      A.    We had a phone conversation, actually.  This is

22  when Officer Byrnes was to drop these papers off to me.

23      Q.    Which papers are you referring to, sir?

```
 1        A.   This packet.  The insubordination.

 2        Q.   Officer Byrnes was --

 3        A.   Sergeant Byrnes.

 4        Q.   Sergeant Byrnes was dropping the packet off to

 5   you?

 6        A.   As he was ordered by the Chief of Police, yes.

 7        Q.   So the Chief called you to tell you that

 8   Sergeant Byrnes would be dropping this package off to

 9   you?

10        A.   No.  I was to notify the Chief and advise him

11   that I had received the packet.

12        Q.   Okay.  So the Chief had called you to request

13   that you advise him that you had received Exhibit 5?

14        A.   I had signed for it, and I called him to advise

15   him I had received the packet, yes.

16        Q.   Okay.  So at the point that you called the

17   Chief, you had already received Exhibit 5?

18        A.   I had just received it.

19        Q.   Just received Exhibit 5.  You telephoned the

20   Chief to let him know you had received it.  Correct?

21        A.   I'm sorry.  That's incorrect.  I'm sorry.  The

22   time frame is off.  I had advised the Chief prior to

23   receiving these documents.  It was a day prior.  So it
```

LEAVITT REPORTING, INC.

147

1    would have been November 7th I had turned him into the

2    FBI.  I called the department, and I called him after I

3    received this packet from Mike Byrnes.

4        Q.    So on November 7th you telephoned the Chief for

5    what purpose?

6        A.    To advise him that apparently nobody was going

7    to properly investigate the wrongful, illegal conduct

8    regarding the Freetown Police Department, and according

9    to my rules and regulations and policies and procedures

10   that I was complying and advising him that I was going to

11   an outside authority to properly investigate.

12       Q.    You telephoned him on November 7th?

13       A.    That is correct.

14       Q.    And you spoke with him?

15       A.    Yes.

16       Q.    Directly?

17       A.    Yes, I did.

18       Q.    What did you say to him specifically, what

19   words you used and what words he used in response?

20       A.    I advised him that I was going to the FBI

21   regarding the White Mountain Cable incidents.  He failed,

22   refused and neglected to properly investigate, have

23   and/or investigate, the town concealed, failed, refused

LEAVITT REPORTING, INC.

148

1    and neglected to investigate.  I advised him that he

2    failed to contact White Mountain Cable, therefore, he

3    concealed a crime, and under the law he was an accessory

4    after the fact, at which time he didn't have much to say

5    to me and hung up.

6        Q.   So he didn't respond to your allegations?

7        A.   He told me I didn't know what I was talking

8    about.

9        Q.   Anything else he said to you?

10       A.   That was it.  And I was served the following

11   day with this.

12       Q.   Did he say anything else -- Did you say

13   anything else to him?

14       A.   That was it.

15       Q.   So prior to your contacting the FBI on

16   November 7th of 2004, had you contacted any outside law

17   enforcement agencies in connection with the White

18   Mountain Cable detail?

19       A.   I had contacted the town Selectmen because they

20   are the police commissioners, and they failed, refused

21   and neglected to have an outside agency brought in.

22   According to the newspaper quotes from the Chief, any and

23   all allegations of misconduct or illegal type activity he

LEAVITT REPORTING, INC.

149

1    turns over to the attorney general's office.  Again, he

2    failed, refused and neglected to do so.  At this point I

3    had no other choice.

4          Q.    So what would be the answer to my question?

5          A.    I contacted my police commissioners.  Yes.

6          Q.    That isn't answering my question.  My question

7    is, prior to you contacting the FBI on November 7th,

8    2004, had you contacted any other outside law enforcement

9    agencies regarding the White Mountain Cable details?  I

10   mean outside of the Town of Freetown.

11         A.    I had spoke with Jack O'Neil from the Bristol

12   County Sheriff's Department briefly.

13         Q.    Who is Jack O'Neil?

14         A.    He was a supervisor for the Town of Somerset.

15         Q.    He's the supervisor for the town?

16         A.    He was.  He had worked for the Somerset Police

17   Department, and he had transferred to the Bristol County

18   Sheriff's Department.  He was the chief of the Law

19   Enforcement Division.

20         Q.    So you contacted the Bristol County Sheriff's

21   Department when?

22         A.    It was before I had gone to the FBI.  So it was

23   probably around September or October.  I had just been --

LEAVITT REPORTING, INC.