1

```
 1                UNITED STATES DISTRICT COURT
 2                         FOR THE
                  DISTRICT OF MASSACHUSETTS
 3
 4
 5
 6   * * * * * * * * * * * * * * * * *
 7   JON M. TAYLOR,                    *
           Plaintiff                   *
 8                                     *
     VS.                               *   CIVIL ACTION NO.
 9                                     *   03-12417-PBS
     TOWN OF FREETOWN,                 *
10   CARLTON E. ABBOTT, JR., ESQ.,     *
     Individually, and as Chief of     *
11   the Freetown Police Department,   *
     and                               *
12   WALTER J. SAWICKI,                *
     Individually, and as Lieutenant   *
13   of the Freetown Police            *
     Department,                       *
14         Defendants                  *
     * * * * * * * * * * * * * * * * *
15
16
17
18
19        VOLUME II OF THE DEPOSITION OF JON M. TAYLOR,
     taken on behalf of the Defendants, pursuant to the
20   applicable provisions of the Federal Rules of Civil
     Procedure, before Ruth E. Hulke, CSR No. 114893 and
21   Notary Public for the Commonwealth of Massachusetts, at
     Kopelman and Paige, P.C., 101 Arch Street, Boston,
22   Massachusetts, on Thursday, June 15, 2006, commencing at
     10:20 a.m.
23
```

LEAVITT REPORTING, INC.

18

1  submitted the paperwork, you were able to attend with
2  pay.  Is that correct?
3       A.   That's correct.
4       Q.   Now, did the location of the book that we have
5  been talking about, this training book, change at any
6  point in time subsequent to 1998?
7       A.   It was readily available after the initial
8  complaint.  Officer Ben Laveck, I believe, attended the
9  class for photography which I believe was through the
10 book, I'm not sure.
11      Q.   I'm not sure I heard your answer.  Did you say
12 it was rarely available or readily available?
13      A.   It was later readily available.
14      Q.   Readily?  Okay.
15      A.   It wasn't available to us initially.
16      Q.   You said after the initial complaint.  What
17 initial complaint?
18      A.   When I was present at the Selectmen's hearing
19 with the Board of Selectmen, the Chief was questioned by
20 Selectman Howland.  And how the issue came up was Officer
21 Ashley and -- excuse me -- Sergeant Ashley and Sergeant
22 Abbott attended a baton training class.  That's how we
23 became aware classes were available.

LEAVITT REPORTING, INC.

1    Q.   So subsequent to that Board of Selectmen's
2  meeting then, the training book was then made readily
3  available to all officers.  Is that correct?
4    A.   Subsequent to the meeting, yes.
5    Q.   At that point in time then you yourself had
6  access to that book and the training opportunities that
7  were listed in there.  Correct?
8    A.   That is correct.
9    Q.   What other trainings did you apply for?
10   A.   Again, I was interested in the motorcycle which
11 I was denied.
12   Q.   Do you recall when you requested that training?
13   A.   I was called when I was in Florida by again
14 Dispatcher Deborah Sousa, Donald Bullock was trying to
15 get ahold of me asking if I was still interested.  They
16 had secured the motorcycle.  So it was probably 1998,
17 '99.
18   Q.   You have already testified about the Train the
19 Trainer training.  Was there any other training that you
20 had requested?
21   A.   No, there wasn't.
22   Q.   Now, you did request to attend a fingerprint
23 recovery training.  Correct?

1   A.   No.  I was approached by the Chief, and he had
2   stated that there was an opportunity in Westport PD, that
3   there was open slots, would you be interested in
4   attending.  I then attended.  I had not requested it.
5   Q.   So the Chief approached you about attending
6   this fingerprint recovery training?
7   A.   Because there was open slots, yes.
8   Q.   That was approximately in June of 2001.
9   Correct?
10  A.   That would be incorrect.  It was still cold, so
11  I want to say it was probably around March.
12  Q.   In 2001, though?
13  A.   I'm not sure what year it was.
14  Q.   Do you recall if it was before or after you
15  went to the Train the Trainer?
16  A.   I believe it was after.
17  Q.   Now, you have also claimed -- Strike that.
18  Were there any other trainings that you can recall that
19  the Chief approached you about attending?
20  A.   I'm not sure if that class you're talking about
21  was fingerprinting or trucks or it was both.  It was
22  something to do with tractor trailers taught by the Mass.
23  State Police.  It was something to do with fingerprints

```
1  be an assignment.
2      Q.   Are there assignments that you're contending
3  that you were unjustly denied?
4      A.   I was never given the opportunity, yes.
5      Q.   Which assignments did you request consideration
6  for?
7      A.   We never had the opportunity.  Again, it was
8  appointed by the Chief.  He sent the people.  I never had
9  the same opportunities as others.
10     Q.   What do you mean, he sent the people?
11     A.   Like, his brother and Sergeant Abbott, Sergeant
12 Ashley, they attended baton training or firearm
13 certification, accident reconstruction.  There was
14 breathalyzer certification to run the BT.
15     Q.   What is BT?
16     A.   Breathalyzer.  Those are just a few examples.
17     Q.   But those are trainings that you're talking
18 about, training opportunities?
19     A.   And/or assignments.  School resource --
20 Correction.  A liaison for the schools, going and
21 speaking on behalf of the police department and the
22 schools, like a DARE officer would be the correct term.
23     Q.   Who got that assignment?
```

28

1    A.    Officer Rose did.
2    Q.    When did that happen?
3    A.    Approximately around '99, '98.
4    Q.    Any others that you recall assignments that
5    were given to others?
6    A.    To the best of my knowledge at this time, what
7    I had spoke about.
8    Q.    Did you ever make any requests to the Chief for
9    specific assignments?
10   A.    Again, we never had the opportunity.
11   Q.    Did you ever make any efforts to, you know,
12   ever approach the Chief and say, "Chief, I would like to
13   be considered for X assignment"?
14   A.    Yes.
15   Q.    Which assignments?
16   A.    Again, teaching auxiliaries, motorcycle
17   training.  I secured the instructor class myself.  After
18   that, it was just frivolous, just a waste of my time.
19   Q.    So then other than those opportunities, you
20   didn't approach the Chief and ask him to be considered
21   for any other assignments that you can recall?
22   A.    It wasn't worth it, no.
23   Q.    Did you ever file any grievances with the union

LEAVITT REPORTING, INC.

```
 1   concerning denial of shifts?
 2       A.   I put in one of the letters I wrote to the
 3   Selectmen and I outlined the shift assignments and/or
 4   favoritism.  It was in the letter regarding my illegally
 5   being charged with the White Mountain Cable incident.  It
 6   was one of the exhibits, I think October of 2000,
 7   roughly, I'm not sure.
 8       Q.   Are you referring to Exhibit A or Attachment A
 9   to Deposition Exhibit 1?
10       A.   Correct.
11       Q.   Did you ever file any grievances with the
12   union, though?
13       A.   I did.  It was a useless process.
14       Q.   But specifically did you ever file any
15   grievances with the union over a change in your shift?
16       A.   We had no -- The response that we received was
17   it was management rights, it was the Chief's right to
18   assign people, there was nothing in our contract when the
19   question was raised.  That's where it ended.
20       Q.   But I guess I'm asking you, did you ever file a
21   grievance on it?
22           MR. FINE:  Objection.  Asked and answered.
23           MR. FAIR:  I beg to differ.
```

LEAVITT REPORTING, INC.

1    A.   Again, the response we received from the Chief
2  of Police was it's managements rights, that until we
3  receive it in our collective bargaining agreement between
4  the Town of Freetown and the union, we had no rights.
5    Q.   So the instances you're talking about, they
6  occurred then prior to the collective bargaining
7  agreement between the union and the town?
8    A.   Until we were able to secure that in our
9  contract, yes.
10    Q.   Then is it your testimony subsequent -- Okay.
11  Strike that.
12    Now, referring your attention to the assignments,
13  did you ever file any grievances in connection with your
14  not getting assignments?
15    A.   Yes.  I had answered that last time we were
16  here.  It was regarding the teaching of the auxiliary
17  class.
18    Q.   Other than that grievance, any others?
19    A.   No.  I did not.
20    Q.   You claim you were also deprived of overtime
21  opportunities.  What opportunities are you referring to?
22    A.   Opportunities I'm referring to specifically
23  are, one instance was the training of the auxiliaries.

1  That was one incident.  Another incident would be if we
2  were and if I had the ability to do accident
3  reconstruction, that could result in overtime.  There was
4  other things that could result in overtime, when you
5  teach.  It could be taking of comp time over overtime,
6  such as firearms instructor at the range, things like
7  that.
8      Q.  Did you ever request to attend firearms
9  instructor training?
10     A.  Actually, Lieutenant Sawicki has done it for
11 the department.  He's been very good at it.  No, I have
12 not.
13     Q.  What about the accident reconstructions, did
14 you ever request to be the accident reconstructionist?
15     A.  Never had the opportunity.  We were told when
16 Officer Medeiros transferred to the Palm Beach Police
17 Department that Sergeant Magnett was assigned the
18 accident reconstruction.
19     Q.  Did you ever request to attend that training?
20     A.  No.  We didn't have the opportunity.
21     Q.  You didn't have the opportunity?
22     A.  It was assigned by the Chief to Sergeant
23 Magnett.  He was then sent to somewhere outside Boston

32

1  for training?
2      Q.    Did you ever file any complaints with the Chief
3  about you're not being considered for the accident
4  reconstructionist?
5      A.    I believe after the comment that was made by
6  Sergeant Magnett after he came out of the Chief's office
7  that anybody who goes against the Chief will never see
8  anything in this department was self-explanatory.  There
9  was no reason to file further grievances.  It was self-
10 evident I was going nowhere.  Neither were the few
11 others.
12     Q.    So the answer is, no, you never filed a
13 complaint with the Chief about not getting the accident
14 reconstructionist assignment?
15     A.    That's correct.
16     Q.    When was this comment by Swede Magnett made
17 that you're referring to?
18     A.    The year?  I'm not specific what year it was.
19 He was thinking about leaving the Freetown PD to transfer
20 to Lakeville PD under Chief Sorrell.  He was called into
21 the Chief's office, and when he exited the Chief's office
22 he blurted out the comment that he was told to hang in
23 there, anybody that goes against the Chief will never see

LEAVITT REPORTING, INC.

33

1  anything in this department, the next sergeant's
2  positions will be in the specific order which was
3  Sergeant Ashley, Swede Magnett, and then Scott Rose.
4      Q.   So at the time the statement was made Sergeant
5  Ashley had not yet been named sergeant.  Correct?
6      A.   I believe he had, so it was around '98, yes.
7      Q.   I thought you just said the order of promotions
8  would be Sergeant Ashley --
9      A.   Swede Magnett.
10     Q.   Correct.  But you're saying that Sergeant
11 Ashley was already --
12     A.   Temporary Sergeant, yes.
13     Q.   He was already Temporary Sergeant?
14     A.   Correct.
15     Q.   But he had not yet been made permanent; is that
16 what you're saying?
17     A.   That's correct.
18     Q.   So that's approximately when the statement was
19 made by Swede Magnett coming out of the Chief's office?
20     A.   That's correct.
21     Q.   You're saying that's approximately 1998?
22     A.   Again, approximately, yes.
23     Q.   When was Sergeant Ashley made permanent

LEAVITT REPORTING, INC.

34

```
 1   Sergeant, do you know?
 2        A.   There are so many dates involved in this case,
 3   I'm not sure.
 4        Q.   Was that approximately 1998?
 5        A.   Let's see.  The Chief first recommended
 6   Sergeant Ashley over a senior officer which was Donald
 7   Bullock, then they appointed Sergeant Lecuyer and his
 8   brother, so that was approximately '97 or '98.  So he was
 9   made shortly after that.
10        Q.   So approximately 1998?
11        A.   Approximately, yes.
12        Q.   What other overtime opportunities were you
13   denied?
14        A.   Again, the specifics were I did file a
15   grievance and was denied which was again the auxiliary
16   training.  There was, I'm sure there was a few more.  But
17   there were so many instances, I can't keep track of
18   everything.
19        Q.   Other than what you have already testified to,
20   are there any other overtime opportunities that you're
21   contending you were denied?
22        A.   Again, to my knowledge, what we discussed.
23        Q.   You're claiming you were subjected to closer
```

```
 1      A.   Yes, I did.
 2      Q.   Which he then gave you.  Correct?
 3      A.   Correct.
 4      Q.   And you then subsequently, instead of taking
 5 the individual to the hospital, brought him straight to
 6 the House of Correction?
 7      A.   He was unable to make bail, yes.  The judge
 8 again reviewed the tape and stated that I had done
 9 everything accordingly.  His attorney pled him out on the
10 green sheet and pled guilty.
11      Q.   Now, you mentioned officer in charge.  What's
12 an officer in charge?
13      A.   OIC was on the midnight shift, it was the most
14 senior officer.
15      Q.   What is the function of an officer in charge?
16      A.   Would act as the sergeant.  The shift in
17 particular was myself and Officer Scott Rose on that
18 shift.
19      Q.   And we're talking about the midnight shift?
20      A.   Correct.
21      Q.   On the midnight shift the officer in charge is
22 ultimately the highest ranking officer on duty?
23      A.   That's correct.
```

38

1    Q.   It would be fair to say that that officer is
2    essentially responsible for making whatever judgment
3    calls need to be made about the operation of the
4    department?
5    A.   You are acting sergeant, yes.
6    Q.   So you're almost acting as Chief of the
7    department in the Chief's absence.  Would that be fair to
8    say?
9         MR. FINE:  Objection.
10   A.   That would be incorrect.  You would be acting
11   as the senior supervisor.
12   Q.   So the person assigned to call the shots on
13   that shift, essentially?
14        MR. FINE:  Objection.
15   A.   Follow the rules and regulations, policy and
16   procedures of the department, yes.
17   Q.   Make sure that the personnel who are also
18   assigned to the shift are doing so as well.  Correct?
19   A.   That's correct.
20   Q.   And making sure that all of the department's
21   rules and regulations are being followed with respect to
22   the law enforcement activities as well.  Correct?
23   A.   That's correct.

LEAVITT REPORTING, INC.

```
1      Q.   When did the conversation between yourself and
2   Donald Bullock take place?
3      A.   It was after the meeting.  He was my supervisor
4   for that night.  He said, "Jon, I have to just let you
5   know I'm supposed to watch everything you do, advise what
6   took place."  The dispatcher also told me she overheard
7   some of the comments at different times.
8      Q.   What meeting are you referring to?
9      A.   A meeting between the supervisors and the
10  Chief.
11     Q.   Who was present?
12     A.   I can only speak on behalf of Mr. Bullock.
13     Q.   What did Mr. Bullock tell you in terms of who
14  was present?
15     A.   I didn't ask.  It was supervisors, so I'm
16  assuming it was all department supervisors at the time.
17     Q.   Did Mr. Bullock give you any indication of who
18  was present other than himself?
19     A.   Again, I'm assuming it was all supervisors.
20     Q.   But what is that assumption based on?
21     A.   It was a supervisors meeting.  I would assume
22  that the supervisors were present.  I don't know who was
23  present.
```

```
1      Q.   Has anybody told you who was present for that
2   meeting?
3      A.   Have not.
4      Q.   When did that meeting take place?
5      A.   It was after that incident.  That incident was
6   in February of, I think of '98.  So it was sometime after
7   that.
8      Q.   Other than what Mr. Bullock told you, is there
9   any other information that you're relying upon to support
10  your contention that the Chief had subjected you to
11  closer supervision by some of your colleagues?
12     A.   Officer Bullock wouldn't lie.  I take his word
13  truthfully.
14     Q.   Okay.
15     A.   A dispatcher also advised me of comments that
16  were made, she overheard them.
17     Q.   Who was that dispatcher?
18     A.   Suzanne Mouquin.
19     Q.   The comments she told you she overheard, this
20  was from that same meeting?
21     A.   Correct.
22     Q.   What did she tell you she overheard?
23     A.   Her not specific words were, basically, I'm
```

41

1    incompetent, I wasn't to be entrusted to be LLC.
2        Q.   She's attributing those comments to whom?
3        A.   Again, she stated what she heard. She was
4    walking through the hall and overheard comments made.
5    She didn't specifically state. It was inside the
6    meeting.
7        Q.   Did she ever identify for you who she heard
8    made those statements?
9        A.   No.
10       Q.   And what about Officer Bullock, did he ever
11   identify for you who had made the statements to him that
12   he relayed to you?
13       A.   Best of my knowledge, he said the Chief.
14       Q.   Well, you're saying the best of your knowledge.
15   Did Officer Bullock specifically tell you the Chief made
16   these comments?
17       A.   To him, yes.
18       Q.   Other than what the dispatcher and Officer
19   Bullock stated to you they heard or overheard at the
20   meeting that you have been testifying about, is there any
21   other information that you're relying upon to support
22   your allegation that you were subjected to closer
23   supervision than some of your colleagues?

LEAVITT REPORTING, INC.

1       Q.    That's the incompetent and could not be trusted
2   to be OIC comment, right?
3       A.    There were other comments.
4       Q.    What other comments?
5       A.    I don't remember them offhand.  It's been over
6   three to four years.
7       Q.    Do you remember any of them?
8       A.    I just told you, no.
9       Q.    What about Lieutenant Sawicki, how did
10  Lieutenant Sawicki malign your good character and
11  reputation?
12      A.    Well, one specific case was while he was at the
13  ADA's office located on Long Street across from Second
14  District Court in Fall River, Mass., after I had been hit
15  by the vehicle he made a comment to members that were
16  present that there was nothing wrong with Taylor,
17  basically I was mentally incompetent, just didn't want to
18  work anymore.  The girl that called me was rather
19  disturbed by such comments, knowing about what my past
20  history and reputation was, and thought I should be made
21  aware of comments that were made.
22      Q.    Who was the person that made the comments to
23  you?

```
 1    A.    Diane Saunders.
 2    Q.    Who is she?
 3    A.    She's one of the receptionists that work there.
 4    Q.    Works at the courthouse?
 5    A.    In that office, yes.
 6    Q.    Which office is that?
 7    A.    The ADA's office.
 8    Q.    The district attorney's office?
 9    A.    That's correct.
10    Q.    What specifically did she state to you that she
11 heard Lieutenant Sawicki say?
12    A.    That there was nothing wrong with me, I was
13 faking it, mentally unstable, I just didn't want to work,
14 I was blaming it on the accident.
15    Q.    Did Ms. Saunders tell you anything else about
16 the statements that were made by Lieutenant Sawicki?
17    A.    No.
18    Q.    Did she say when those statements were made?
19    A.    It was after I was hit by the car, so it was --
20 It's in the report.  I don't remember the exact dates.
21 Again, it's been three or four years.  It's in the
22 complaint.  I would have to look at the complaint to
23 refresh my memory.
```