UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. NO. 03-12417-PBS

| | |
|---|---|
| JON M. TAYLOR,<br><br>       Plaintiff,<br><br>v.<br><br>TOWN OF FREETOWN, CARLTON E.<br>ABBOTT, JR., individually and as Chief of the<br>Freetown Police Department, and WALTER J.<br>SAWICKI, individually and as Lieutenant of<br>the Freetown Police Department,<br>       Defendants. | DEFENDANTS' MEMORANDUM IN<br>SUPPORT OF THEIR MOTION FOR<br>SUMMARY JUDGMENT |

I.  INTRODUCTION

On December 1, 2003, the plaintiff, Jon M. Taylor (hereinafter, "Plaintiff") filed his

complaint in this matter.  Prior to serving that complaint, Plaintiff filed his First Amended

Complaint.  After Defendants moved to dismiss, Plaintiff's First Amended Complaint was

recommended for dismissal by Magistrate Judge Alexander.  In response to that

recommendation, the Court permitted Plaintiff an opportunity to amend his complaint.

On or about January 13, 2005, Plaintiff filed his Second Amended Complaint

(hereinafter, "Complaint").  In Counts I, II, III and IV, Plaintiff alleged that the defendants,

Town of Freetown (hereinafter, "Town"), Freetown Police Chief Carlton Abbott, Jr. (hereinafter,

"Abbott") and Freetown Police Lieutenant Walter J. Sawicki (hereinafter, "Sawicki"), in

violation of 42 U.S.C. §1983, M.G.L. c.12, §§11H and 11I and Article 16 of the Massachusetts

Declaration of Rights, deprived him of his right to free speech and interfered with his protected

conduct under M.G.L. c.149, §185.  In Count V, Plaintiff asserted that the Town violated M.G.L.

c.149, §185(a)(5) by retaliating against him for engaging in activity that is protected under §185.

Finally, in Counts VI and VII[1], respectively, Plaintiff alleged that Abbott and Sawicki tortiously interfered with his contractual and/or advantageous business relationship with the Town and that they defamed him.

Subsequently, Defendants moved to dismiss Plaintiff's Complaint which the Court allowed with respect to the state civil rights act claims against both Abbott and Sawicki (Count IV) and the defamation claim against Abbott (Count VII).  Now come Defendants and respectfully submit that they are entitled to an entry of judgment as a matter of law as to all remaining counts against them for the reasons detailed below.

II.    FACTS & PROCEDURAL HISTORY

Defendants rely upon and incorporate herein their Local Rule 56.1 Statement of Facts. Defendants' Statement of Facts will be referred to below as "SOF ¶___."

III.    ARGUMENT

A.    SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter law." Fed.R.Civ.P. 56(c).  In order to defeat a summary judgment motion, "the non-moving party must demonstrate the existence of a genuine issue of material fact pertaining to those issues on which it would bear the burden of proof at trial." Kauffman v. Puerto Rico Telephone Co., 841 F.2d 1169, 1171 (1st Cir. 1988).  Under Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1987), summary judgment is appropriate where the non-moving has the burden of proof and "fails to make a showing sufficient to establish the existence of an element essential to that party's case."

---

[1] In his Complaint, Plaintiff labeled two (2) separate counts as "Count VI."  To avoid any confusion, the second of these counts, "Defamation", will be referred to as Count VII.

B.    PLAINTIFF CANNOT RECOVER ON ALLEGEDLY RETALIATORY EVENTS
      THAT OCCURRED PRIOR TO DECEMBER 1, 2000.

Section 1983 does not in and of itself contain a time limitation for the filing of claims thereunder. See Street v. Vose, 936 F.2d 38, 39 (1st Cir. 1991) cert. denied, 502 U.S. 1063 (1992). In assessing the timeliness of such claims, the United States Supreme Court has directed the federal courts to borrow the statute of limitations applicable to personal injury actions under the law of the forum state. See id. citing Wilson v. Garcia, 471 U.S. 261, 276-280 (1985). As such, Plaintiff's federal claims, as well as his state tort claims, are governed by a three (3) year statute of limitations period. Id.; M.G.L. c. 260, §§2A and 5B; see Pagliuca v. City of Boston, 35 Mass.App.Ct. 820, 822-23 (1994). Plaintiff's claim under M.G.L. c. 149, §185 is subject to a two (2) year period for filing. M.G.L. c. 149, §185(d).

In most cases, the date of accrual of an action occurs when the plaintiff knows, or has reason to know, of the injury on which the action is based. Ruiz-Sulsona v. University of Puerto Rico, 334 F.3d 157, 159 (1st Cir. 2003). "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify [and] [e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Amtrak v. Morgan, 536 U.S. 101, 114 (2002).

Given that the initial complaint in this matter was filed with the Court on December 1, 2003, Plaintiff is precluded from recovering on claims that are based on discrete events that occurred prior to December 1, 2000. Thus, to the extent he is alleging in his §1983 and Article 16 claims that he was retaliated against by being denied promotions, denied training requests and/or subjected to disciplinary action prior to December 1, 2000, such claims are time barred. See Street, 936 F.2d at 39. With respect to his state "whistle blower" claim, the applicable date is December 1, 2001. M.G.L. c. 149, §185(d).

C. <u>PLAINTIFF HAS FAILED TO STATE CLAIMS FOR RELIEF UNDER §1983 AND ARTICLE 16 OF THE MASSACHUSETTS DECLARATION OF RIGHTS.</u>

In Counts I through III, Plaintiff asserts that he is entitled to relief under 42 U.S.C. §1983 and Article 16[2] of the Massachusetts declaration of rights as a result of Defendants' alleged joint and several deprivation of Plaintiff's right to free speech, as guaranteed to him by the First Amendment to the United States Constitution and Article 16 of the Massachusetts Constitution.[3] Complaint at ¶¶31-33.

A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law and second, the conduct must have worked a denial of rights secured by the Constitution or by federal law. <u>Soto</u> v. <u>Flores</u>, 103 F.3d 1056, 1061 (1st Cir. 1997) <u>cert.</u> <u>denied,</u> 522 U.S. 819 (1997) <u>citing</u> <u>Martinez</u> v. <u>Colon</u>, 54 F.3d 980, 984 (1st Cir.) <u>cert.</u> <u>denied</u>, 516 U.S. 987 (1995). Under the second element, a plaintiff is required to prove not only a deprivation of a right, but also that the defendant's conduct was a cause in fact of the alleged deprivation. <u>Id.</u> at 1062 <u>citing</u> <u>Maldonado Santiago</u> v. <u>Velazquez Garcia</u>, 821 F.2d 822, 831 (1st Cir.1987). In an action pursuant to § 1983, there can be no municipal liability under a respondeat superior theory. <u>Fabiano</u> v. <u>Hopkins</u>, 352 F.3d 447, 452 (1st Cir. 2003) <u>citing</u> <u>Monell</u> v. <u>Dept. of Soc. Servs.</u>, 436 U.S. 658, 690-95 (1978). Rather, to establish liability against a municipality, a plaintiff must prove deprivation of a constitutional right by means of "the execution of the government's policy or custom." <u>Id.</u> <u>citing</u> <u>City of Canton</u> v. <u>Harris</u>, 489 U.S. 378, 385 (1989). It is well-established that a suit brought against municipal officials in their official capacities is tantamount to a claim against the municipality.

---

[2] Defendants are unaware of any Massachusetts decision which holds that an independent cause of action exists under Article 16 for interference with the right to free speech and urges the Court to dismiss that claim.
[3] Plaintiff asserts that Defendants interfered with his "protected conduct pursuant to M.G.L. c. 149, §185." Complaint at ¶31. However, § 1983 is available to remedy deprivations of rights, privileges or immunities created by federal law, but not state law. <u>See</u> <u>Playboy Enterprises, Inc.</u> v. <u>Public Service Commission of Puerto Rico</u>, 906 F.2d 25, 31-32 (1st Cir. 1983) <u>cert.</u> <u>denied</u>, 498 U.S. 959 (1990).

Canney v. City of Chelsea, 925 F.Supp. 58, 69 (D. Mass. 1996) citing Kentucky v. Graham, 473 U.S. 159, 166 (1985).

      1.     Plaintiff has failed to identify any right depriving policy or custom of the Town.

In his Complaint, Plaintiff alleges that the Town had "a custom or policy of violating the rights of its Police Officers by harassing and retaliating against citizens who exercise their right of free speech." Complaint at ¶42. This allegation is nothing more than a restatement of Plaintiff's evidentiary burden for establishing his §1983 claim against the Town and fails to identify the custom or policy of the Town that is supposedly at issue. In the absence of admissible evidence demonstrating the existence of a right depriving Town policy or custom, Plaintiff's §1983 and Article 16 claims against the Town must be dismissed. See Fabiano, 352 F.3d at 452.

      2.     Plaintiff's speech was not entitled to First Amendment protection.

The inquiry into the protected status of speech is one of law, not fact. Connick v. Myers, 461 U.S. 138, 148, n.7 (1983). As the United States Supreme Court has aptly stated, "[w]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick, 461 U.S. at 147-48. More recently, the Supreme Court expanded on this principle and held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 547 U.S. __, __ (2006); 126 S.Ct. 1951, 1960.

In order to make out a claim against Abbott or Sawicki individually for deprivation of his right to free speech, Plaintiff must demonstrate that (1) the speech at issue involved a matter of public concern; (2) that the strength of Plaintiff's and the public's First Amendment interests outweighed the strength of the Town's interest in promoting efficient performance of its Police Department; and (3) that the speech in question was a substantial or motivating factor for the alleged retaliation against him.  Mullin v. Town of Fairhaven, 284 F.3d 31, 37-38 (1st Cir. 2002). If Plaintiff succeeds in making this showing, Defendants may rebut it by showing that they would have reached the same decision even in the absence of the protected speech.  See O'Connor v. Steeves, 994 F.2d 905, 913 (1st Cir. 1993).

    a.  Plaintiff's 1998 conversations with Ashley.

In his Complaint, Plaintiff asserts that he first engaged in protected speech when he spoke to then Officer Elton Ashley and Officer Scott Rose in July and September 1998.  Complaint at ¶11-12.  A review of Plaintiff's account reflects, however, that those conversations, at most, involved nothing more than Plaintiff responding to Ashley's inquiry about Plaintiff's position regarding internal police department politics and Plaintiff's personal willingness to help them evade disciplinary action by forging paperwork.  Plaintiff Deposition Vol. I at 53-55, 62.  It is undisputed that these conversations only came about after Ashley approached Plaintiff and solicited his views on those subjects.  Under the circumstances, Plaintiff's conversations with Ashley and Rose cannot be characterized as efforts on Plaintiff's part to bring attention to matters of public concern.  See Mullin, 284 F.3d 31, 37-38.

Moreover, Plaintiff conceded at his deposition that he does not possess any admissible evidence that Ashley or Rose were acting at Chief Abbott's request or that Ashley or Rose ever

informed Chief Abbott of Plaintiff's responses to Ashley's alleged inquiries.[4] Id. at 56, 62-63,

74-75.  Conversely, Chief Abbott expressly denies that he ever directly or indirectly instructed

Ashley or Rose to speak to Plaintiff and denies that Ashley or Rose ever advised him of any such

conversations they may have had with Plaintiff.  Abbott Affidavit at ¶150.  Thus, Plaintiff

cannot meet his burden of showing that the 1998 speech was a substantial or motivating factor

for the retaliation he claims Chief Abbott engaged in.  See Mullin, 284 F.3d 31, 37-38.

> b.  Plaintiff's October and November 2000 letters to the Board of Selectmen.

The next allegedly protected acts that Plaintiff is relying upon are his October 26, 2000

and November 22, 2000 letters to the Board of Selectmen.  Complaint at ¶19; Plaintiff

Deposition Vol. I at 70-71.  A fair reading of both of those letters, however, clearly demonstrates

that Plaintiff was writing to the Board in their capacity as the Police Department appointing

authority in an effort to resolve a personnel issue that he had with the Chief.  Contrary to

Plaintiff's assertion, the letters are not reflective of someone who is attempting to expose

corruption in the Police Department, but instead, was Plaintiff's personal attempt to remedy the

Chief's having brought what Plaintiff believed to be false disciplinary charges against him.  He

was not writing to the Board as a citizen regarding matters of public concern, but instead, was

writing to his employer as an employee upon matters only of personal interest to him which is

outside of the First Amendment's protections.  See Connick, 461 U.S. at 147-48.

Additionally, even if it could be argued that the October and November 2000 letters

constituted an attempt to bring to the Board's attention Plaintiff's allegations of corruption in the

Police Department, Plaintiff's doing so would have been part of his official duties as a Freetown

Police Officer.  Under Rule 9.21 of the Department's Rules and Regulations, Plaintiff was

---

[4] Plaintiff has not alleged that Ashley or Rose were acting at Lt. Sawicki's behest or that Ashley or Rose ever
informed Sawicki of Plaintiff's responses.  Complaint at ¶¶11-12.

obligated to report to his supervisors any violations of Department rules and regulations or policies and procedures that he observed or otherwise became aware of other officers engaging in. Exhibit 9 at 2-3. If Plaintiff believed that officers in the Department, including the Chief, were engaging in misconduct, he had an obligation under Rule 9.21 to report it to his appointing authority and the ultimate Town authority on police matters, the Board of Selectmen. Since Plaintiff's letters to the Board were made, for First Amendment purposes, as part of his official duties as a police officer and not as a citizen, they do not fall within the First Amendment's protection. Garcetti, 126 S.Ct. at 1960.

c. Plaintiff's July 15, 2002 grievance to Chief Abbott.

The next allegedly protected act Plaintiff engaged in was his filing of his July 15, 2002 grievance to Chief Abbott. Complaint at ¶19; Plaintiff Deposition Vol. I at 67-69. That document was a grievance Plaintiff filed pursuant to the terms of the collective bargaining agreement ("CBA") between the Town and Plaintiff's Union concerning the manner in which Abbott was assigning overtime. See Complaint Exhibit C. Specifically, Plaintiff alleged that the Chief was violating Article VIII, Section 1A and 1E of the CBA. This letter clearly represented an effort on Plaintiff's part to address a purely internal personnel matter regarding the interpretation and application of the CBA and as such, cannot form the basis of a First Amendment claim. See Connick, 461 U.S. at 147-48; Alinovi v. Worcester School Committee, 777 F.2d 776, 787 (1st Cir. 1985) cert. denied, 479 U.S. 816 (1986).

d.) Plaintiff's June 27, 2003 letter to the Board of Selectmen.

The final expression of protected speech that Plaintiff contends he made was when he wrote to the Board of Selectmen on June 27, 2003. Complaint at ¶19; Plaintiff Deposition Vol. I at 67-69. Once again, however, a fair reading of that letter reflects that Plaintiff was writing to the Board in their capacity as the ultimate Police Department authority in an effort to remedy

what he perceived as the Chief's mistreatment of him. It was a personal matter that Plaintiff was seeking to resolve, not one of public concern. See Alinovi, 777 F.2d at, 787.

Moreover, and as noted above, even if Plaintiff's letter could be read as an attempt on his part to expose corruption in the Police Department, he was duty bound under Rule 9.21 to report such activity to the Board. Exhibit 9 at 2. As a result, his letter is not entitled to protection under the First Amendment. Garcetti, 126 S.Ct. at 1960.

     3.    <u>Plaintiff cannot demonstrate that his speech was a substantial or motivating factor for any of the retaliatory actions that were allegedly taken against him or that Defendants would have reached a different decision in the absence of his speech.</u>

In his Complaint, Plaintiff has identified Defendants' failure to promote him, assignment of him to "unsafe" police cruisers and unfavorable shifts, denial of training and overtime opportunities, maligning of his reputation and subjection of him to unwarranted disciplinary investigations as the allegedly retaliatory actions that were taken against him. In addition, Defendants anticipate that Plaintiff will attempt to raise matters outside his Complaint such as the Town's handling of his injury leave request. For the reasons explained below, Plaintiff has failed to demonstrate, as is his burden, that his speech was a substantial or motivating factor for any of the actions that were taken or that different decisions would have been made in the absence of Plaintiff's speech. See Mullin, 284 F.3d at 37-38; O'Connor, 994 F.2d at 913.

    a.  <u>Failure to promote.</u>

As the record reflects, the two (2) sergeant positions which became available in the first half of 1999 were awarded by the Board of Selectmen to Michael Lecuyer and Steven Abbott.[5] SOF ¶43-45. Because his brother was a candidate for the position, Chief Abbott did not submit a recommendation to the Board of Selectmen, but instead, simply forwarded them the survey forms that he had asked the sergeants and lieutenants in the Department to complete. Exhibit 10.

At the time of their appointments, Lecuyer and Steven Abbott had been full-time, permanent Freetown police officers with the Town for approximately twenty-one (21) and eleven (11) years, respectively, whereas Plaintiff had only been a full-time, permanent Freetown police officer for less than two (2) years.  SOF ¶4, 44.  In addition, Lecuyer and Steven Abbott were named as one of the top three candidates for promotion on, respectively, five (5) and three (3) of the five (5) supervisor surveys Chief Abbott received.  See Exhibit 10.  In contrast, Plaintiff was not named on any of the surveys.  See id.  Finally, the promotions were made more than a year before Plaintiff sent his first letters to the Board of Selectmen and, as argued above, there is no evidence that Defendants were aware of Plaintiff having engaged in any protected speech prior to that time.

Similarly, the promotion to sergeant that was awarded to Donald Bullock also predated Plaintiff's transmittal of his October and November 2000 letters to the Board.[6]  At the time of his promotion, Donald Bullock had been a full-time permanent Freetown police officer for approximately twenty-one (21) years, as compared to Plaintiff's three (3) years.  SOF ¶52.  In addition, Bullock had been named as one of the top three choices on two (2) of the five (5) surveys that Chief Abbott had previously asked the Department supervisors to complete, whereas Plaintiff, again, was not named on any of them.  See Exhibit 10.  Chief Abbott considered the surveys in ultimately recommending Bullock for the position which recommendation the Board of Selectmen accepted.  SOF ¶51.

When the need for an acting sergeant arose again in September 2001, the position was awarded to the Department's most senior patrol officer, Charles Sullivan.  SOF ¶75.  At the time

---

[5] They were appointed acting sergeants on May 3, 1999 and permanent sergeants on June 28, 1999.  SOF ¶43, 45.

[6] Donald Bullock was appointed acting sergeant on December 6, 1999 and permanent sergeant on September 12, 2000.  SOF ¶52, 63.

of the appointment, Sullivan had been a permanent, full-time Freetown police officer for more than twenty-one (21) years versus Plaintiff's four (4) years. SOF ¶4, 76.

As for the Town's assignment of Elton Ashley to acting sergeant in January 2003, given the ongoing discussions between the Town and the Union over a new promotional procedure and the need to fill the vacancy in the supervisor ranks, Chief Abbott recommended that the Board of Selectmen assign the most senior patrol officer as acting sergeant until a permanent sergeant could be chosen via the new process. SOF ¶80. Since Officer Rouke was out on injured on duty status and Mark and Donald Bullock declined the position, Elton Ashley was the most senior officer. SOF ¶81. At the time of his being appointed acting sergeant, Ashley had been a permanent, full-time Freetown police officer for more than eight (8) years as compared to Plaintiff's five and a half (5 ½). SOF ¶4, 82.

Subsequent to Ashley's assignment, the Department's new promotional procedure was implemented which required officers to take a written examination. SOF ¶87. All officers, including Plaintiff, were advised of the date time and location of the exam and were instructed via the exam announcement to signify their intention to take the exam via email to Lt. Sawicki. SOF ¶90; Exhibit 19. Despite indicating that he wished to take the exam, Plaintiff never appeared at the testing location to do so.[7] SOF ¶104.

After none of the officers who took the October 2003 exam achieved a passing score, a second exam was scheduled for December 20, 2003. SOF ¶106. Plaintiff was provided with a copy of the exam announcement, but did not sign up for the exam by the November 1, 2003 deadline. SOF ¶107-108; Exhibit 27. Notwithstanding his failure to sign up, Plaintiff was

---

[7] At his deposition, Plaintiff stated the reason he did not show up for the exam was because no one ever told him that he could. Plaintiff Deposition Vol. II at 87-90. Plaintiff also conceded, however, that no one ever told him that he could <u>not</u> take the exam and that to the extent he was unsure about his eligibility to sit for the exam, he never took any steps to clarify the matter. <u>Id.</u>

advised in writing on three (3) separate occasions that he would nonetheless be permitted to take the exam. SOF ¶109; Exhibit 28. When Plaintiff's counsel subsequently requested on his behalf that the exam be rescheduled to accommodate Plaintiff's vacation plans, Chief Abbott obliged and the exam was rescheduled to January 20, 2004. SOF ¶110-111; Exhibit 29. Although Plaintiff and his attorney were notified of the new date, Plaintiff inexplicably failed to show up to take the exam.[8] SOF ¶112, 115; Exhibit 30.

As the foregoing demonstrates, the evidence does not support a finding that Plaintiff's speech was a substantial or motivating factor in the Board's decision not to promote him. The promotions of Lecuyer, Steven Abbott and Donald Bullock all occurred prior to Plaintiff sending his first letter to the Board of Selectmen, were all made with consideration of the results of the supervisor surveys and were awarded to officers who had significantly more experience as permanent, full-time Freetown Police Officers than Plaintiff. Similarly, Sullivan had seventeen (17) more years of experience as a permanent, full-time Freetown police officer than Plaintiff at the time of the appointment and was the most senior patrol officer in the Department. As for Elton Ashley, he too was senior to Plaintiff and moreover, the position he was put in was a decidedly temporary one that would be filled permanently pursuant to the new promotional exam process. Although Plaintiff was given multiple opportunities to participate in the promotional exam process, his actions in response to those opportunities paint a portrait of an officer who was not truly interested in advancement, but of one who was simply attempting to bait the Town into taking action that he could in turn use as part of the lawsuit he clearly anticipated filing.

---

[8] Although not raised in his Complaint, Plaintiff was most recently advised by Chief Abbott on or about January 26, 2005 of another promotional exam which was to be given on May 7, 2005. SOF ¶136; Exhibit 40. Once again, Plaintiff overbound failed to sign up for and take the exam. SOF ¶137.

b.  <u>Assignment to unsafe cruisers.</u>

It is unclear as to what evidence Plaintiff is relying upon to support his claim that any vehicle he was assigned was "unsafe." Notwithstanding this evidentiary gap, the fact of the matter is that all of the Department's vehicles were assigned by and received regular maintenance under the supervision and direction of the Department's Maintenance Supervisor. SOF ¶19; Exhibit 5.   Neither Chief Abbott nor Lt. Sawicki have ever served the Department in that capacity and therefore would not have played a role in Plaintiff's cruiser assignment.  SOF ¶20.   Additionally, at no time was Plaintiff the only officer who was assigned to use a certain cruiser, including 551, as the cruisers were assigned to multiple officers covering the Department's three shifts.  SOF ¶18; Exhibit 4.   In fact, Lt. Sawicki, the Department's Court Officer, was even assigned to use Cruiser 551 at times.  <u>See</u> Exhibit 4.  Simply put, there is no evidence to support Plaintiff's allegations that any of the cruisers he was assigned were "unsafe", that Abbott or Sawicki had anything to do with those assignments or that such assignments were made with an intent to retaliate against him for engaging in protected speech.

c.  <u>Denial of training opportunities</u>

Overall, the record reflects very few requests for training from Plaintiff.  His 1999 request to attend the Train The Trainer course predated any of his letters to the Board and was not approved because Chief Abbott failed to see how Plaintiff teaching at a local college would inure to the benefit of the Department.  SOF ¶47-48.    In addition, Abbott was uncertain as to whether such a course taught by the Department of Correction would translate well to the public safety and law enforcement arena.  SOF ¶48.    When Chief Abbott subsequently learned that Plaintiff was interested in taking a Train The Trainer course that was being offered by the Massachusetts Criminal Justice Training Council in 2001, he approved Plaintiff for that training and Plaintiff was permitted to attend <u>with</u> pay.  SOF ¶68.

The only other training that Plaintiff has requested is Motorcycle Operation training. Plaintiff Deposition Vol. II at 18-20. When he requested to attend that training in 2001, the number of requests from officers exceeded the Department's need for motorcycle operators and so Chief Abbott approved the officers who he believed had the most motorcycle operating experience and who were actively riding motorcycles at that time. SOF ¶69-72. Ultimately, Plaintiff and Officer Scott Rose were not selected. Plaintiff Deposition Vol. I at 237-40. The fact that another officer who has not been alleged to have engaged in protected activity also had his training request denied demonstrates that there was no nexus between the Chief's denial and Plaintiff's speech.[9]

No later than November 2000, the Department training book was made readily available to all officers in the Department, including Plaintiff. SOF ¶22-24; Exhibit 6; Plaintiff Deposition Vol. II at 18-19. From time to time, Chief Abbot also advised officers by email of upcoming training opportunities. Exhibit 7. Of the 94 training opportunities that were approved by Chief Abbott between February 2001 and June 2006, Plaintiff had requested to attend a total of two (2) different ones. See Exhibit 8; Plaintiff Deposition Vol. I at 18-20. Of his requests, he was approved for the Train The Trainer course and was denied the Motorcycle Operation training. The record also reflects that in or around March 2001, Chief Abbott approached Plaintiff and asked him if he would be interested in attending a Fingerprint Recovery training which Plaintiff subsequently did. Plaintiff Deposition Vol. I at 19-21.

    d.   Unfavorable shift assignments.

The only instance in which Plaintiff's shift was altered that Defendants are aware of

---

[9] Although not raised in his Complaint, Plaintiff was denied the opportunity to attend the same training on July 15, 2004 because another officer had already requested and received approval from Chief Abbott to attend the training and because his request came only a few days before the training was to take place. SOF ¶118-120; Exhibits 31 and 32.

occurred in November 1999, prior to his sending his letters to the Board.  In that instance, the

Chief changed Plaintiff's shift assignment to the 12:00am to 8:00am shift in an effort to

accommodate another officer for whom that shift was posing a family hardship.  SOF ¶12-14.

Prior to making that switch, Chief Abbott asked Plaintiff if he cared what shift he worked to

which Plaintiff responded that he did not.  SOF ¶14.  As a result, Chief Abbott moved Plaintiff

back to the 12:00am to 8:00am shift which Plaintiff had been assigned to as recently as July

1999.  See Exhibit 3.

It also bears noting that under the shift bidding procedure that was implemented in June

2001, Plaintiff listed the four (4) day a week 12:00am to 8:00am shift as his first choice on

eleven (11) of the twelve (12) shift bids he between July 2001 and December 2006.[10]  SOF ¶16.

As such, it is disingenuous for Plaintiff to characterize the 12:00am to 8:00am shift as

"unfavorable" when it would appear that it was his preferred shift choice.

    e.  Denial of overtime opportunities.

It is not entirely clear as to what Plaintiff's claim is in this regard, but it would appear

that he is asserting that he was unjustly denied the opportunity to train the Department's

auxiliary police officers, which often times is done on an overtime basis.  Plaintiff Deposition

Vol. II at 37-41.  Assuming this is the case, the record does not reflect that Plaintiff possessed the

requisite certification or teaching experience in the particular subject areas that the auxiliaries

were trained in.  Simply taking the Train The Trainer course was not enough.   For example, to

train the auxiliaries in firearms use, Plaintiff would have needed to be a certified firearms

instructor.  SOF ¶29.  As was detailed above, Plaintiff never availed himself of the numerous

training opportunities that were made available to him and was not certified or otherwise

---

[10] No shift bids were submitted by Plaintiff for some of the bid periods, in part because of his injury status.  See SOF
¶152.

qualified to teach any of the subject areas for which the auxiliaries received in-house training for. SOF ¶30. In the absence of such qualifications, Plaintiff was not eligible for any of the overtime opportunities that would have flowed from the training of the auxiliaries.

Additionally, Plaintiff testified at his deposition that, other than the requests for training referenced above, he never submitted any requests to Chief Abbott to for any specific job assignments, e.g. firearms instructor, accident reconstructionist, etc., which would have made him eligible to teach auxiliaries on a given subject. See Plaintiff Deposition Vol. II at 27-34. In the absence of evidence that he made any requests to the Department to train the auxiliaries, Plaintiff cannot be said to have been denied those opportunities.

f.    Maligning Plaintiff's reputation or character.

According to Plaintiff, Chief Abbott and Lt. Sawicki retaliated against him by making statements to various persons which Plaintiff claims maligned his reputation and character in and out of the Department. With respect to Chief Abbott, Plaintiff has alleged that the Chief advised supervisors "to write him up for whatever you can." Complaint at ¶13. No admissible evidence has been offered to support this allegation, however, and Chief Abbott has denied same. Abbott Affidavit at ¶151.

As for Lt. Sawicki, Plaintiff had asserted that an employee of the Fall River District Attorney's Office, Diane Saunders, overheard Lt. Sawicki state to an Assistant District Attorney in 2003 that Plaintiff had "faked" a work-related injury. Complaint at ¶13; Plaintiff Deposition Vol. II at 114-15. At her deposition, however, Ms. Saunders denied ever hearing Lt. Sawicki make such a statement and denied that she ever told Plaintiff that she did. Saunders Deposition at 19-20, 30, 44. Moreover, Lt. Sawicki has denied the allegation. Sawicki Affidavit at ¶12.

g.   Internal Affairs investigations, letters of counseling and written reprimand.

Although Plaintiff contends that he has been unfairly accused and investigated for alleged misconduct, only one (1) of the twelve (12) such investigations that have taken place since 1999 has resulted in his being disciplined and that incident only resulted in his receiving a written warning in October 2005.  SOF ¶153.  As for the remaining investigations, eight (8) of them resulted in no action whatsoever being taken against Plaintiff and three (3) resulted only in his receiving a written letter of counseling.[11]  SOF ¶153.

Chief Abbott's investigation of Plaintiff for suspicion of double dipping in connection with White Mountain Cable details was justified given what the Department's records reflected. See SOF ¶56; Exhibit 13.  Chief Abbott initially gave Plaintiff the same opportunity he had previously given to another officer, i.e. admit to the transgression and accept punishment, but when Plaintiff professed his innocence, Chief Abbott investigated the matter further.  SOF ¶59. When such efforts proved to be inconclusive, he gave Plaintiff the benefit of the doubt and informed him the day after their initial meeting that he was dismissing the charges against Plaintiff.  SOF ¶60-62.  When Plaintiff later complained about the matter to the Board of Selectmen in his October 26, 2000 letter, Chief Abbott confirmed to Plaintiff in writing that no disciplinary action was or would be taken, that there was no active investigation involving Plaintiff and that no disciplinary documentation concerning White Mountain existed in his personnel file.  SOF ¶65; Exhibit 14.  It is unclear how such action, resolved in Plaintiff's favor, can be deemed retaliatory.

Turning to the counseling letter that was issued in connection with the investigation of the anonymous complaint, Lt. Sawicki recommended that no disciplinary action be taken against

---

[11] Under the Department's disciplinary policy, counseling letters are not considered to be disciplinary action, are not placed in an officer's personnel file and are not punitive in nature.  Instead, they are intended to help the officer improve on areas of his performance so as to avoid possible disciplinary action in the future.  SOF ¶98.

Plaintiff for the events that led to the filing of the complaint, but recommended that he be counseled in the areas of the Department's Internal Affairs policy and the state perjury statute. SOF ¶86; Exhibit 17.   This recommendation, and Chief Abbott's subsequent acceptance of same, came as a direct result of Plaintiff's suggestion in his May 14, 2003 response to the complaint that the initiation of the investigation was improper and that Chief Abbott had committed perjury when signing the Complaint Control Form.  SOF ¶¶85-86, 88; Exhibits 16 and 18.  Since a review of the Department's Internal Affairs policy and the perjury statute clearly show that Plaintiff's implied assertions were erroneous (see M.G.L. c. 268, §§1-1A; Exhibit 1), the issuance of a counseling letter was justified and cannot be considered retaliatory.

Similarly, the Chief's issuance of a counseling letter regarding racial profiling was also warranted.  To begin with, the issue was a very sensitive and public one that came to Chief Abbott's attention via a July 20, 2003 Boston Globe article entitled "Race, sex and age drive ticketing" with the subheading of "Minorities and men least likely to receive warnings."  Exhibit 21.  Since the article made reference to a Freetown Police Officer as having potentially engaged in racial profiling, Chief Abbott clearly had a responsibility to follow up on the matter. Subsequently, the Chief's investigation revealed that Plaintiff was the officer who had ticketed the driver identified in the article, that Plaintiff issued six (6) citations and that of those six (6), the five (5) white motorists received warnings and the lone African-American individual – the driver identified in the Globe article – received the only fine.  SOF ¶96.  Given these indisputable facts, Chief Abbott's written instruction to Plaintiff to familiarize himself with the Department's Racial and Gender Profiling and Traffic Safety policies and his suggestion that Plaintiff modify his conduct so as to avoid any real or perceived allegations of racial or gender profiling was hardly unreasonable and clearly cannot be considered retaliatory.

As for the counseling letter that was issued to Plaintiff by Sgt. Steven Abbott for tardiness, Plaintiff conceded in his email response to Sgt. Abbott's allegation that he was in fact late on the day in question.  Exhibit 34.

Finally, although Plaintiff has not amended his Complaint to include Chief Abbott's insubordination charge against him, in anticipation that he will rely on same in his opposition, Defendants will address the matter here.[12]  The discipline in question flowed from the response that Plaintiff had given to Sgt. Abbott in the tardiness incident directly above.  Specifically, Plaintiff indicated that he had overslept because of prescription medication that he was taking. Pursuant to Department Rule 13.9, Chief Abbott emailed Plaintiff and instructed him to provide him with information regarding the type of medication he was taking and the dosage by the end of his next shift.  SOF ¶124; Exhibit 35.  Although he received the email, Plaintiff did not respond to the Chief in any way.  Plaintiff Deposition Vol. I at 127-34.  Chief Abbott then requested the information a second time and although Plaintiff received the email, he again chose to ignore it.  SOF ¶126; Plaintiff Deposition Vol. I at 127-34.  As a result, Chief Abbott had to place Plaintiff on paid administrative leave until such time as he could determine whether the medication that Plaintiff was taking could impair his ability to perform his job safely.  SOF ¶128, 131.   It is undisputed that it was not until after Plaintiff had ignored Chief Abbott's two (2) email requests and Chief Abbott had placed Plaintiff on paid administrative leave that Plaintiff produced the requested information.  After finally receiving the information, and reflecting on the unnecessary steps he had to take to get it, Chief Abbott forwarded Town Counsel a draft set of insubordination charges on November 2, 2004.  SOF ¶129; Exhibit 37.  From there, formal charges were forwarded to the Board of Selectmen and a hearing was held at which Plaintiff did

---

[12] Defendants do so without waiver of any argument that said claim should not be considered by the Court unless and until Plaintiff has properly amended his Complaint.

not dispute that he had ignored the Chief's email requests to him. SOF ¶130, 142; Exhibit 38. Due to Plaintiff's failures to respond in any way to Chief Abbott's emails, the Board of Selectmen voted on October 3, 2005 to issue Plaintiff a written reprimand for insubordination. Exhibit 45. On these facts, the minor disciplinary action taken that was taken was clearly justified under the circumstances.

In sum, the foregoing demonstrates that the Town has demonstrated a certain amount of restraint and reasonableness in treating with the various complaints and allegations of misconduct that have been made against Plaintiff since 1999. Of the twelve (12) Internal Affairs investigations that have been conducted regarding Plaintiff since that time, only one (1) – the 2005 insubordination reprimand - resulted in his being disciplined. SOF ¶153. As for the remaining investigations, eight (8) of them resulted in no action being taken whatsoever and three (3) resulted in his receiving a letter of counseling for the reasons explained above. SOF ¶153. When this minimal disciplinary history is coupled with the fact that Chief Abbott nominated Plaintiff as the Department's lone recipient of the Mothers Against Drunk Driving Officer of the Year Award in 1999 and issued him a letter of commendation in November 2002 for his meritorious service in connection with his investigation of a stolen car ring (see SOF ¶46, 79; Exhibits 11 and 15), it eliminates any possible inference of retaliation.

h. Plaintiff's injury leave request.

Although Plaintiff has not amended his Complaint to include an allegation that the Town's treatment toward him in connection with his November 12, 2004 injury leave request was retaliatory, in anticipation that he will rely on same in his opposition, Defendants will address the matter here.[13] In this regard, it is anticipated that Plaintiff will assert that the Town

---

[13] Defendants do so without waiver of any argument that said claim should not be considered by the Court unless and until Plaintiff has properly amended his Complaint.

intentionally delayed the processing of his injury leave request and that it subsequently sought an involuntary disability retirement with respect to him in retaliation for his protected speech.

As the record reflects, Plaintiff advised Chief Abbott by letter dated November 12, 2004 that he was suffering from the ongoing effects of his June 21, 2003 work related accident, to wit, sleep deprivation and black outs, and requested to be placed on injured on duty leave pursuant to M.G.L. c. 41, §111F.  Exhibit 39.  In response, Chief Abbott sent Plaintiff for a psychological evaluation before Mark S. Schaefer, Ph.D. who subsequently opined by report dated January 19, 2005 that Plaintiff was disabled from his duties as a police officer due to Post-Traumatic Stress Disorder type symptoms related to his June 21, 2003 work accident.  SOF ¶133-34.  Plaintiff was permitted to utilize his available sick leave while his injury leave request was pending.  SOF ¶135.

After receiving Dr. Schaefer's report, Town Counsel forwarded a copy to Plaintiff's counsel and requested that he contact him to discuss it.  Exhibit 41.  Thereafter, Town Counsel represented in writing that the Town was willing to consider granting Plaintiff's request if he would enter into an agreement with the Town in which he would agree to follow Dr. Schaefer's treatment recommendations.  Exhibit 42.  When Plaintiff's counsel responded, he injected the pending insubordination charges into the mix and attempted to secure a conditional stipulation from the Town that it would not utilize any of the information it received from Dr. Schaefer's evaluation in defending itself against Plaintiff's emotional distress claims in the instant matter.  Exhibit 43.  This triggered a series of offers and counteroffers from both sides until eventually, a resolution of the matter was reached in June 2005, pursuant to which, Plaintiff was granted injury leave benefits retroactive to the date of his initial request, i.e. November 12, 2004.  SOF ¶141; Exhibit 44.

Thereafter, Plaintiff's counsel provided Town Counsel with a note from Plaintiff's psychiatrist which stated that Plaintiff was able to return to his position as a police officer without restrictions.  SOF ¶144.  When the Town began making arrangements for Plaintiff's return, however, it received a second note from the same psychiatrist which indicated that Plaintiff was not ready to return to work.  SOF ¶145-146.  Given the conflicting information, the Town referred Plaintiff back to Dr. Schaefer for a re-evaluation.  SOF ¶147.  In his January 9, 2006 report and his January 25, 2006 addendum thereto, Dr. Schaefer opined that Plaintiff continued to be disabled from his duties as a result of his June 2003 work accident.  SOF ¶148.  In the addendum, Dr. Schaefer stated that "it may be time to consider whether Officer Taylor should be evaluated for disability and retirement from the force."  SOF ¶148.  Based on this suggestion, as well as the length of time Plaintiff had already been out of work, Chief Abbott filed an involuntary accidental disability retirement application concerning Plaintiff with the Bristol County Retirement Board on February 21, 2006.  SOF ¶149.  When Plaintiff later produced an April 6, 2006 note from his psychiatrist which stated that Plaintiff was again fit for a return to duty, Chief Abbott subsequently returned Plaintiff to active duty and withdrew the involuntary retirement application.  SOF ¶150-51.

In the end, Plaintiff received all of the injury leave benefits to which he was entitled and was allowed to return to duty upon verification that he was fit to do so.  Given all of the attendant facts and circumstances, the Town's and Chief Abbott's actions regarding Plaintiff's injury leave request and the retirement application that flowed therefrom were clearly reasonable and were in no way motivated by a desire to retaliate against Plaintiff's speech.

   4.    <u>Plaintiff cannot demonstrate that Lt. Sawicki was responsible for any of the alleged adverse employment actions and there is no evidence that Sawicki was aware of Plaintiff's alleged protected activity prior to October 2, 2003.</u>

In his Complaint, Plaintiff contends that Defendants, including Lt. Sawicki, retaliated against him by failing to promote him, assigning him to inferior police cruisers, depriving him of training and overtime opportunities, altering his shift assignment and disciplining him. As the record reflects, however, Lt. Sawicki was not at any time responsible for promoting officers, assigning cruisers, approving training or granting the overtime in question nor did he possess the authority to discipline officers. SOF ¶154. To the extent that Plaintiff has alleged Lt. Sawicki investigated an anonymous citizen complaint that was filed against Plaintiff, Lt. Sawicki was obligated to do so as the Department's Internal Affairs Officer and no disciplinary action was ultimately taken against Plaintiff as a result of the complaint or Lt. Sawicki's investigation. Finally, while it is true that Lt. Sawicki himself filed an internal complaint against Plaintiff with Chief Abbott as a result of Plaintiff's conduct at the Fall River District Court on December 29, 2003, said complaint did not result in any disciplinary action ever being taken against Plaintiff. In the absence of any evidence that Lt. Sawicki was responsible for the acts of retaliation Plaintiff has alleged were committed against him, Plaintiff's claims against Sawicki must fail.

Additionally, even if Plaintiff could demonstrate that Lt. Sawicki was responsible for one or more of the above acts, there is no evidence that Lt. Sawicki became aware of Plaintiff's allegations of police corruption until he received a copy of Attorney Fine's October 2, 2003 letter of presentment to the Board and had his attorney draft a response to same on or about November 5, 2003. As such, there is no evidence to demonstrate that Plaintiff's speech was a substantial or motivating factor for any of the actions that Lt. Sawicki was supposedly responsible for or allegedly participated in prior to that date and therefore, all of Plaintiff's state and federal free speech claims against him should be dismissed.

      D.      <u>PLAINTIFF HAS FAILED TO STATE A CLAIM FOR RELIEF UNDER
M.G.L. C. 149, SECTION 185.</u>

Under the relevant portion of M.G.L. c.149, §185(b)(1), an employer is prohibited from
taking retaliatory action against an employee because the employee:

> (1)Discloses, or threatens to disclose to a supervisor or to a public body an
> activity, policy or practice of the employer…that the employee reasonably
> believes is in violation of a law, or a rule or regulation promulgated pursuant to
> law, or which the employee reasonably believes poses a risk to public health,
> safety or the environment…

M.G.L. c. 149, §185(b)(1).

Section 185 defines "retaliatory action" as "the discharge, suspension or demotion of an
employee, or other adverse employment action taken against an employee in the terms and
conditions of employment."  M.G.L. c. 149, §185(a)(5).

To begin with, the Town fails to understand how Plaintiff's letters to the Board of
Selectmen can be deemed "whistle blowing" when the activity Plaintiff was supposedly blowing
the whistle on, i.e. double dipping by officers with respect to White Mountain Cable details, was
one that the Board was already well aware of and had already addressed by taking disciplinary
action against an officer.[14]  SOF ¶55.  Plaintiff cannot be said to have "disclosed" to the Board of
Selectmen that which the Board already had remediated.  This is particularly so given Plaintiff's
refusal of Chief Abbott's requests to provide the Town with information as to whom he had
previously complained to internally.  SOF ¶93. 100-103; Exhibits 20, 24-26.

While Plaintiff testified at his deposition that he informed Chief Abbott on November 7,
2004 via telephone that he was going to go to the FBI regarding the White Mountain Cable
details issue (Plaintiff Deposition Vol. I at 145-49), there is no evidence in the record that Chief

---

[14] In addition, disciplinary charges had also been brought against Plaintiff and another officer.  SOF ¶38, 58.  The
other officer retired prior to a hearing on the charges being held and Plaintiff, as was discussed earlier, was given the
benefit of the doubt and the charges against him were dismissed.  SOF ¶62.

Abbott or the Board of Selectmen had knowledge that Plaintiff actually did so and there is no evidence that Plaintiff or anyone else ever advised Chief Abbott or the Board that Plaintiff had reported the matter to any outside agency.

Additionally, although Plaintiff may have been of the opinion that the double dipping allegations should have been investigated by an outside law enforcement agency, the Town's decision not to do so was a discretionary function that was not in violation of a law, or a rule or regulation promulgated pursuant to law, and cannot have been reasonably believed to pose a risk to public health, safety or the environment. See Service v. Newburyport Housing Authority, 63 Mass.App.Ct. 278, 283-84 (2005) rev. denied 444 Mass. 1105 (2005).

Moreover, the only communications Plaintiff alleges he had with any of the Defendants during the period encompassed within the two (2) year statutory timeframe consist of his July 15, 2002 grievance letter to Abbott, his June 27, 2003 letter to the Board and his November 7, 2004 conversation with Chief Abbott. With regard to the grievance, the activity referenced in that document, by its own terms, went solely to alleged violations of a collective bargaining agreement. See Complaint Exhibit C. It would not have been reasonable for Plaintiff to believe that Abbott's overtime assignment practices were in violation of any law, rule or regulation or that they posed a risk to public health, safety or the environment. See Service, 63 Mass.App.Ct. at 283-84.

Finally, for the reasons discussed in Section C above, Plaintiff's §185 claim should also be dismissed because he has not demonstrated that any retaliatory action was taken against him subsequent to his submission of his letters to the Board of Selectmen and/or alleged conversation with Chief Abbott nor has he shown that any such action was taken against him "because" of the disclosures he made. M.G.L. c. 149, §185; see Service, 63 Mass.App.Ct. at 283-84.

E.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR RELIEF FOR INTERFERENCE WITH A CONTRACTUAL AND/OR ADVANTAGEOUS BUSINESS RELATIONSHIP.

In Count IV, Plaintiff alleges that Abbott and Sawicki tortiously interfered with his contractual and/or advantageous business relationship with the Town.[15]  To succeed on either claim, Plaintiff must establish (1) the existence of a contract or business relationship which contemplated an economic benefit; (2) Defendants' knowledge of the contract or business relationship; (3) that the Defendants' interference, in addition to being intentional, was improper in motive or means; and (4) that Plaintiff suffered economic harm as a result of the Defendants' conduct.  Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 394-95 (2005); Bourque v. Cape Southport Associates, LLC, 60 Mass.App.Ct. 271, 277-78 (2004) rev. denied, 441 Mass. 1105 (2004).  When interference claims are brought in the context of an employment relationship, the courts have held that an employee's supervisor is privileged to act as he did unless he acted out of malevolence, i.e. for a spiteful malignant purpose unrelated to the corporate interest."  Ayash, 443 Mass. at 395 citing Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 476 (1992).

To begin with, Plaintiff has not identified the contractual relationship that was interfered with.  To the extent he is referring to the collective bargaining agreement between the Town and the Union, Plaintiff lacks standing to bring such a claim.  See Peabody Federation of Teachers, Local 1289, AFT, AFL-CIO v. School Comm. of Peabody, 28 Mass.App.Ct. 410, 414 (1990); Johnston v. School Committee of Watertown, 404 Mass. 23, 25 (1989).

As for his interference with an advantageous business relationship claim, the record is

_____

[15] Plaintiff has also alleged a claim for negligent interference with a contractual or business relationship, but Defendants are unaware of the existence of any such cause of action under Massachusetts law.  To the extent that one may exist, Abbott and Sawicki, as public employees, are personally immune from such a claim pursuant to M.G.L. c. 258, §2.  Pruner v. Clerk of the Superior Court, et al., 382 Mass. 309, 313 (1981).

devoid of any admissible evidence to establish, as was discussed in greater detail above, that either Abbott or Sawicki intentionally interfered with his employment with the Town. Similarly, there is no evidence that Plaintiff suffered any damages due to a discontinuation of the business relationship, as he must. See Ayash, 443 Mass. at 394-95; Buster v. George W. Moore, Inc., 438 Mass. 635, 652 (2003); Bourque, 60 Mass.App.Ct. at 277-78. At no time has Plaintiff been terminated, suspended or otherwise caused to suffer any loss of salary or other employment benefits as a result of any actions on the part of Chief Abbott or Lt. Sawicki. The absence of such evidence is fatal to Plaintiff's intentional interference claims. See id.

F.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR RELIEF AGAINST LT. SAWICKI FOR DEFAMATION.

To prove his defamation claim against Lt. Sawicki,[16] Plaintiff must demonstrate that Sawicki published a false and defamatory communication of and concerning him without any privilege to do so. McAvoy v. Shufrin, 401 Mass. 593, 597 (1988). Whether the statement is reasonably susceptible of a defamatory meaning is a question of law for the Court. Foley v. Lowell Sun Pub. Co., 404 Mass. 9, 11 (1989). The test is whether, under the circumstances, the statement discredits Plaintiff in the minds of any considerable and respectable segment of the community. Draghetti v. Chmielewski, 416 Mass. 808, 811 (1994); Smith v. Suburban Restaurants, Inc., 374 Mass. 528, 529-30 (1978). Matters of opinion are not actionable unless they are both derogatory and based on undisclosed facts. See Dulgarian v. Stone, 420 Mass. 843, 850 (1995); Myers, 380 Mass. at 339.

For purposes of defamation actions, police officers are "public officials" and a plaintiff "may not recover damages for defamation related to his public office unless he proves by clear and convincing evidence that the defendant made the false statement with actual malice."

---

[16] Plaintiff's defamation claim against Chief Abbott was previously dismissed by the Court.

McNamee v. Jenkins, 52 Mass.App.Ct. 503, 505-06 (2001) citing Rotkiewicz v. Sadowsky, 431 Mass. 748, 752 (2000).  To meet this burden, it must be shown that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false. Id. citing Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 867 (1975).

At his deposition, Plaintiff testified that the only false and defamatory oral statement he is alleging Lt. Sawicki made was his alleged comment at the District Attorney's Office that Plaintiff had "faked" a work-related injury.  Plaintiff Deposition Vol. II at 236-37.  As noted above, however, the supposed witness to Lt. Sawicki making this statement denied that she ever heard Lt. Sawicki make such a statement or that she ever told Plaintiff that she had and Sawicki has denied the allegation.  Saunders Deposition at 19-20, 30, 44; Sawicki Affidavit at ¶12.

As for written statements, Plaintiff identified Lt. Sawicki's December 29, 2003 memorandum to Chief Abbott and his June 10, 2003 Internal Affairs report regarding the anonymous citizen complaint.  Plaintiff Deposition Vol. III at 6, 142-43.  When questioned about what statements in the December 29th memorandum he was claiming were false and defamatory, Plaintiff pointed to the characterizations of Plaintiff's conduct that Lt. Sawicki made, specifically, that Plaintiff "replied in a gruff and rising voice", "responded in an aggressive manner" and "appeared flushed and he displayed a hostile look."  Id. at 7-9.  He also contended that Lt. Sawicki did not state "Jon I'm leaving, I am not walking anywhere with you."  Id. at 13-14.  Finally, he asserted that the penultimate paragraph of the memorandum, which he acknowledged was an expression of Lt. Sawicki's opinion, was false and defamatory.  Id. at 16-20.  When asked to identify the false and defamatory statements in the June 10, 2003 IA report, Plaintiff identified the recommendations that Lt. Sawicki made to Chief Abbott in the last four (4) paragraphs of his report, although it was unclear as to which of those statements Plaintiff was contending were false.  Id. at 145-151.

It is clear from reading the statements in the context in which they were written that they are not reasonably susceptible of a defamatory meaning. See Foley, 404 Mass. at 11. The December 29, 2003 report contained nothing more than Lt. Sawicki's personal observations as to how Plaintiff appeared to him on the day in question. By their very nature, the statements are Lt. Sawicki's opinion as to how Plaintiff acted and appeared to him. Similarly, Lt. Sawicki's "recommendations" in the June 10, 2003 are not statements of fact, but simply represent his opinion as to how Chief Abbott should treat with the matter based on the information Lt. Sawicki garnered from his investigation. No reasonable person would interpret the statements Plaintiff has taken issue with for anything more than Lt. Sawicki's personal opinion and they are hardly of the type that would hold Plaintiff up to ridicule or treat him with contempt. See Draghetti, 416 Mass. at 812.

In addition, Plaintiff cannot demonstrate that if the statements were defamatory, that they were published by Lt. Sawicki with actual malice. In the absence of such proof, Plaintiff cannot proceed with his claim. See McNamee, 52 Mass.App.Ct. at 505-06.

Finally, Lt. Sawicki clearly enjoyed a conditional privilege to submit the reports in question given the supervisory position he held over Plaintiff as a lieutenant, his role as the Department's Internal Affairs Officer and Abbott's position as Chief. See Bratt v. International Business Machs. Corp., 392 Mass. 508, 509 (1984)(holding that an employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job). Plaintiff has not demonstrated that Lt. Sawicki published either document to anyone other than Chief Abbott and there is no evidence that Lt. Sawicki abused the conditional privilege so as to have lost it. See id.

G.    EVEN IF PLAINTIFF IS ABLE TO MAKE OUT CLAIMS AGAINST ABBOTT AND SAWICKI INDIVIDUALLY, THEY ARE QUALIFIEDLY IMMUNE FROM SUCH CLAIMS.

It is well-established that government officials are qualifiedly immune from personal liability for actions taken while performing discretionary functions.  Lynch v. City of Boston, 180 F.3d 1, 13 (1st Cir. 1999).  They "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Id. quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In order for a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right in light of pre-existing law.[17]  Id. citing Anderson v. Creighton, 483 U.S. 635, 640 (1987). The burden is on the plaintiff to plead sufficient facts to establish that a specific, not a general, right was clearly established at the time of the challenged conduct and that the challenged conduct violated that right.  Souza v. Pina, 53 F.3d 423, 425 (1st Cir. 1995).  Although typically applied to civil rights claims, courts have held that the doctrine of qualified immunity also shields public officials from liability for intentional torts and other claims.  See, e.g., Lynch v. City of Boston, 989 F.Supp. 275, 286 (D. Mass. 1997) (Keeton, D.J.) citing Restatement (Second) of Torts § 895D(3) (1977); cf. Duarte v. Healy, 405 Mass. 43, 49-51 (1989) (applying common law qualified immunity to statutory claim for violation of state Privacy Act).

In determining whether the general right that is being invoked by Plaintiff was clearly established prior to the time the allegedly retaliatory acts took place, i.e. to engage in speech on matters of public concern without retaliation, the general right must be placed in a reasonably specific context.  Wagner v. City of Holyoke, 404 F.3d 504, 509 (1st Cir. 2005).  Given the facts

---

[17] In applying this wholly objective standard, the Supreme Court has emphasized that "qualified immunity questions should be resolved at the earliest possible stage of a litigation."  Anderson, 483 U.S. at 646 n.6 quoting Harlow, 457 U.S. at 817

and circumstances that surrounded the allegedly retaliatory acts, as discussed in Section C above, this is not a case in which reasonable officers, in light of clearly established law, "*must* have known that [they were] acting unconstitutionally" as the actions that were taken were reasonably supported by the underlying events which led to same. See id. quoting Dirrane v. Brookline Police Department, 315 F.3d 65, 71 (1st Cir. 2002).

In many respects, the instant matter is not unlike the facts that existed in Wagner v. City of Holyoke. In that case, the Court found that the employee's broad range of complaints, some of which were unprotected and antagonistic, as well as his disregard for certain department protocols and disobedience in following the department's chain of command would have permitted a reasonable superior officer to believe that he could discipline the employee regardless of the content of his speech without violating the employee's First Amendment rights. Id. at 71. The Court held that even if the superior's reasoning were mistaken, it would not have been egregiously so and, accordingly, qualified immunity was available. Id. citing Ringuette v. City of Fall River, 146 F.3d 1, 5 (1st Cir. 1998).

Applying this reasoning to the instant matter, the actions of Chief Abbott and Lt. Sawicki, for the reasons explained in Section C above, were discretionary functions that were made independent of Plaintiff's protected speech and were based on what they reasonably believed was consistent with established Department policies and protocols and justified by the attendant facts and circumstances. As such, they are qualifiedly immune from personal liability for actions taken while performing those discretionary functions. Lynch, 180 F.3d at 13.

IV.    CONCLUSION

Based on the foregoing, Defendants respectfully request that an entry of judgment as to all counts of the Complaint in this matter be made in their favor.

DEFENDANTS

By their attorneys,


/s/David C. Jenkins

/s/Joseph S. Fair
David C. Jenkins (BBO# 251000)
Joseph S. Fair (BBO# 637818)
Kopelman and Paige, P.C.
 Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02116
Dated:  November 15, 2006          (617) 556-0007

/s/Joseph S. Fair
Joseph S. Fair

CERTIFICATE OF SERVICE

This is to certify that on the date subscribed below I caused a copy of the foregoing document to be served through the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) and that non-registered participants, if any, were served with paper copies of said document.

Dated:  November 15, 2006              /s/ Joseph S. Fair


298287/60700/0503

32