UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. NO. 03-12417-PBS

JON M. TAYLOR,
       Plaintiff,

v.

TOWN OF FREETOWN, CARLTON E.
ABBOTT, JR., individually and as Chief of the
Freetown Police Department, and WALTER J.
SAWICKI, individually and as Lieutenant of
the Freetown Police Department,
       Defendants.

DEFENDANTS' STATEMENT OF
MATERIAL FACTS TO WHICH
THERE IS NO GENUINE ISSUE
PURSUANT TO LOCAL RULE 56.1

Defendants, Town of Freetown (hereinafter, "Town"), Carlton E. Abbott, Jr. (hereinafter, "Chief Abbott") and Lt. Walter Sawicki (hereinafter, "Lt. Sawicki") hereby set forth their Statement of Material Facts To Which There Is No Genuine Issue pursuant to Local Rule 56.1.

1. The defendant, Town of Freetown (hereinafter, "Town"), is governed by an elected three (3) member Board of Selectmen (hereinafter, "Board"). Chief Abbott Affidavit at ¶2.

2. At all times relevant, the Freetown Police Department (hereinafter, "Department") was governed by M.G.L. c. 41, §97 and as such, the Board of Selectmen has served as the appointing authority for all Department personnel and is ultimately responsible for all hiring, firing and promotional decisions. Abbott Affidavit at ¶3.

3. The defendant, Carlton E. Abbott, Jr., (hereinafter, "Abbott"), has served as the Town's Police Chief from August 1998 to the present. Abbott Affidavit at ¶1.

4. The plaintiff, Jon M. Taylor (hereinafter, "Plaintiff"), has served as a permanent, full-time police officer in the Freetown Police Department (hereinafter, "Department") from September 6, 1997 to the present. Abbott Affidavit at ¶4.

5. The defendant, Walter Sawicki (hereinafter, "Sawicki"), has served as a permanent, full-time police lieutenant in the Department from September 1987 to the present. In addition, he has served as the Department's Internal Affairs (hereinafter, "IA") officer since January 15, 2003 and as the Department's Court Officer since September 12, 2000. Sawicki Affidavit at ¶1.

6. Pursuant to the Department's IA policy, Sawicki, as the IA officer, is required to investigate all complaints made against the Department or its members regardless of the source of the complaint. Abbott Affidavit at ¶6; Exhibit 1 at 3, 10.

7. The police officer rank structure in the Department in increasing order of authority is as follows: auxiliary police officer, reserve police officer, patrol officer, sergeant, lieutenant and chief. Abbott Affidavit at ¶7.

8. At all times relevant, the Department's reserve patrol officers and permanent, full-time police officers from the rank of patrol officer up to and including the rank of lieutenant were members of a collective bargaining unit that was represented initially by the Freetown Police Association and later by Local 1144 of the Laborers' International Union of North America (hereinafter, "Union"). Abbott Affidavit at ¶8.

9. At all times relevant, the terms and conditions of the reserve patrol officers and permanent, full-time police officers in the Department have been governed by the terms of a collective bargaining agreement between the Town and the Union. Abbott Affidavit at ¶9; Exhibit 2.

10. In general, permanent, full-time police officers have at all times relevant been assigned to one of the following regular shifts or some combination thereof: 8:00am to 4:00pm, 4:00pm to 12:00am or 12:00am to 8:00am. Abbott Affidavit at ¶10.

11. Prior to June 2001, officer shift assignments were made at the discretion of the Police Chief. Abbott Affidavit at ¶11.

12. In July 1999, Plaintiff's assigned shift was the 12:00am to 8:00am shift. Abbott Affidavit at ¶12; Exhibit 3.

13. Sometime thereafter, the Department shifts were reassigned and Plaintiff was assigned to a different shift. Abbott Affidavit at ¶13.

14. In and around November 1999, Chief Abbott reassigned Plaintiff to the 12:00am to 8:00am shift in an effort to accommodate another officer who had expressed to the Chief that the midnight shift was posing a family hardship. Prior to making that change, Chief Abbott asked Plaintiff if he had any objections to going back to the midnight shift and Plaintiff responded that he did not. Abbott Affidavit at ¶14.

15. In June 2001, the Town and the Union negotiated a shift bidding procedure which is still in effect today under which officers are permitted to bid on their desired shifts every twelve (12) weeks in order of their length of service in grade/rank. Abbott Affidavit at ¶15.

16. The Department's records reflect that of the twelve (12) shift bids that Plaintiff submitted for the various twelve (12) week scheduling periods that ran from July 2001 through December 2006, he listed the four (4) day a week 12:00am to 8:00am shift as his first choice eleven (11) times, all of which were granted. Abbott Affidavit at 16.

17. In addition to being assigned to a particular shift, officers are assigned to a particular police cruiser for use on their shift. Abbott Affidavit at ¶17.

18. The total number of officers assigned to the three (3) shifts exceeds the number of police cruisers the Department possesses so each cruiser is assigned to multiple officers for use

over the three (3) shifts. The cruiser assignments are not permanent, but instead, are periodically reassigned among the officers. Abbott Affidavit at ¶18; Exhibit 4.

19. Pursuant to Department Orders, a Cruiser Maintenance Supervisor has been assigned to oversee the maintenance of the Department's cruisers. Throughout Chief Abbott's tenure, the Maintenance Supervisor has also been responsible for making the cruiser assignments. Since December 2002, the Maintenance Supervisor has also designated one officer for each cruiser to serve as that particular cruiser's Maintenance Officer. At all times relevant, the officers assigned to the cruisers have been responsible for reporting any repair and maintenance issues to the Maintenance Supervisor. Abbott Affidavit at ¶19; Exhibit 5.

20. Neither Chief Abbott nor Lt. Sawicki have ever served as the Department's Maintenance Supervisor. Abbott Affidavit at ¶20; Sawicki Affidavit at ¶4.

21. Throughout Chief Abbott's tenure, officers who are desirous of receiving additional training beyond the mandatory must first receive the approval of the Chief in order to attend. Chief Abbott Affidavit at ¶21.

22. As early as November 2000, the Department instituted a training book which contained the outside training courses that were being offered which officers could request to attend. Chief Abbott Affidavit at ¶22.

23. Blank Request For Training forms were disseminated to all officers and additional forms were made available to officers in the training book itself. Chief Abbott Affidavit at ¶23; Exhibit 6.

24. The training book was made readily available to all officers in the Department, including Plaintiff. Plaintiff Deposition Vol. II at 18-19; Exhibit 6.

25. From time to time, Chief Abbot would also advise officers by email of upcoming training opportunities that were available. Abbott Affidavit at ¶24; Exhibit 7.

26. A review of the Department's records reveals that a total of 94 out of 133 training opportunities were approved by Chief Abbott between February 2001 and June 2006. Abbott Affidavit at ¶25; Exhibit 8.

27. Auxiliary police officers are essentially citizen volunteers who are assigned to assist the Department as needed. Abbott Affidavit at 26.

28. The auxiliary police officers are trained in part by full-time officers within the Department. Abbott Affidavit at 27.

29. In order to train the auxiliary officers, a full-time officer must be certified or possess experience in teaching the particular subject area that the auxiliaries are being trained in by him. Abbott Affidavit at 28.

30. Plaintiff is not a certified instructor in any of the specific subject areas auxiliaries are trained by the Department in nor does he possess experience teaching in any of those specific subjects. Abbott Affidavit at 29.

31. In addition to their regular shifts, full-time officers regularly work paid details, such as construction and utility details for private entities. Abbott Affidavit at ¶30.

32. After working a paid detail, officers are required to submit a detail slip containing the information for the detail that was worked including the date, the start and stop time, the total number of hours and the entity for which the detail was performed. Abbott Affidavit at ¶31.

33. Payment for the details that officers work is made by the Department based on the information that officers provide on the detail slips and on the weekly payroll reports that

they are required to submit which identifies the number of regular, overtime and detail hours they worked on each day. Abbott Affidavit at ¶32.

34. Since 1998, Rule 9.21 of the Department's Rules and Regulations, a copy of which Plaintiff received, has required that officers, upon observing or otherwise becoming aware of a violation by another officer of the force or by an employee of the Department's Rules and Regulations or Policies and Procedures, to report said violations to their Superior Officer. Abbott Affidavit at 33; Exhibit 9 at 2-3.

35. In and around 1998, a large number of the paid details that were performed by officers were for White Mountain Cable Company in connection with White Mountain Cable's installation of cable television lines in Town. Abbott Affidavit at ¶34.

36. On September 21, 1998, Chief Abbot was informed by a sergeant that a patrol officer who was assigned to the 12:00am – 8:00am shift had also worked a White Mountain Cable detail that started at 6:30am that same day. Abbott Affidavit at ¶35.

37. Upon investigating the matter further, it appeared to Chief Abbott that the officer had in fact been paid on certain days for working White Mountain Cable details that covered periods of time which overlapped with the end of the officer's 12:00am – 8:00am shift, without any evidence that another officer had covered the officer's shift for the period of overlap, thereby resulting in his being paid for being in two places at the same time. Abbott Affidavit at ¶36.

38. Based in part on this finding, Chief Abbott sent a request to the Board of Selectmen requesting that a disciplinary hearing be scheduled regarding the officer. Abbott Affidavit at ¶37.

39. As a result of his findings, Chief Abbott expanded his investigation and examined the White Mountain Cable detail history for all officers who were assigned to the 12:00am – 8:00am shift.  Abbott Affidavit at ¶38.

40. On November 27, 1998, Chief Abbott interviewed a second officer in connection with his investigation of potential White Mountain Cable detail improprieties, but that officer was not ultimately charged, however, due to insufficient evidence.  Abbott Affidavit at ¶39.

41. On or about February 19, 1999, Chief Abbott distributed a memorandum to all of the Department's existing sergeants and lieutenants and asked them to provide the names of three (3) officers who they would recommend for promotion to sergeant using the criteria identified in the memorandum.  Abbott Affidavit at ¶40.

42. By letter dated April 30, 1999, Chief Abbott submitted the completed supervisor surveys to the Board of Selectmen for their consideration in filling two (2) sergeant vacancies.  In his letter to the Board, Chief Abbott disclosed that his brother Steven Abbott was a candidate for one of the vacancies and therefore, he could not make any recommendations as to any of the candidates.  Abbott Affidavit at ¶41; Exhibit 10.

43. At a May 4, 1999 meeting of the Board of Selectmen, the Board announced that Steven Abbott and Michael Lecuyer had been appointed to the rank of acting sergeant.  Abbott Affidavit at ¶42.

44. At the time of their acting sergeant appointments, Steven Abbott and Lecuyer had been permanent, full-time Freetown police officers since October 31, 1988 and April 3, 1978, respectively.  Abbott Affidavit at ¶43.

45. Thereafter, the Board appointed Steven Abbott and Lecuyer to the rank of permanent sergeant effective June 28, 1999.  Abbott Affidavit at ¶44.

46. On September 7, 1999, Chief Abbott advised Plaintiff that he would be the recipient of the 1999 Mothers Against Drunk Driving Officer of the Year Award.  In order to receive the award, an officer must be nominated by his chief.  Plaintiff was the only officer that the Chief nominated for the award.  Abbott Affidavit at ¶45; Exhibit 11.

47. On or about October 8, 1999, Plaintiff approached Chief Abbott and verbally requested to attend a "Train The Trainer" course that was being offered by the Department of Correction.  Plaintiff stated that the reason why he wanted to attend the training was so that he could teach at Bristol Community College.  Abbott Affidavit at 46.

48. Chief Abbott denied Plaintiff's request because he failed to see how Plaintiff teaching at a local college would inure to the benefit of the Department and was uncertain as to whether such a course taught in the care and custody of prisoners context of corrections work would translate well to the public safety and law enforcement arena.  Abbott Affidavit at 47.

49. On December 3, 1999, the Chief submitted a request to the Board of Selectmen that they appoint an acting sergeant to fill in for Lt. Roger Levesque who was expected to be out of work for an extended period of time. Abbott Affidavit at ¶48; Exhibit 12.

50. In his request, Chief Abbott recommended that the position be made permanent upon Lt. Levesque retiring or otherwise leaving the Town's service.  Abbott Affidavit at ¶49; Exhibit 12.

51. Using the same criteria that he had previously asked the Department supervisors to consider in making their sergeant recommendations, as well as the results of those surveys, Chief Abbott recommended Donald Bullock for the position.  Abbott Affidavit at ¶50; Exhibit 12.

52. On December 6, 1999, the Board appointed Donald Bullock acting sergeant. At the time of his appointment, Bullock had been a permanent, full-time Freetown officer since August 8, 1988. Abbott Affidavit at ¶51.

53. At the beginning of January 2000, Chief Abbott interviewed a third officer in connection with his White Mountain Cable investigation. During the interview, Chief Abbott presented the officer with a written offer of stipulated discipline under which the officer would admit to the violations at issue and agree to accept six (6) punishment days. In response, the officer admitted to having worked White Mountain Cable details on several occasions for time periods that overlapped with his regular patrol shift and signed the offer of stipulated discipline. Abbott Affidavit at ¶52.

54. Shortly thereafter, the officer brought the matter before the Union for its approval of the disciplinary agreement, but the Union refused to give its assent. Abbott Affidavit at ¶53.

55. Since the Union's assent was necessary in order for the agreement to be enforceable as to both the officer and the Union, and since that option was no longer available, Chief Abbott referred a formal set of disciplinary charges against the officer to the Board of Selectmen on January 4, 2000. The hearing was held on February 22, 2000 at which the officer forthrightly admitted to the violations. As a result, the Board voted to issue him two (2) punishment days. Abbott Affidavit at ¶54.

56. Based on Chief Abbott's review of Department records, it appeared that Plaintiff had also been paid for working a White Mountain Cable detail that covered a period of time which overlapped with the end of his 12:00am – 8:00am shift. Specifically, the Department's police log for the day in question reflected that Plaintiff had made traffic stops at 7:03am and 7:16am while on patrol, despite the fact that the Department

schedule, as well as the payroll voucher Plaintiff completed for that day reflected that he began working a White Mountain Cable detail at 7:00am.  Abbott Affidavit at ¶55; Exhibit 13.

57. Sometime in February 2000, Chief Abbott interviewed Plaintiff in connection with his White Mountain Cable detail investigation.  Abbott Affidavit at ¶56.

58. As he had with the other officer, Chief Abbott presented Plaintiff with a written offer of stipulated discipline under which Plaintiff would admit to the violation at issue and agree to accept two (2) punishment days.  Abbott Affidavit at ¶57.

59. At that meeting, Plaintiff rejected Chief Abbott's offer, denied the allegation and stated that he and Sgt. Lecuyer had discussed the potential problem of working both a detail and patrol, suggesting in essence that another officer had covered his patrol shift for him and that the police log was in error.  At that time Chief Abbott stated that he would look into the matter further.  Abbott Affidavit at ¶58.

60. Subsequently, Chief Abbott spoke with Sgt. Lecuyer who stated that he could not recall any officers covering for Plaintiff on the day in question. Abbott Affidavit at ¶59.

61. In addition, Chief Abbott sought to listen to the recordings of the Department dispatch tapes for the day at issue, but was advised by the dispatch supervisor that the tapes had been destroyed as a result of a previous lightning strike.  Abbott Affidavit at ¶60.

62. In light of these facts and the fact that Plaintiff had not been disciplined for any reason in the past, Chief Abbott gave Plaintiff the benefit of the doubt and advised him the day after their initial meeting that he was dismissing the charges against Plaintiff.  Abbott Affidavit at ¶61.

63. Following Lt. Levesque's retirement in April 2000, the Board of Selectmen appointed Donald Bullock to the position of permanent sergeant effective September 2000, consistent with Chief Abbott's December 3, 1999 recommendation.  Abbott Affidavit at ¶62.

64. On or about October 26, 2000, Plaintiff wrote to the Board of Selectmen in connection with his earlier request for a copy of the disciplinary charges that Chief Abbott had presented to him at the beginning of February 2000.  In his letter to the Board, Plaintiff objected to the Chief's accusations and reasserted his request for a copy of the "complaints issued against me by Chief Charlton (sic) Abbott, Jr." and further requested that a letter be placed in his personnel file reflecting that he had been falsely accused. Complaint Exhibit A.

65. After receiving a copy of Plaintiff's October 26, 2000 letter to the Board, Chief Abbott sent Plaintiff a letter dated October 31, 2000 in which he confirmed that no disciplinary action was taken or is being taken against him regarding White Mountain Cable details, that there was no active investigation involving Plaintiff regarding same and that no disciplinary documentation concerning White Mountain existed in his personnel file. Abbott Affidavit at ¶64; Exhibit 14.

66. On or about November 22, 2000, Plaintiff sent a letter to the Board of Selectmen in response to Chief Abbott's October 31, 2000 letter.  Complaint Exhibit B.

67. In his letter, Plaintiff expressed his dissatisfaction with Chief Abbott's response to Plaintiff's October 26, 2000 letter.  Complaint Exhibit B.

68. In January 2001, Chief Abbott learned via another officer that Plaintiff was interested in taking a "Train The Trainer" course that was being offered by the Massachusetts

Criminal Justice Training Council and approved him to attend same without loss of pay. Chief Abbott Affidavit at 65; Plaintiff Deposition Vol. II at 17-18.

69. In and around June 2001, Chief Abbott received requests from multiple officers to attend a multi-day Motorcycle Operation training, including one from Plaintiff.  Chief Abbott Affidavit at ¶66.

70. Since the demand for the training exceeded the Department's need for motorcycle operators, not all of the requests could be approved so Chief Abbott approved the officers who he believed had the most motorcycle operating experience and who were actively riding motorcycles at that time.  Chief Abbott Affidavit at ¶67.

71. At the time of the training, Plaintiff did not own a motorcycle of his own.  Chief Abbott Affidavit at ¶68.

72. Plaintiff and Scott Rose were the two (2) officers whose requests for the Motorcycle Operation training were denied.  Chief Abbott Affidavit at ¶69; Plaintiff Deposition Vol. I at 237-40.

73. In and around June 2001, Chief Abbott approached Plaintiff and asked him if he would be interested in attending a Fingerprint Recovery training.  Plaintiff responded that he was and was subsequently sent to the training by Chief Abbott.  Abbott Affidavit at ¶70; Plaintiff Deposition Vol. II at 19-21.

74. In and around August 2001, Donald Bullock voluntarily resigned his sergeant position and was returned to the rank of patrol officer.  Abbott Affidavit at ¶71.

75. To fill the vacancy created by Bullock's resignation of rank, Chief Abbott recommended to the Board of Selectmen that it appoint the most senior patrol officer, Charles Sullivan,

to the position of Acting Sergeant which recommendation the Board voted to accept on or about September 4, 2001.  Abbott Affidavit at ¶72.

76. At the time of his appointment, Sullivan had been a permanent, full-time Freetown officer since July 1, 1980.  Abbott Affidavit at ¶73.

77. On or about July 15, 2002, Plaintiff filed a grievance with Chief Abbott pursuant to the terms of the collective bargaining agreement between the Town and the Union. Complaint Exhibit C.

78. In his grievance, Plaintiff asserted that the manner in which Chief Abbott was assigning overtime violated Article VIII, Sections 1A and 1E of the collective bargaining agreement.  Complaint Exhibit C.

79. On November 14, 2002, Chief Abbott issued Plaintiff a letter of commendation for his meritorious service in connection with his investigation of a stolen car ring.  Abbott Affidavit at ¶74; Exhibit 15.

80. In and around November 2002, Sgt. Lecuyer announced that he would be retiring thereby resulting in another sergeant vacancy.  As a result, Chief Abbott recommended to the Board that it appoint the most senior officer who was willing and able to accept the position of acting sergeant until such time as a permanent sergeant could be selected. Abbott Affidavit at ¶80.

81. At the time, Mark Rouke was the most senior officer but was out of work on injured on duty leave and, therefore, was not physically able to fill the position.  As a result, Chief Abbott approached the next most senior officer, Mark Bullock, but he indicated that he did not want the position because of the work schedule that accompanied the position. This made Donald Bullock the next most senior officer, but he was not interested in

returning to the sergeant position that he had previously resigned from. This left Elton Ashley as the next most senior officer. Abbott Affidavit at ¶76.

82. On November 18, 2002, the Board accepted the recommendation of Chief Abbott and appointed Ashley to the position of acting sergeant effective January 15, 2003. At the time of his appointment, Ashley had been a permanent, full-time Freetown officer since March 6, 1995. Abbott Affidavit at ¶77.

83. Before, during and after this period of time, the Town was in the process of discussing a new promotional procedure with the Union which was to include, among other things, a written examination component. Abbott Affidavit at ¶78.

84. On or about April 17, 2003, Chief Abbott received an anonymous written complaint from a citizen. Consistent with the Department's Internal Affairs policy, Chief Abbott completed a Complaint Control Form and forwarded the complaint to Lt. Sawicki for investigation. Chief Abbott Affidavit at 79; Exhibit 1 at 3, 10.

85. Pursuant to Lt. Sawicki's request, Plaintiff submitted a May 14, 2003 written response to the complaint. Abbott Affidavit at 80; Exhibit 16.

86. Based on Plaintiff's response, Lt. Sawicki recommended to Chief Abbott that no disciplinary action be taken against Plaintiff in response to the citizen's allegations, that Plaintiff be counseled regarding the "perception" by motorists that he is following too closely and that Plaintiff be counseled regarding the Department's IA policy and the state perjury statute. Abbott Affidavit at 81; Exhibit 17.

87. On June 9, 2003, the Department's newly negotiated promotional procedure, including the written examination requirement, was implemented. Abbott Affidavit at ¶82.

88. By memorandum dated June 12, 2003, Chief Abbott advised Plaintiff that the anonymous complaint was not sustained and that no disciplinary action would be taken. Chief Abbott instructed Plaintiff to give consideration to motorists' perceptions that he is following too closely and to familiarize himself with the Department's IA policy and the state perjury statute. Abbott Affidavit at ¶83; Exhibit 18.

89. On June 21, 2003, Plaintiff was struck by a motor vehicle while on duty which resulted in his suffering physical injuries and being placed on injured on duty leave pursuant to M.G.L. c. 41, §111F. Abbott Affidavit at ¶84.

90. On June 24, 2003, Chief Abbott sent an email to all officers, including Plaintiff, advising them that a copy of the announcement for the upcoming sergeant promotional exam had been placed in each of their Department mailboxes and that a copy had also been posted on the Union bulletin board. Abbott Affidavit at ¶85; Exhibit 19.

91. The announcement advised officers that the exam would be held on October 11, 2003 at 10:00am at the Freetown Senior Center, which is located next to the Police Station, and instructed interested officers to contact Lt. Sawicki if they intended to take the exam. Abbott Affidavit at ¶86; Exhibit 19.

92. On or about June 27, 2003, Plaintiff sent a letter to the Board of Selectmen in which he alleged that he was being retaliated against by Chief Abbott as a result of his having complained internally about officers in the Department who had claimed to be working paid details for White Mountain Cable at a point at which they were still on duty. Complaint Exhibit D.

93. By letter dated July 2, 2003, Chief Abbott ordered Plaintiff to report in writing no later than August 1, 2003 the names of the officers that he contends he complained internally

to, the date and time of the report, the manner in which the report was made and the essence of the report.  Abbott Affidavit at ¶88; Exhibit 20.

94. On July 20, 2003, the Boston Globe published a newspaper article entitled "Race, sex and age drive ticketing" with the subheading of "Minorities and men least likely to receive warnings."  Abbott Affidavit at ¶89; Exhibit 21.

95. In the article, the reporter identified an African-American motorist who contended that he had been issued a traffic citation and fine by a Freetown Police Officer for driving 40 MPH in a 35 MPH zone.  Exhibit 21 at 1, 7.

96. Upon investigating the matter, Chief Abbott learned that the officer who had issued the citation was Plaintiff and discovered that on the day in question, Plaintiff issued a total of six (6) citations.  The five (5) motorists whose race Plaintiff identified on the citation as being White received only warnings, while the lone African-American motorist – the one that was identified in the Globe article – received the only fine.  Abbott Affidavit at 91.

97. Based on this information, Chief Abbott issued Plaintiff a counseling letter on July 21, 2003 in which he instructed him to familiarize himself with the Department's Racial and Gender Profiling policy and Traffic Safety policy and encouraged him to modify his conduct so as to avoid any real or perceived allegations of racial or gender profiling in the future.  Abbott Affidavit at 92; Exhibit 22.

98. Under the Department's disciplinary policy, counseling letters are not considered to be disciplinary action, are not placed in an officer's personnel file and are not punitive in nature.  Instead, they are intended to help the officer improve on areas of his performance so as to avoid possible disciplinary action in the future.  Abbott Affidavit at ¶93.

99. In response to the instructions contained in the announcement for the October 11, 2003 promotional exam, Plaintiff sent an email to Lt. Sawicki on August 1, 2003 indicating that he wished to take the exam.  Abbott Affidavit at ¶94; Exhibit 23.

100.     On August 1, 2003, Plaintiff responded to Chief Abbott's July 2, 2003 order to him provide information regarding Plaintiff's White Mountain Cable detail allegations by stating that he had provided his attorney with proof of unlawful conduct regarding those details and that his attorney had advised him that the information would be produced to Town Counsel.  Abbott Affidavit at ¶95; Exhibit 24.

101.     On August 5, 2003, Chief Abbott reiterated his July 2, 2003 order to Plaintiff to provide the information he had requested.  Abbott Affidavit at ¶96; Exhibit 25.

102.     By letter dated August 7, 2003, Plaintiff advised Chief Abbott that the information the Chief had requested had been given to his attorney who would in turn produce it to Town Counsel.  He further advised Chief Abbott to direct all further communications on the matter to Plaintiff's attorney, Howard Fine.  Abbott Affidavit at ¶97; Exhibit 26.

103.     Contrary to his representations in his August 1 and 7, 2003 letters, neither Plaintiff nor his attorney ever produced the information Plaintiff referred to in his letters outside of the context of this litigation.  Abbott Affidavit at ¶98; Plaintiff Deposition Vol. II at 211-12.

104.     On October 11, 2003, the promotional exam was administered as scheduled. Three (3) of the officers who had previously sent emails to Lt. Sawicki indicating that they wished to take the exam appeared at the testing location and took the exam.  Plaintiff was not one of them.  Abbott Affidavit at ¶99; Plaintiff Deposition Vol. II at 88.

105.    At no time did Chief Abbott, Lt. Sawicki or any other Department officials advise Plaintiff verbally or in writing that he could not take the exam and, other than checking his Department mailbox the day before the exam, Plaintiff did not take any steps to determine if he would be allowed to take the exam.  Plaintiff Deposition Vol. II at 87-90.

106.    None of the officers who took the October 2003 exam achieved a passing score, so a second exam was scheduled for December 20, 2003.  Abbott Affidavit at ¶101.

107.    Plaintiff, who was out of work on injured on duty status at the time, but was in the process of returning to duty, was provided with a copy of the new exam announcement via memorandum from Chief Abbott dated October 16, 2003.  Abbott Affidavit at ¶102; Plaintiff Deposition Vol. II at 91-92, 94-95; Exhibit 27.

108.    Plaintiff never responded to the posting to signify a desire to take the exam.  Abbott Affidavit at ¶103; Plaintiff Deposition Vol. II at 92.

109.    Despite the fact that Plaintiff did not sign up for the exam by the November 1, 2003 deadline, he was advised in writing that he would nonetheless be permitted to take the exam.  Abbott Affidavit at ¶104; Plaintiff Deposition Vol. II at 98-101; Exhibit 28.

110.    Subsequently, Attorney Fine wrote to Chief Abbott and advised him that Plaintiff would be away on a non-refundable vacation when the exam was scheduled to take place and requested that the exam be rescheduled.  Abbott Affidavit at ¶105; Plaintiff Deposition Vol. II at 102-03; Exhibit 29.

111.    In an effort to accommodate Plaintiff, the December 20, 2003 was rescheduled by Chief Abbott to January 10, 2004.  Abbott Affidavit at ¶106.

112.     On December 4, 5 and 9, 2003, Chief Abbott notified Plaintiff and Attorney Fine in writing that the exam had been rescheduled to January 10, 2004. Abbott Affidavit at ¶107; Plaintiff Deposition Vol. II at 92; Exhibit 30.

113.     On December 29, 2003, an incident occurred between Lt. Sawicki and Plaintiff which resulted in Lt. Sawicki filing a written complaint with Chief Abbott for whatever action Chief Abbott deemed appropriate. Sawicki Affidavit at 10; Exhibit 31.

114.     After receiving Plaintiff's response to Lt. Sawicki's complaint, no further action was taken on the matter by Chief Abbott or the Board of Selectmen. Chief Abbott Affidavit at ¶109.

115.     On January 10, 2004, the aforementioned promotional exam was administered as scheduled, but Plaintiff never reported to the testing location to take the exam and did not advise anyone with the Department as to the reason why. Abbott Affidavit at ¶110; Plaintiff Deposition Vol. II at 110.

116.     The officer who received the highest score on the January 10, 2004 exam was Elton Ashley. Abbott Affidavit at ¶111.

117.     Following the completion of the formal promotional process, Elton Ashley was appointed by the Board of Selectmen to the rank of permanent sergeant effective March 22, 2004. Abbott Affidavit at ¶112.

118.     On July 15, 2004, Plaintiff sent Chief Abbott an email requesting approval to attend a multi-day Motorcycle Operation training that was scheduled to take place from July 19, 2004 through July 23, 2004. Abbott Affidavit at ¶113; Exhibit 31.

119.        As of the date of Plaintiff's email, Officer Ryan Perreira had already requested and received approval from Chief Abbott to attend the same training. Abbott Affidavit at ¶114; Exhibit 32.

120.        Due to the fact that Perreira had already been approved for the training and that Plaintiff's request was received only a few days before the training was take place and would require Chief Abbott to find someone to cover Plaintiff's shifts, Chief Abbott denied Plaintiff's request. Abbott Affidavit at ¶115.

121.        On September 21, 2004, Plaintiff reported for his shift eighteen (18) minutes late and was instructed by the officer in charge of the shift, Sgt. Steven Abbott, to advise him of the reason. Abbott Affidavit at 116; Exhibit 33.

122.        On September 22, 2004, Plaintiff advised Sgt. Abbott via email that he had overslept due to prescription medication that he was taking. Abbott Affidavit at 117; Exhibit 34.

123.        On September 27, 2004, Sgt. Steven Abbott issued Plaintiff a counseling notice for being tardy on September 21, 2004, citing prior incidents of tardiness in support of same. Complaint Exhibit L.

124.        After being advised of the reason Plaintiff had provided for being late, i.e. prescription medication, Chief Abbott, pursuant to Department Rule 13.9, emailed Plaintiff on September 22, 2004 and instructed him to provide him with information regarding the type of medication he was taking and the dosage by the end of his next shift. Abbott Affidavit at 119; Exhibit 35.

125.        Although he received the email, Plaintiff did not respond to the Chief in any way. Abbott Affidavit ¶120; Plaintiff Deposition Vol. I at 127-34.

126.    Receiving no response by the designated deadline, Chief Abbott emailed Plaintiff on September 27, 2004 and again directed him to provide the requested information. Abbott Affidavit at 121; Exhibit 36.

127.    Once again, Plaintiff received the email, but chose to ignore it.  Abbott Affidavit at ¶122; Plaintiff Deposition Vol. I at 127-34.

128.    In light of Plaintiff's failures to respond, Chief Abbott placed Plaintiff on paid administrative leave on October 8, 2004 and instructed him to report to the Chief's office on October 12, 2004.  Abbott Affidavit at 123; Plaintiff Deposition Vol. I at 127-34.

129.    After eventually receiving the information and reflecting on the steps he had to take to get it, Chief Abbott, on November 2, 2004, forwarded Town Counsel a draft set of insubordination charges that he wished to file against Plaintiff.  Abbott Affidavit at ¶125; Exhibit 37.

130.    On November 8, 2004, Chief Abbott forwarded a final version of the charges to the Board of Selectmen and requested that a hearing be held regarding same.  Plaintiff was also sent a copy of the charges.  Abbott Affidavit at ¶126; Exhibit 38.

131.    While the disciplinary charges were still pending, and after receiving confirmation from the Town physician that the medications Plaintiff was taking would not impair his abilities to perform his job safely, Chief Abbott advised Plaintiff that he was restoring him to active duty.  Chief Abbott Affidavit at ¶127.

132.    In response, Plaintiff advised Chief Abbott by letter dated November 12, 2004 that he was suffering from the ongoing effects of his June 21, 2003 work related accident, to wit, sleep deprivation and black outs, and that he did not feel he could safely perform his job duties as a result of same.  Plaintiff requested that Chief Abbott place him on

injured on duty leave pursuant to M.G.L. c. 41, §111F.  Abbott Affidavit at 128; Exhibit 39.

133.    On December 10, 2004, Chief Abbott ordered Plaintiff to undergo a psychological evaluation before Mark S. Schaefer, Ph.D. in connection with his request for injury leave benefits.  Abbott Affidavit at 129.

134.    Plaintiff was examined by Dr. Schaefer on December 21 and 28, 2004 who subsequently opined by report dated January 19, 2005 that Plaintiff was disabled from his duties as a police officer due to Post-Traumatic Stress Disorder type symptoms that Plaintiff was suffering from as a result of his June 21, 2003 work accident.  Abbott Affidavit at 130.

135.    Plaintiff was permitted to utilize his available sick leave while his injury leave request was pending.  Abbott Affidavit at 131.

136.    On January 26, 2005, Chief Abbott mailed Plaintiff and Attorney Fine a copy of a posting for a promotional exam that was to be given on May 7, 2005.  Abbott Affidavit at ¶132; Exhibit 40.

137.    Plaintiff never signed up for the exam or made any other efforts to take the exam. Abbott Affidavit at ¶133.

138.    After receiving Dr. Schaefer's report, Town Counsel forwarded a copy to Plaintiff's counsel by letter dated February 3, 2005 and requested that he contact him to discuss it.  Abbott Affidavit at 134; Exhibit 41.

139.    By letter dated February 17, 2005, Attorney Fair followed up with Attorney Fine further on the matter. Abbott Affidavit at 135; Exhibit 42.

140.    By letter dated March 1, 2005, Attorney Fine sent Attorney Fair a proposed memorandum of agreement concerning Plaintiff's pending request for injury leave benefits.  Abbott Affidavit at 136; Exhibit 43.

141.    Thereafter, the parties exchanged a number of offers and counteroffers on the matter a resolution of the matter was finally reached in June 2005, pursuant to which, Plaintiff was granted injury leave benefits retroactive to the date of his initial request, i.e. November 12, 2004, and continuing.  Abbott Affidavit at 137; Exhibit 44.  .

142.    After numerous requests for continuances by Plaintiff, a hearing was eventually held on September 19, 2005 at which Plaintiff did not dispute that he had ignored the Chief's email requests to him.  Chief Abbott Affidavit at ¶138.

143.    After taking the matter under advisement, the Board of Selectmen voted on October 3, 2005 to issue Plaintiff a written reprimand for insubordination as a result of his failure to respond in any way to Chief Abbott's emails.  Chief Abbott Affidavit at ¶139; Exhibit 45.

144.    On October 7, 2005, Attorney Fine provided Town Counsel with a note from Plaintiff's psychiatrist who in turn provided it to Chief Abbott.   The note from Plaintiff's psychiatrist stated that Plaintiff was able to return to his position as a police officer without restrictions with medication.  Chief Abbott Affidavit at ¶140.

145.    After verifying that the medications would not impair Plaintiff's ability to perform his job safely, Chief Abbott advised Plaintiff by letter dated November 7, 2005 that he was to report to duty effective November 21, 2005.  Chief Abbott Affidavit at ¶141.

146.    On or about November 18, 2005, Chief Abbott received a second note from the same psychiatrist which indicated that Plaintiff was not ready to return to work. Chief Abbott Affidavit at ¶142.

147.    Given the conflicting information that he had received, Chief Abbott referred Plaintiff back to Dr. Schaefer for a re-evaluation. Chief Abbott Affidavit at ¶143.

148.    In his January 9, 2006 report and his January 25, 2006 addendum thereto, Dr. Schaefer opined that Plaintiff continued to be disabled from his duties as a result of his June 2003 work accident. In his addendum, Dr. Schaefer stated that "it may be time to consider whether Officer Taylor should be evaluated for disability and retirement from the force." Chief Abbott Affidavit at ¶144.

149.    Based on Dr. Schaefer's suggestion, as well as the length of time Plaintiff had already been out of work, Chief Abbott filed an involuntary accidental disability retirement application concerning Plaintiff with the Bristol County Retirement Board by letter dated February 21, 2006. Chief Abbott Affidavit at ¶145.

150.    On or about April 6, 2006, Chief Abbott received a note from Plaintiff's psychiatrist which stated that Plaintiff was again fit for a return to duty. Abbott Affidavit at ¶146.

151.    After receiving confirmation of this following a further evaluation by Dr. Schaefer, Plaintiff was returned to active duty and Chief Abbott withdrew the involuntary retirement application he had filed. Abbott Affidavit at ¶147.

152.    In total, Plaintiff was out of work and received injury leave benefits from the Town as a result of his June 21, 2003 accident and the effects therefrom for a total of approximately thirty-two (32) months covering the following periods of time: June 21,

2003 – October 26, 2003, December 8, 2003 – June 17, 2004 and November 12, 2004 – August 7, 2006.  Abbott Affidavit at ¶148.

153.     Only one (1) of the twelve (12) Internal Affairs investigations that have been conducted since 1999 regarding Plaintiff has resulted in his being disciplined and that incident only recently occurred (October 2005) and involved his receiving a written reprimand.  As for the remaining investigations, eight (8) of them resulted in no action whatsoever being taken against Plaintiff and three (3) resulted only in his receiving a written letter of counseling.  Abbott Affidavit at ¶149.

154.     At no time relevant to this matter did Lt. Sawicki's duties make him responsible for promoting officers, assigning cruisers, approving training or granting the overtime in question in this case nor did he possess the authority to discipline officers.  Sawicki Affidavit at 11.

DEFENDANTS

By their attorneys,

/s/David C. Jenkins

/s/Joseph S. Fair
David C. Jenkins (BBO# 251000)
Joseph S. Fair (BBO# 637818)
Kopelman and Paige, P.C.
 Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02116
Dated:  November 15, 2006               (617) 556-0007

<u>CERTIFICATE OF SERVICE</u>

     This is to certify that on the date subscribed below I caused a copy of the foregoing document to be served through the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) and that non-registered participants, if any, were served with paper copies of said document.

Dated:  November 15, 2006               /s/ Joseph S. Fair

298284/60700/0503

26