UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
─────────────────────────────────)
                                  )
JON M. TAYLOR,                    )
         Plaintiff,               )
                                  )
         v.                       )  CIVIL ACTION NO. 03-12417
                                  )
TOWN OF FREETOWN, et al.,         )
            Defendants.           )
─────────────────────────────────)
```

**MEMORANDUM AND ORDER**

March 29, 2007

Saris, U.S.D.J.

## I. **INTRODUCTION**

Plaintiff Jon. M. Taylor alleges that Defendants the Town of Freetown ("the Town"); Carlton E. Abbott, the police chief; and Walter Sawicki, his supervisor, violated his First Amendment rights and state law by taking retaliatory actions against him for refusing to cover up, and then protesting, police corruption. Defendants have moved for summary judgment on the grounds that Plaintiff's speech was not protected, the claims are time-barred, and the evidence is insufficient. The record is extremely messy and complicated with at least six alleged protected acts and multiple acts of alleged retaliation. After hearing, and a review of the complex record, the motion is **ALLOWED**.

## II. **FACTS**

When all reasonable inferences have been drawn in the Plaintiff's favor, the record supports the following facts, many

of which are hotly disputed.

A.   <u>The Parties</u>

Plaintiff is a police officer in Freetown, Massachusetts with a graduate degree in criminal justice.  Freetown's police department is small, consisting of only 17 officers.  Taylor joined the Department in November 1988 as an Auxiliary Police Officer.  He was promoted to a Reserve Police Officer and then to a full-time officer on September 6, 1997.

Carlton E. Abbott, Jr., Esq. has been the Chief of Police and Taylor's supervisor since July 1998.  Since 1999, Abbott has had the authority to discipline subordinates.  Lieutenant Walter Sawicki is also Taylor's supervisor, and serves as the Internal Affairs ("IA") Officer who investigates complaints against the police.  The Board of Selectmen ("the Board") is the appointing authority for all Department personnel and possesses ultimate authority in hiring, firing, and promotional decisions.  The Board also serves as the Department's Police Commission, overseeing Abbott and his department.

B.   <u>The Cable Details</u>

In September 1998, Officer Elton Ashley approached Taylor, allegedly at the direction of Chief Abbott, and asked him whose side he was on: Abbott's or another group of officers'.  Ashley warned Taylor that if he was not loyal to Abbott, he would be "on the outside looking in."  Plaintiff responded that he was

politically neutral.  Later, Ashley approached Taylor with another officer and told him that Chief Abbott had sent them to ask if he would cover up the officers' falsification of time slips related to a detail worked for the White Mountain Cable Company.  (There is no admissible evidence Abbott actually said this.)  Taylor refused to participate.

Starting in 1998, Abbott commenced an investigation into "double-dipping," or working a paid detail while on duty, in relation to the cable detail.  As a result of this investigation, in early January 2000, Abbott presented Officer Ashley with a written offer of stipulated discipline in which he would admit to wrong-doing and receive six punishment days.  When the Union refused to approve this agreement, Abbott submitted formal disciplinary charges.  At a hearing before the Board on February 22, 2000, Ashley received two punishment days.

In February 2000, Chief Abbott also accused Taylor of involvement in the cable detail incident.  Taylor says that he was brought to the Chief's office, presented with a written offer of stipulated discipline, given a pen, and told to sign the papers.  Taylor denied the allegations and walked out.  Plaintiff claims Abbott attempted to intimidate and coerce him into signing the agreement and complained to his Sergeant about the matter.  Abbott never charged or disciplined Plaintiff.

C. <u>1999 Incidents</u>

In Plaintiff's view, while the investigation was pending, defendants retaliated against him in 1999 for refusing to participate in the cover-up by failing to promote him, giving him a bad shift assignment and refusing him training.

On February 19, 1999, Abbott sent a memorandum around to all existing supervisors asking them to provide the names of three officers they would recommend for promotion using specific criteria outlined in the memo.  On April 30, 1999, Abbott submitted to the Board the surveys so it could fill two sergeant vacancies.  Abbott's brother, Steven Abbott, was a candidate and, due to this conflict of interest, he made no recommendations.  On May 4, 1999, the Board promoted Steven Abbott and Michael Lecuyer to acting sergeants.  Abbott had been a permanent, full-time officer since 1988 and Lecuyer had been a full-time officer since April 1978.  Abbott and Lecuyer were made permanent sergeants on June 28, 1999.

That December, in anticipation of another sergeant position opening up, Abbott requested the Board appoint an acting sergeant with the knowledge that the position would likely be made permanent in the future.  Abbott again solicited input from Department supervisors, and recommended that Donald Bullock receive the position.  Ashley was the number two candidate.  On December 6, 1999, the Board appointed Bullock acting sergeant.  Bullock had been a permanent, full-time officer since August

1988.

In April 2000, the Board appointed Donald Bullock permanent sergeant based on his 1999 promotion to acting sergeant and consistent with Chief Abbott's recommendation.

Taylor also asserts that Abbott changed his shift in retaliation for his refusal to cover-up the double-dipping scandal.  Prior to June 2001, the Chief handled all shift assignments.  In November 1999, Taylor was assigned to the day shift.  Without Taylor's knowledge or approval, Abbott rescheduled Taylor's daytime shift to the graveyard (12 a.m. to 8 a.m.) shift to accommodate a junior officer.  In March 2001, a new shift assignment procedure was implemented where officers bid on desired shifts every twelve weeks.  Of the twelve bids submitted between July 2001 and December 2006, Taylor listed the graveyard shift as his first choice eleven times.

D. <u>Letters to the Board</u>

In response to Abbott's double-dipping investigation, Taylor sent several angry letters to the Board of Selectmen.  In the first letter sent to the Board on October 26, 2000, he requested a written copy of the complaints issued against him by Chief Abbott and demanded that a written letter signed by each Board member be placed in his personnel file indicating that Chief Abbott had falsely charged him.  The letter also recounted Taylor's interview with the Chief and the Chief's accusations

against him, and contained an allegation that Abbott had "deceived the Board of Selectmen" by presenting one of the officers involved in the scandal for promotion.  Taylor threatened to pursue the matter to "the next highest level of Justice" should the Board fail to comply with his requests.

In an October 31, 2000 letter, Abbott responded that no disciplinary action "was taken or is being taken" against Taylor, that there was "no active investigation ongoing" concerning him, and that "no disciplinary documentation concerning White Mountain exists or is contained in [his] personnel file."

Taylor sent another missive to the Board on November 22, 2000 stating that Abbott's letter "did not properly answer [his] request" because the letter "failed to acknowledge that a disciplinary letter initially existed," and Abbott "did not admit to asking [him] to sign a written complaint" or "admit to any wrongdoing."  Taylor also stated that he was "falsely accused of a crime," and that the Board "failed to have an investigation conducted by an outside agency."  He expressed concern that "physical evidence ha[d] disappeared," and that his "future advancement in this department [had been] threatened as a direct result of [his] previous request."

Plaintiff claims that in retaliation Abbott and the Board failed to promote him again when a new sergeant position opened up several months later in August 2001.  Deviating from his prior

procedure, Abbott recommended to the Board that the most senior
patrol officer, Officer Sullivan, be appointed sergeant.   The
Board promoted Officer Sullivan on September 4, 2001.   Sullivan
became a permanent, full-time officer on July 1, 1980, and was
more senior than Taylor.

   F. The Union Grievance

   On July 15, 2002, Taylor filed a union grievance with Chief
Abbott, complaining that Abbott did not adhere to a prior
established overtime assignment policy or with provisions of the
collective bargaining agreement.   He further informed the Chief
that the "matter [was] not only a violation of the (CBA) but
could be brought to the attention of the EEOC and the Mass State
Ethics Commission."

   Again, Taylor claimed he was retaliated against for filing
the grievance by being denied a promotion to a sergeant position.
In November 2002, when another position opened up, Abbott again
adopted a "most-senior" policy.   Officer Ashley received the
recommendation and was subsequently appointed acting Sergeant
effective January 2003.   Ashley became a permanent, full-time
officer on March 6, 1995 and was senior to Taylor.   On the other
hand, he had been disciplined as a result of Abbott's
investigation.

   I. Cruiser Control

   During their shift, police officers are assigned a cruiser

7

for their use.  Each cruiser is assigned to multiple officers for use over the three shifts and, at some point, reassigned among the officers.  During Abbott's tenure, a Cruiser Maintenance Supervisor was responsible for cruiser assignments.  It is disputed whether Abbott ever had responsibility over cruiser assignments.  Neither Chief Abbott nor Lt. Sawicki have ever served as Maintenance Supervisor.  Taylor alleges he was assigned to older, high mileage vehicles.

G. <u>More Problems</u>

On June 23, 2003, Taylor sent another letter to the Board stating that Abbott's accusation that Taylor falsified records "was the direct and immediate result of [his] initially complaining internally about the unlawful conduct of other officers in [his] department."  Taylor stated he had "experienced many other incidents of harassment and retaliation by Chief Abbott" since that period including but not limited to "being precluded from competing for career advancement opportunities -- such as the January 2003 promotion of Elton Ashley . . . being denied training and teaching opportunities, being forced to work late shifts, being . . . subjected to a hostile work environment" as well as other allegations.  Taylor also reiterated his suspicion that the Board failed to investigate his claims due to various conflicts of interest and urged it "to promptly investigate [his] original complaint of departmental misconduct."

8

On July 20, 2003, the Boston Globe published an article on racial profiling during traffic stops in which a motorist was interviewed regarding an incident with a Freetown police officer. (Bill Dedman, Speed Trap: Who gets a ticket, who gets a break? Boston Globe, July 20, 2003.)  Taylor issued the citation to the person interviewed by the Globe on the night in question. Despite Abbott's belief that Taylor had done nothing wrong, on July 24, 2003, Abbott ordered Taylor to review the Department's Racial and Gender Profiling policy and Traffic Safety policy.

On the same day, the Board discussed Taylor's June letter containing allegations of retaliation and determined there was nothing to substantiate Plaintiff's claims.

Additionally, sometime during the summer of 2003, Taylor states that a secretary in the Fall River Assistant District Attorney's office told Taylor that she overheard Lt. Sawicki tell an Assistant District Attorney ("ADA") that he had faked a work-related injury.  The secretary denies this.

H. A New Promotion Procedure

A new promotional procedure was instituted on June 9, 2003. The new procedure included a written exam, a personal recommendation from Abbott, and a Board interview.  A promotional exam was scheduled for October 11, 2003.  Taylor signed up to take the exam.  On October 11, 2003, three officers, not including Taylor, took the written sergeant's exam.  Taylor never

took the exam because his eligibility was never confirmed.

Because all the officers who took the October exam failed, another test was scheduled for December 20, 2003.  Taylor's attorney informed the Defendants that Taylor had a scheduling conflict and would like the exam to be rescheduled.  The letter also expressed concern regarding fairness since Taylor had been "repeatedly denied fair and legitimate opportunities to compete" for a sergeant position.  Abbott rescheduled the exam to January 10, 2004 and notified Taylor.  When the exam was administered, Taylor failed to appear.  Officer Ashley received the highest score on the exam and was promoted from acting sergeant to sergeant in March 2004.  Despite other opportunities, Plaintiff never registered for or took any promotional exam.

I. <u>Prescription Overdose</u>

On September 21, 2004, Taylor was late for his shift. Sergeant Abbott, the officer in charge, demanded an explanation. The next day Taylor emailed Sgt. Abbott stating that he had overslept due to prescription medication he was taking.  On September 22, Chief Abbott instructed Taylor, pursuant to Department Rule 13.9, to provide him with information regarding the type of medication Plaintiff was taking by end of shift. Taylor consulted with other officers and his union representative, who spoke to Abbott on Taylor's behalf.  On September 27, Sgt. Abbott issued Taylor a counseling notice for

being tardy.  Chief Abbott emailed Taylor a second time requesting information.  Again, union representatives spoke to Abbott.  Abbott placed Taylor on paid administrative leave on October 8, 2004.  Taylor finally produced a list of medications on October 26, 2003.

Abbott forwarded to Town Counsel a copy of draft disciplinary charges against Taylor on November 2, 2004.  Five days later, on November 7, 2004, Taylor told Chief Abbott that he was going to the FBI with information on the cable scandal.[1]  On November 8, 2004, Abbott filed formal disciplinary charges against Taylor.

While the charges were pending, Abbott restored Taylor to active duty.  Taylor sent Abbott a letter on November 12, 2004 requesting injured duty status because he felt he couldn't safely perform his job.  Due to this request, Abbott told Plaintiff to see Dr. Mark Schaefer for a psychological evaluation.  Dr. Schaefer reported that Taylor was disabled and suffering from Post Traumatic Stress Disorder ("PTSD")-type symptoms as a result of his work accident.  While Plaintiff's leave request was pending, Taylor was out on sick leave available under his collective bargaining agreement.  Initially, Taylor was not granted extended sick leave benefits that other officers have

---

[1] Taylor says he told Abbott that he would also report misconduct in connection with a School Resource Officer grant Abbott filed.

11

allegedly received in the past.  However, by June 2005, Taylor
was granted injury leave benefits retroactive to the date of his
initial request in November 2004.  On September 19, 2005, the
Board considered the insubordination charges against Taylor,
eventually issuing a written reprimand.

On October 7, 2005, Abbott received a note from Taylor's
psychiatrist stating that he could return to duty without
restrictions and he reinstated Taylor to active duty.  However,
on November 18, 2005, Abbott received a second note from Taylor's
psychiatrist stating he was not ready to return to work.  Chief
Abbott then referred Plaintiff to Dr. Schaefer for re-evaluation.

Dr. Schaefer reported that Taylor was still disabled and
should consider retirement.  On February 21, 2006, Abbott filed
an involuntary accidental disability retirement application for
Taylor.  Then, on April 6, 2006, Abbott received a note from
Taylor's psychiatrist stating he was fit for duty.  After
confirmation of his status, Abbott reinstated Taylor and withdrew
the retirement application.

### III. <u>SUMMARY JUDGMENT STANDARD</u>

"Summary judgment is appropriate when 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.'"  <u>Barbour v.</u>

Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting
Fed. R. Civ. P. 56(c)).  "To succeed [in a motion for summary
judgment], the moving party must show that there is an absence of
evidence to support the nonmoving party's position."  Rogers v.
Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp.
v. Catrett, 477 U.S. 317, 325 (1986).

        "Once the moving party has properly supported its motion for
summary judgment, the burden shifts to the non-moving party, who
'may not rest on mere allegations or denials of his pleading, but
must set forth specific facts showing there is a genuine issue
for trial.'"  Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 256 (1986)).  "There must be
'sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party.  If the evidence is merely
colorable or is not significantly probative, summary judgment may
be granted.'"  Rogers, 902 F.2d at 143 (quoting Anderson, 477
U.S. at 249-50) (citations and footnote in Anderson omitted).
The Court must "view the facts in the light most favorable to the
non-moving party, drawing all reasonable inferences in that
party's favor."  Barbour, 63 F.3d at 36.  In this case, all
inferences have been drawn for the Plaintiff.

IV. **DISCUSSION**

A. **§ 1983 Claims**

    **1. Statute of Limitations**[2]

Defendants first argue that Plaintiff's claims prior to December 1, 2000 are time-barred under the applicable three-year statute of limitations. See Poy v. Boutselis, 352 F.3d 479, 483 (1st Cir. 2003). Plaintiff asserts that claims prior to December 1, 2000 are timely under a continuing violation theory. See O'Connor v. City of Newark, 440 F.3d 125, 128 (3rd Cir. 2006); see also Centro Medico Del Turabo, Inc. v. de Melecio, 406 F.3d 1, 6-8 (1st Cir. 2005).

To prevail on a continuing violation theory, Plaintiff must reach back and establish a "substantial relationship" between the timely and untimely acts in order to recover for those prior acts. Sabree v. United Bd. of Carpenters and Joiners Local, 921 F.2d 396, 400-01 (1st Cir. 1990). Courts examine several factors to determine whether violations occurring before the time limitations are actionable, including:

> (1) did the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation?; (2) were the alleged acts reoccurring . . . or more in the nature of an isolated work assignment or employment decision?; and (3) did the act have the degree of permanence which should trigger an employee's awareness of the duty to assert his or her rights?

---

[2] The first complaint was filed on December 1, 2003. The First Amended Complaint was filed on March 23, 2004. The Second Amended Complaint was filed on January 13, 2005.

Smith v. Bath Iron Works Corp., 943 F.2d 164, 166 (1st Cir. 1991)
(citing Berry v. Bd. of Supervisors of L.S.U., 715 F.2d 971, 981
(5th Cir. 1983)).

With respect to the third prong, permanence is "basically an
inquiry into what the plaintiff knew or should have known at the
time of the discriminatory act." Id. "What matters is whether,
when and to what extent the plaintiff was on inquiry notice."
Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990). Thus if the
Plaintiff knew or should have known he was being retaliated
against, he had a duty to assert his rights or lose the
opportunity to bring a claim.

Defendant argues that because Taylor filed his claim on
December 1, 2003, the statute of limitations would bar all
alleged retaliatory actions before December 1, 2000. Plaintiff
claims four retaliatory actions in this time period due to his
refusal to participate in the cover-up: that he was not promoted
in April 1999 and December 1999; that he was denied a training
opportunity in October 1999; and that he received an unfavorable
shift assignment in November 1999. Defendants argue that each
failure to promote represents a discrete act which, under the
Sabree standard, should have triggered plaintiff's awareness of
his duty to assert his rights. See Amtrak v. Morgan, 536 U.S.
101, 114 (2002). Any claims of retaliation arising from the
failure to promote prior to December 2000 are discrete acts,

which are time-barred.

However, Plaintiff claims a pattern of petty harassment including refusal to approve training, imposition of unfair shift assignments, bad cruisers, and denial of benefits which are the kind of recurring, impermanent acts which survive under a continuing violation theory.

### 2. The First Amendment

Defendants argue that Plaintiff did not engage in speech that is protected under the First Amendment.  To prevail on a Section 1983 claim[3] alleging violations of the First Amendment, Plaintiff must establish that: "(1) his expression involved matters of public concern; (2) his interest in commenting upon those matters outweighed [his public employer's] interests in the efficient performance of its public services; and (3) his protected speech was a substantial or motivating factor in [his public employer's] adverse employment actions."  Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir. 2003) (internal citations omitted).  The first two prongs are questions of law "whereas the third prong is generally for the fact finder to decide."  Id. at 219.

If the plaintiff can satisfy these elements, the burden shifts to the defendant to show, by a preponderance of the

---

[3] Plaintiff also asserts a First Amendment claim under Article 16 of the Massachusetts Declaration of Rights, but does not press the claim in his brief.

16

evidence, that the plaintiff would have suffered similar treatment even in the absence of the protected speech.  Mullin v. Town of Fairhaven, 284 F.3d 31, 38 (1st Cir. 2002).

      a.  **Matters of Public Concern**

The Supreme Court has held that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record."  Connick v. Meyers, 461 U.S. 138, 147-48 (1983); see also Mullin, 284 F.3d at 38.  Speech implicates a matter of public concern if it can be "fairly considered as relating to any matter of political, social, or other concern to the community."  Connick, 461 U.S. at 146.  However, when a public employee speaks as an employee upon matters only of personal interest "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency."  Id. at 147.

Plaintiff alleges that he first engaged in protected speech in 1998 when Officers Ashley and Rose approached him in order to gain his help in covering up the cable scandal.  "Where a public employee speaks out on a topic which is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression."  Baron v. Suffolk County Sheriff's Dep't, 402 F.3d 225, 233 (1st Cir. 2005)

17

(citation omitted).  Refusal to engage in public corruption is related to a matter of inherent political concern to a community and is protected speech.  See Putnam v. Town of Saugus, 365 F. Supp. 2d 151, 169 (D. Mass. 2005).

Plaintiff also claims that he engaged in protected speech when he sent his October 2000 and November 2000 letters to the Board of Selectmen.  The primary objective of those letters, however, was not to inform the Board about the existence of corruption in the Department but was an attempt by Taylor to remedy a wrong he felt was perpetrated against him by Chief Abbott who was investigating him for the double dipping.

True, Taylor alleges that Abbott engaged in misconduct by deceiving the Board when he presented a "tainted" officer for promotion.  Ethical misconduct is a matter of public concern, but the inquiry does not stop there.  A court must also look to the form, content, and context of the communication.  The accusations of misconduct are couched within a communication primarily directed to remedy a personal situation.  As such, the October 2000 letter predominantly does not address matters of public concern and is not protected speech.

Plaintiff asserts that he also engaged in protected speech when he filed his grievance with Chief Abbott on July 15, 2002. In this grievance, Plaintiff complains of alleged violations of a collective bargaining agreement in assigning overtime, including

overtime for auxiliary training.  Plaintiff maintains that, since the origins of the grievance can be traced to the internal complaints about ongoing police corruption, the grievance is a matter that raises issues of public concern.  However, the July 2002 letter is Plaintiff's interpretation of a provision in a collective bargaining agreement regarding assignment of overtime. As an expression of disagreement regarding an internal personnel matter, the grievance is not a matter of public concern.  See Connick, 461 U.S. at 148-49.

Plaintiff's June 27, 2003 letter to the Board states that Chief Abbott falsely accused him of wrongdoing in direct retaliation for his complaints regarding unlawful conduct by other officers.  It also alleges that the Board as well as the union failed to act due to members' personal relationships with Defendants and others involved in the detail scandal.  While the letter's focus is on the alleged retaliatory treatment of Plaintiff, the retaliation directly resulted from an issue clearly touching upon a matter of public concern: police corruption.  See Putnam, 365 F. Supp. 2d at 169.

Alternatively, the Defendants argue that, even if Plaintiff's letter is determined to address a matter of public concern, it still is not protected by the First Amendment.  In Garcetti v. Ceballos, the Supreme Court recently held that "when public employees make statements pursuant to their official

duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." __ U.S. __, 126 S. Ct. 1951, 1960 (2006).  To demonstrate Plaintiff's duties, Defendants point to Rule 9.21 of the Rules and Regulations Manual of the Freetown Police Manual, which imposes a general obligation on all officers to report violations of departmental rules and policies and all other laws to their superior officers.

Defendants' view of <u>Garcetti</u> would eliminate First Amendment protection whenever an employee speaks out regarding widespread matters of public concern because he had an obligation under the rules to tell his superior of any rule infractions.  Taylor, who was not a supervisor, lacks broad official responsibilities for ensuring that other officers are not engaged in misconduct. <u>Garcetti</u> is not meant to strip an employee of First Amendment protection when speaking out regarding issues of serious and widespread public concern, like corruption, just because a garden-variety rule requires him to tell a supervisor.  <u>See</u> <u>id.</u> at 1961.  Taylor's June 2003 letter to the board is not subject to <u>Garcetti</u>'s "official duty" exception.

### b. **Balancing Plaintiff's and Town's Interests**

In <u>Pickering v. Board of Education</u>, the Court held that there must be a balance between the "interests of the [plaintiff], as a citizen, in commenting upon matters of public

concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. 563, 568 (1968). The Defendants do not address this analysis. The public's interest in disclosing police corruption outweighs the police department's interest in efficiency. See Guilloty Perez v. Pierluisi, 339 F.3d 43, 53 (1st Cir. 2003).

### c. Causal Relationship between Protected Speech and Retaliation

As to the final element, the Plaintiff must produce sufficient evidence to show a causal relationship between his protected speech and the alleged retaliatory acts. In doing so, Taylor must demonstrate that the protected activity "was a substantial or motivating factor in the adverse employment action." Putnam, 365 F. Supp. 2d at 171 (citing Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004)).

### i.  Failure to Promote

Plaintiff argues that defendant failed to promote him on numerous occasions in retaliation for his protected speech. The first promotion arose in August 2001. Plaintiff points out that Chief Abbott deviated from his prior procedure and recommended that the Board appoint the most senior patrol officer as acting sergeant. The Board appointed Officer Charles Sullivan to the post of acting sergeant. The record reflects that Officer Sullivan was a permanent, full-time officer since 1980, seventeen

years longer than the Plaintiff.  There is no evidence he was
unqualified, or that Sullivan was picked over Taylor to punish
Taylor for his speech.  Indeed, there is no evidence that Abbott
even knew that Plaintiff refused to engage in double-dipping, the
only protected speech that occurred prior to this selection.

When a temporary sergeant position opened up in January
2003, Chief Abbott again followed his "most-senior" policy and
suggested that the Board appoint Elton Ashley acting sergeant.
Ashley held two-and-a-half more years of service than Plaintiff.
There is certainly a disputed fact question as to whether Officer
Ashley was qualified in light of his prior record of misconduct.
The problem is that Plaintiff's protected speech was five years
earlier.  Taylor's only protected activity prior to this event
was the 1998 conversation in which Plaintiff refused to engage in
the cover-up.  Again, there is no admissible evidence that Chief
Abbott was aware of this exchange or was himself involved in the
corruption, and as such, no evidence to show that Taylor's
protected speech in 1998 was a substantial or motivating factor
in denying these promotions, or to show an improper motive on
Chief Abbott's part.

Subsequent to Ashley's appointment as acting Sergeant in
January 2003, the Department implemented a new promotional
procedure which required officers to take a written examination.
Throughout the period this procedure was in place, Plaintiff

failed to take the exam and therefore has not been considered for promotion.  Based on this record, Plaintiff cannot demonstrate that his protected speech was a substantial factor in his failure to win promotion either in January 2003 or on subsequent dates.

### ii.  Assignment to Unsafe Cruisers

Plaintiff urges the court to find that Defendants acted with retaliatory intent when Plaintiff was assigned older, high mileage vehicles while supervisors were assigned to other vehicles.  However, Taylor presents no evidence to show that the Defendants controlled or influenced the cruiser assignment process in any way or that, prior to his June 2003 letter to the Board, the Defendants were aware that Plaintiff had engaged in protected conduct.  Based on this record, Taylor cannot demonstrate that his protected speech was a substantial or motivating factor in his cruiser assignments.

### iii. Denial of Training Opportunities

Taylor asserts he was denied training opportunities in retaliation for his alleged protected activities.  The first denied training opportunity occurred in October 1999, when Abbott turned down Taylor's request to attend a "Train the Trainer" course at a local community college.  This was a year after the refusal to assist in the cover up.  Again, there is no evidence at this point that Abbott knew of the cover up.  Accordingly, there is no evidence of improper motive.

In July 2004, Plaintiff requested permission to attend a
motorcycle training course.  Defendants introduced evidence that
Chief Abbott denied Plaintiff's request to attend the training
because of to the lateness of the request (the request was
submitted three days prior to the training), the prior approval
of another more junior officer, and Abbott's belief that
Plaintiff did not own a motorcycle.  Taylor offers no evidence to
indicate that the denial of training was impermissibly motivated.
Moreover, there is no evidence that denial of motorcycle training
affected his employment status in any way, for example affecting
promotion or pay opportunities.  See <u>Burlington Northern & Santa</u>
<u>Fe Ry. v. White</u>, __ U.S. __, 126 S. Ct. 2405, 2415-16 (2006)
(suggesting that for a denial of training opportunities to be
actionable as a materially adverse employment action, the
training must contribute "significantly to the employee's
professional advancement").  Moreover, while Taylor was denied
some training opportunities, he received others.  Taylor fails to
show that denial of any training amounted to an adverse
employment action.

**iv.  Unfavorable Shift Assignments**

Taylor claims that the Defendants unlawfully retaliated
against him by assigning him to unfavorable shifts.  The record
reflects one instance where Taylor's shift was altered without
his knowledge.  Moreover, since shift-bidding was implemented in

June 2001, Plaintiff has bid consistently for the graveyard shift as his first choice.  While his reasons for bidding on the graveyard shift may have been due to a desire to avoid interactions with Sawicki and Abbott, the record cannot support Taylor's contention that his shift assignments were due to retaliation on the part of the defendants when Taylor requested the shifts in question.

Taylor has also failed to demonstrate, as he must, that the lone shift change in November 1999 constituted a materially adverse employment action.  See Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005).  While Taylor may have preferred working a day shift, there is no objective evidence that demonstrates he was materially disadvantaged.  See Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996).  The November 1999 shift change does not rise to the level of an adverse employment action.

**v.  Denial of Overtime Opportunities**

Plaintiff contends that Defendants retaliated against him by not allowing him to train auxiliary police officers.  The record on this claim is a mess.  It appears that Department policy regarding training of auxiliary officers has evolved since 1998. Plaintiff has various certifications, but the record shows that Plaintiff never requested specific assignments to teach

25

auxiliaries in a given subject.  Also, the record shows that
Plaintiff's certifications consist mainly of infrared breath test
and traffic radar certifications.  He possesses completion of
training certificates in Police Policies and Procedures and Basic
Fingerprint Recovery, but it is unclear whether those documents
reflect teaching certifications.  The auxiliary ride-along policy
changed after Plaintiff engaged in protected speech and filed
this lawsuit.  Taylor presents no evidence that once a new
auxiliary training program was in place, he made any effort to
receive status as a field training officer.  Without further
evidence in this tangled corner of the case, Taylor cannot show a
genuine issue of material fact that he was denied overtime
opportunities as a result of his protected speech.

### vi.  Maligning Plaintiff's Reputation or Character

Plaintiff alleges that due to investigations regarding a
racial profiling complaint and false statements allegedly made by
Lt. Sawicki his reputation has been damaged.

The actions taken by Chief Abbott in response to the racial
profiling complaint were in accordance with his duties as Chief.
It was only upon investigation that Chief Abbott discovered that
Plaintiff issued the citation in question.  There is no evidence
that Abbott's investigation into the racial profiling accusation
against a Freetown officer was improperly motivated.

Next, Plaintiff contends that Lt. Sawicki never made comments accusing Plaintiff of faking his work injury.  As sole evidence of this exchange, Plaintiff submits an affidavit from himself and his wife regarding a conversation they had with Diane Saunders.  However, Taylor presents no admissible non-hearsay evidence that Lt. Sawicki ever made the comments.  Plaintiff has not presented evidence to support a disputed question of fact.

### vii. IA Investigations, Letters of Counseling & Written Reprimand

Plaintiff claims that an IA complaint filed by Sawicki in December of 2003 was a retaliatory, adverse employment action. Sawicki filed this complaint after an altercation that occurred between Taylor and himself and shortly after filing the complaint in this action.  Taylor concedes that this altercation occurred, but objects to Sawicki's characterization of his demeanor during the incident.  No action was taken against the Plaintiff as a result of this complaint and, as such, it cannot be deemed to be an act of retaliation.

The next allegedly retaliatory action taken against Plaintiff occurred in September 2004 when Taylor was issued a counseling notice for being tardy.  This claim is waived because it was not asserted in the complaint.  (In any event, the counseling notice was not issued by either of the defendants, but by Stephen Abbott.)

The third IA action taken against Taylor was in connection to Taylor's failure to respond to the Chief's emails regarding medication Plaintiff was taking in November 2004.  The claim relating to this action is also not alleged in the complaint, and not properly before the Court.  When Plaintiff failed to respond after multiple requests, the Chief filed formal disciplinary charges against Plaintiff with the Board.  While the formal charges were filed shortly after Plaintiff's threat to go to the F.B.I. about the alleged concealment of the White Mountain payroll scam and the alleged falsification of information on a grant application, the Chief had already, <u>five days before that threat</u>, submitted draft charges to the Town Counsel.  As such, even if the merits of the claim were to be considered, the Chief's disciplinary charges against Taylor cannot be considered retaliatory.

### viii. Injury Leave Request

Plaintiff also claims retaliation because Abbott refused to grant him extended sick leave benefits in response to his injury leave request on November 12, 2004.  This claim is not asserted in the complaint.[4]

---

[4] Even if it was fairly pleaded, it is unavailing.  Taylor points the Court to evidence in the record that other officers were granted such benefits.  (Pl. Ex. 33.)  However, the two documents contained in the exhibit are a settlement agreement and an attendance record from some point in time.  As a condition of the settlement agreement, an officer was granted extended leave

28

Because Taylor has failed to present sufficient evidence of retaliation, summary judgment is **ALLOWED** as to Counts I - IV of Plaintiff's second amended complaint, alleging violations of 42 U.S.C. § 1983 and violations of Article 16 of the Massachusetts Declaration of Rights and the Massachusetts Civil Rights Act, Mass. Gen. Laws c. 12 §§ 11H & 11I.

## B. **Massachusetts Whistleblower Statute Claim**

To succeed on his Massachusetts Whistleblower claim, Plaintiff must show that: (1) he disclosed an activity, policy, or practice of the employer that he reasonably believed to be in violation of a law, rule, or regulation; (2) his disclosure played a substantial or motivating part in the retaliatory action; and (3) the retaliatory action caused him damages. See Larch v. Mansfield Mun. Elec., 272 F.3d 63, 67 (1st Cir. 2001); see also Mass. Gen. Laws ch. 149, § 185(b)(1).

As discussed above, Plaintiff has not demonstrated that any retaliatory actions were taken against him subsequent to his letter to the Board or that the disclosure was a substantial or motivating part in any adverse employment actions. Accordingly, Defendant's motion for summary judgment as to Count V is **ALLOWED**.

---

benefits almost a year after his request for injured duty status. Taylor points to no other history of grants of extended leave benefits. Taylor ultimately received benefits after a period of negotiation and an eventual settlement agreement.

C. **Tortious Interference Claims**

In order to succeed on his tortious interference claim, Plaintiff must show that (1) he had a contract with third party; (2) the defendant knowingly induced the third party to break the contract; (3) the defendant's interference was intentional and by improper motive or means; and (4) he was harmed.  Wright v. Shriner's Hosp., 412 Mass. 469, 476 (Mass. 1992).  The Massachusetts Supreme Judicial Court has emphasized that to establish tortious interference something more than intentional interference must be established.  United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816 (Mass. 1990.)  Further, the Supreme Judicial Court has held that, in the context of employment relationships, a supervisor has a right to act as he sees fit "unless he did so 'malevolently, i.e., for a spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" Wright, 412 Mass. at 476 (citation omitted).

As evidence of intentional, malicious, or improper interference on the part of the Defendants, Taylor points the court generally to his arguments regarding the adverse employment actions he suffered allegedly as a result of retaliation. "Where, as here, the claim is against an individual official of the employer, the 'controlling factor' in the alleged interference must rise to the level of 'actual malice,'" that is, the interference must result from "a spiteful, malignant purpose,

unrelated to the legitimate corporate interest." <u>Martin-Kirkland</u>, 2006 WL 1110371, at *5.  Plaintiff has not introduced evidence to support a claim of actual malice on the part of the Defendants unrelated to the interests of the police department. Accordingly, Defendants motion for summary judgment on Count VI is **<u>ALLOWED</u>**.

## D. **<u>Defamation Claim</u>**

"To withstand a motion for summary judgment for defamation, a plaintiff must show that: (a) [t]he defendant made a statement, concerning the plaintiff, to a third party; (b) the statement could damage the plaintiff's reputation in the community; (c) the defendant was at fault in making the statement; and (d) the statement either caused the plaintiff economic loss" or is actionable without proof of economic loss.  <u>Ravnikar v. Bogojavlensky</u>, 438 Mass. 627, 629-630 (Mass. 2003).  As a matter of law, only statements of libel, statements charging plaintiff with a crime, statements alleging certain diseases, and statements that may prejudice plaintiff's business or profession are actionable without economic loss.  <u>Id.</u> at 630.

As a threshold issue, a court must decide as a question of law whether the statement is "reasonably susceptible of a defamatory meaning." <u>Foley v. Lowell Sun Publishing Co.</u>, 404 Mass. 9, 11 (Mass. 1989).  This inquiry requires a court to view

the statement in "its totality in the context in which it was uttered or published."  Id. (citation omitted).  There are two statements at issue under this claim.  The first involves Lt. Sawicki's alleged comments to an ADA.  However, there is no admissible evidence to support plaintiff's allegations that the statements were made.

The second allegation of defamatory conduct involves an internal affairs investigation against Plaintiff.[5]  This investigation involves Lt. Sawicki's December 2003 complaint to Chief Abbott.  Taylor's objection stems from certain characterizations that Lt. Sawicki makes, specifically that Taylor spoke in a "gruff and rising voice," acted in an "aggressive manner," and "appeared flushed and displayed a hostile look."  He disputes Lt. Sawicki's statements that his actions were meant to intimidate and, in Sawicki's opinion, were insubordinate.  In his deposition, Taylor did not testify that the events or statements cited in Sawicki's complaint were false. While he testified that some of the statements and actions alleged by Sawicki would be "out of character" for him, he could not say with any certainty that he did not speak or act in the

---

[5] Another investigation mentioned by plaintiff stemmed from an anonymous citizen complaint regarding Taylor received by Chief Abbott in April 2003.  Sawicki, in his report, suggested Taylor may have been insubordinate by stating that Chief Abbott falsified data and perjured himself.  This claim is not in the complaint and will not be addressed.

manner described in the complaint.  (See, e.g., Taylor Dep. Tr. Vol. II: 238-264; Vol. III: 1-19).

The distinction between fact and opinion is often hard to draw.  Moreover, opinions can be quite hurtful.  Nonetheless, because Sawicki's statements about Taylor's demeanor as "aggressive" or "hostile" are based on disclosed, non-disputed events, the complaint cannot be considered defamatory.  See Yoke v. Nugent, 321 F.3d 35, 42 (1st Cir. 2003) (explaining that an "'expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified or unreasonable the opinion may be or how derogatory it is'" quoting Lyons v. Globe Newspaper Co., 415 Mass. 258, 266 (1993)).

Based on the foregoing, Defendant's motion for summary judgment as to Count VII is **ALLOWED**.

### **V. ORDER**

After hearing, review of the briefs, and review of the extensive and complicated record, the Court **ALLOWS** Defendant's motion for summary judgment (Docket No. 73).

 **S/PATTI B. SARIS**
                    United States District Judge